UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

               - against-

JIA HOU, *et al.*,

                   Defendants.

-------------------------------------------------------------------- X

                 S1 12 Cr. 153 (RJS)

## REPLY MEMORANDUM OF LAW OF JIA (JENNY) HOU
## IN SUPPORT OF HER PRE-TRIAL MOTIONS

October 22, 2012

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Sheryl E. Reich
Renato C. Stabile
148 East 78th Street
New York, N.Y. 10075
(212) 737-0400
(212) 988-6192
lefcourt@lefcourtlaw.com
*Attorneys for Jenny Hou*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

POINT ONE

THE COURT SHOULD SUPPRESS THE E-MAILS UNLAWFULLY SEIZED
FROM MS. HOU'S GOOGLE E-MAIL ACCOUNT ..................................................1

    A. The Government Intentionally Concealed The Identity of Straw Donor-3
       As Pan's Brother.................................................................................................2

    B. Pan's Statement That He Did Not Know Whether Ms. Hou Understood What
       He Meant When Pan Said It Was "Richard's Event" Was Material To The
       Probable Cause Determination Because It Was Relevant To Evaluating
       Ms. Hou's Conduct and Awareness of the Fraudulent Scheme .........................6

    C. The Government's Failure to Disclose That It Had Issued Grand Jury
       Subpoenas for the Same Documents Shows Bad Faith .......................................8

    D. Since The Government Has Now "Seized" 1,900 Emails, The Court Should
       Order The Government To Destroy Or To Return To Ms. Hou All Emails That
       Were Not Seized ...............................................................................................10

POINT TWO

THE COURT SHOULD SEVER THE DEFENDANTS TO ASSURE THAT
MS. HOU WILL BE ABLE TO PRESENT CRITICAL EXCULPATORY
EVIDENCE NEEDED TO MEET THE CHARGES AGAINST HER .......................11

The Evidence is Highly Favorable and Not Subject to Significant Cross-Examination ..............11

A Severance Will Assure Mr. Pan's Testimony .........................................................14

A Severance Will Not Require Significant Additional Judicial Resources...................................14

CONCLUSION.......................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Groh v. Ramirez,*
   540 U.S. 551 (2004)..................................................................................................2, 9

*Illinois v. Gates,*
   462 U.S. 213 (1983)........................................................................................................3

*Kyllo v. United States,*
   533 U.S. 27 (2001)..........................................................................................................9

*McDonald v. United States,*
   335 U.S. 451 (1948)........................................................................................................1

*Olmstead v. United States,*
   277 U.S. 438 (1928)........................................................................................................9

*United States v. Bailey,*
   607 F.2d 237 (9th Cir. 1979) .........................................................................................9

*United States v. Doane,*
   2009 U.S. Dist. LEXIS 61908 (S.D.N.Y. 2009)........................................................10

*United States v. Falso,*
   544 F.3d 110 (2d Cir. 2008)...........................................................................................4

*United States v. Freedman,*
   317 Fed. Appx. 22 (2d Cir. 2008) ...............................................................................14

*United States v. Hendrickson,*
   26 F.3d 321 (2d Cir. 1994).............................................................................................5

*United States v. Jackson,*
   2005 U.S. Dist. LEXIS 27793 (S.D.N.Y. 2005)........................................................14

*United States v. Jones,*
   132 S. Ct. 945 (2012).....................................................................................................9

*United States v. Karo,*
   468 U.S. 705 (1984)........................................................................................................9

*United States v. Vaughn,*
   430 F.3d 518 (2d Cir. 2005)...........................................................................................7

*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010) ................................................................................................9

*Warshak v. United States,*
   490 F.3d 455 (6th Cir. 2007), *rev'd on other grounds,* 532 F.3d 521 (6th Cir.
   2008). ..................................................................................................................................10

*Wong Sun v. United States,*
   371 U.S. 471 (1963) ............................................................................................................1

**STATUTES**

18 U.S.C. § 2518(1)(c) .............................................................................................................8, 9

18 U.S.C. §2518(5) ....................................................................................................................10

Jia (Jenny) Hou submits this reply to the government's October 10, 2012 Memo-
randum of Law in Opposition to her pretrial motions ("Gov't Br.").

## POINT ONE

### THE COURT SHOULD SUPPRESS THE E-MAILS
### UNLAWFULLY SEIZED FROM MS. HOU'S GOOGLE E-MAIL ACCOUNT

The government dismisses the significance of the information it omitted from the

November 17, 2011, email search warrant application (Amended Declaration of Gerald

B. Lefcourt, dated September 10, 2012 [Dkt #50] ("Lef. Decl.") Ex. I).[1] That information

included: (i) the identity of Straw Donor-3 as co-defendant Oliver Pan's brother; (ii) the

exculpatory information provided to the government by Pan; and (iii) the existence of

outstanding grand jury subpoenas for the exact same records.

The government's failure to include all material facts unconstitutionally eliminat-

ed the role of a neutral and detached magistrate in the warrant process.  As the Supreme

Court has reminded us, "the Fourth Amendment has interposed a magistrate between the

citizen and the police....so that an objective mind might weigh the need to invade [the

searchee's] privacy in order to enforce the law." *McDonald v. United States*, 335 U.S.

451, 455 (1948)]. As the Supreme Court more recently explained,

> The point of the Fourth Amendment . . . is not that it denies law enforce-
> ment the support of the usual inferences which reasonable men draw from
> evidence. Its protection consists in requiring that those inferences be
> drawn by a neutral and detached magistrate instead of being judged by the

---

[1] Subsequent to the filing of Ms. Hou's motion the government produced a February 17,
2012, search warrant application to Google that sought and obtained the same materials
sought by the first warrant.  Since the facts set forth in the latter application are almost
entirely based on the fruits of the first search, suppression of the emails obtained via the
latter warrant would be required if the first warrant is found wanting. *See Wong Sun v.
United States*, 371 U.S. 471 (1963).

officer engaged in the often competitive enterprise of ferreting out crime.

*Groh v. Ramirez*, 540 U.S. 551, 575 (2004) (*quoting Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (footnotes omitted)). Clearly, the Fourth Amendment requires the magistrate to draw inferences from the facts, not the government, and that can only be done if the magistrate is presented with the appropriate information.

Here, the government asked the Magistrate Judge to conclude that Ms. Hou's email communications with Mr. Pan about Straw Donor-3's donation "shows that Hou is aware of Pan's role in the fraudulent scheme" (Lef. Decl. Ex. I, ¶13). Ms. Hou, of course, was the campaign treasurer and it was her *job* to follow up on campaign donations, so there was nothing inherently unusual, let alone unlawful, in Ms. Hou's email communications with Pan. But the government presented the Magistrate Judge with just a limited number of facts with which to determine objectively Ms. Hou's "awareness" of the fraudulent scheme. Had all of the material facts been included, the sinister gloss placed by the government on the limited facts in the search warrant application would have been substantially, if not entirely, erased. The Magistrate Judge is likely to have reached a different conclusion of Ms. Hou's "awareness" of the fraudulent scheme had her actions been placed in the proper context and the nexus between Ms. Hou's emails and that which the government claimed was evidence of a crime would have been eliminated.

## A. The Government Intentionally Concealed The Identity of Straw Donor-3 As Pan's Brother

The government contends that it "never attempted to hide [the identity of Straw Donor-3] from the Magistrate Judge" (Gov't Br. 26). According to the government, that information was not "hidden" because Pan's Criminal Complaint, incorporated by refer-

2

ence into the search warrant application, alleged that "Pan recruited at least two straw donors whose last names were the exact same as his own".

The government does not explain how the Magistrate Judge was supposed to make the leap in logic that Straw Donor-3 was Pan's brother from "at least two other straw donors" shared Pan's last name. If anything, by *not* identifying Straw Donor-3 as Pan's brother, the more likely inference was that Straw Donor-3 was *not* one of the two straw donors who shared Pan's last name, not the other way around.[2]

Second, the government argues that the Court should overlook this omission because "it is not at all clear that the Government could have alleged that Hou knew that Pan and Pun were brothers" (Gov't Br. 27). Obviously, the government could not include facts of which it was not aware. But what the government knew or did not know about Ms. Hou's knowledge is not the test of whether the Magistrate Judge should have been told the identity of Straw Donor-3 when assessing the warrant application.

Search warrants are based on "probabilities" and "inferences". *See Illinois v. Gates*, 462 U.S. 213, 231 (1983) ("In dealing with probable cause, . . . as the very name implies, we deal with probabilities"). The issue is therefore not what Ms. Hou knew but

---

[2] To the extent that the government insinuates that it might not have known that Straw Donor-3 was Pan's brother the government is being too cute by half. The government unquestionably knew that Straw Donor-3 was Pan's brother since (1) on November 7, 2011, the government noted that Pan told the government that "Pan has not heard back from Jenny Hou since he emailed her. Pan advised that he spoke with his brother who advised him that the $800.00 check was cashed by the Liu campaign" (FBI 302 (Lef. Decl. Ex. B, bates 24)); (2) on the recording of the August 17 fundraising event, while discussing the donation forms, Pan is overheard twice telling the undercover "he's my brother" (bates 225); and (3) the government obtained the emails between Ms. Hou and Pan pertaining to Straw Donor-3 from Pan himself, while he was attempting to cooperate.

If the government did not by then know Straw Donor-3's relationship to Pan, it certainly could have asked Pan. And if the government did not avail itself of its access to Pan, it should not be permitted to insulate itself based on its own willful blindness.

whether a neutral and detached magistrate evaluating all of the facts might draw a different inference about the purpose of Ms. Hou's contact with Pan. The Magistrate Judge was entitled to consider Ms. Hou's alleged awareness of the criminal scheme in light of the fact that the donor about whom Ms. Hou was inquiring was Pan's (and not the undercover agent's) brother and therefore Pan was the obvious conduit to the donor.

Third, the government argues that if Ms. Hou knew that Straw Donor-3 was Pan's brother, "the inclusion of that fact would only have strengthened the probable cause to issue the Warrant" because Pan told Ms. Hou at the August 17 fundraising event that the straw donors were "all [the Undercover's] friends and relatives" (Gov't Br. 27).

Tellingly, this statement, allegedly made to Ms. Hou, [3] was not contained in the search warrant application. So while the government may now wish to rewrite the search warrant application to include this additional fact, the Court must assess the warrant on its face, not on what the government might have included had it to do over again. *United States v. Falso*, 544 F.3d 110, 121 (2d Cir. 2008) ("All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath") (*quoting United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006).

Finally, in a footnote, the government argues that "[i]t is nothing but a distraction for Hou to point out that Pun's New Jersey residence would have made him ineligible for matching funds." (Gov't Br. 28 n.18). Indeed, not only was Pun's campaign donation

---

[3] We have carefully reviewed the video of the August 17 event where this statement was made. While the statement was clearly made, Ms. Hou is not visible and no response is heard from her. Thus, it is not evident she heard the statement. In any case, the statement is of a piece with "this is Richard's event" – a vague attempt to bestow credit on Kong, though there is no evidence that anyone in the campaign knew on what basis credit was being assigned.

ineligible for New York City matching funds, but **9 of the 19 donations were ineligible for New York City matching funds (including Pan's and Kong's)** – another fact omitted by the government in the search warrant application.  It is reasonable to conclude that the Magistrate Judge might well have asked what is going on here if the point of the exercise, according to the government, is to obtain matching funds and half of these straw donations could not further that goal.  And indeed, that is why Ms. Hou's statement to the undercover agent that she was "not sure" whether the donations were eligible for New York City matching funds was also relevant. *See* Hou Opening Br. 15.

Certainly, we agree with the government that an inept, bungled, or even impossible criminal scheme does not confer immunity on a defendant.  However, whether or not the goals of the scheme are attainable is certainly relevant to a defendant's state of mind and the inferences that can reasonably be drawn from the defendant's conduct.  This is especially true where, as here, the most reasonable inference is that Ms. Hou, as campaign treasurer, knew that funds from out of state donors were ineligible for matching funds. *See United States v. Hendrickson*, 26 F.3d 321, 337 (2d Cir. 1994) (noting that, in a narcotics conspiracy case, defendants' actual ability to carry out the crime was "highly relevant" to determining whether they agreed to do so).

In sum, since the government asked the Magistrate Judge to draw inferences about Ms. Hou's "awareness" of Pan's role in the fraudulent scheme when she emailed Pan about Straw Donor-3, the government should have presented all of the information it had available that would have permitted the Magistrate Judge to draw his own inferences about Ms. Hou's awareness in the context of all of the material information – not just the single inference urged by the government, based on a selective presentation of the facts.

**B. Pan's Statement That He Did Not Know Whether Ms. Hou Understood What He Meant When Pan Said It Was "Richard's Event" Was Material To The Probable Cause Determination Because It Was Relevant To Evaluating Ms. Hou's Conduct and Awareness of the Fraudulent Scheme**

The government characterizes Pan's statements to the government during the period when he was attempting to cooperate as "self-serving" because he was "downplaying" his criminal conduct, took a path of "minimization and denial," and repeatedly referred to his criminal offense as a mere "mistake" (Gov't Br. 29). Therefore, the government argues, Pan had an incentive also to minimize the criminal conduct of ranking campaign officials, such as Ms. Hou, and that it is "far from clear" that Pan was being honest with the government during his interviews. (*Id.*).

We are not sure which FBI 302s the government is referencing, because in the ones provided in discovery, Pan squarely admits his guilt and accepts full responsibility for his agreement with the undercover to enlist straw donors to contribute money to the Liu campaign. *See* Lef. Decl. Ex. B.

For example, according to the government's FBI 302 of Pan's October 24, 2011, interview, Pan admitted that:

> Pan's friend, Richard LNU, provided the money for the event. Richard LNU was introduced to Pan by David Chen. Richard LNU provided Pan with $20,000.00. Pan provided 18-19 people to be used as 'straw donors'. Pan advised that the individuals filled out the contributions cards and then used their credit card or wrote a check out to the campaign for $800.00. Pan then reimbursed each of the individuals with the money Richard LNU provided....Pan advised that he came up with the ideal [sic] to use 'straw donors' and that no one helped him.

Lef. Decl. Ex. B, bates 22-23.

Having admitted his own guilt, Pan had a strong incentive to provide as much inculpatory information as possible about the other members of the Liu campaign. In

fact, Pan provided to the government his emails with Ms. Hou regarding Straw Donor-3 and also made consensually recorded phone calls to former campaign treasurer, Mei Ru (bates #229A) (though notably, the agents never thought to have him phone Ms. Hou). Given Pan's strong incentive as a potential cooperator to inculpate anyone he could, including Ms. Hou, his statements to the government about Ms. Hou's lack of knowledge about the straw donor scheme are more reliable, not less reliable.

To be an effective cooperator – which is what Pan was trying to be – it is important not only to admit one's own guilt (which Pan did), but to assist the government in identifying other wrongdoers, which Pan endeavored to do.  Certainly, it was against Pan's interest, as a potential cooperating witness seeking to help himself, to *exculpate* individuals related to the campaign. *See United States v. Vaughn*, 430 F.3d 518, 523-524 (2d Cir. 2005) (where co-conspirator gave incriminating testimony against defendant, court held it "obvious" that "cooperators may have an interest in currying favor with the prosecutor").  Under these circumstances, the inherent reliability of Pan's exculpatory statements questioning Ms. Hou's knowledge of the straw donors should have been presented to the Magistrate Judge who was asked by the government to evaluate whether or not Ms. Hou was "aware of Pan's role in the fraudulent scheme" when she emailed Pan about Straw Donor-3.

Finally, the government argues that Pan's statements to the government were unreliable because he did not "admit" to having engaged in exactly this type of conduct prior to the August 17 fundraising event, even though he made that claim to the undercover agent (Gov't Br. 29-30).  Perhaps the reason Pan did not "admit" to using straw donors in the past is that he never did so: tellingly, the government has not claimed Pan was in-

7

volved with any other straw donors.  And that's not surprising, since Pan had no prior

involvement in the 2013 campaign and only took on an active role at the instigation of the

government.[4]

Accordingly, Pan's reliable exculpatory statements about Ms. Hou – that he did

not know if she understood that when he said "this is Richard's event" he meant that

Kong had provided all the money – should have been given to the Magistrate Judge to

use in evaluating the inferences that could be drawn about Ms. Hou's "awareness" of the

fraudulent scheme when she sent emails to Pan regarding Pan's brother, Straw Donor-3.

### C. The Government's Failure to Disclose That It Had Issued Grand Jury Subpoenas for the Same Documents Shows Bad Faith

The Fourth Amendment prohibits searches that are "unreasonable." The govern-

ment prevented the Magistrate Judge from deciding whether the search warrant was rea-

sonable by not informing him of all of the relevant circumstances, including the fact that

a grand jury had already issued subpoenas for the exact same records.

Like telephone conversations, emails and instant messages are among the most in-

timate communications we have.  That is why interception of wire communications re-

quires a showing of necessity. *See* 18 U.S.C. § 2518(1)(c).  As the government concedes

in the search warrant application at ¶6(f), "an instant messenger is a computer application

which allows real-time, instantaneous text communication between two or more people –

*much like an oral conversation* – through a computer network, such as the Internet. Peo-

ple communicating in real-time through such application are said to be 'instant messag-

ing' or 'IM-ing' one another, or 'chatting' with one another".

---

[4] Instead, it suggests that when Pan told Kong that he had used straw donors in the past,
he was doing what many people do when they meet someone like Kong, who is perceived
as more powerful than they are – exaggerating his ability to meet Kong's demands.

We submit that emails, and particularly instant messages, are deserving of heightened Fourth Amendment protection and that a showing of necessity – or in this case, *lack of* necessity – may be considered by the magistrate in evaluating the reasonableness of the search requested by the government. *Groh v. Ramirez, supra*, 540 U.S. 575 (". . . the Fourth Amendment has interposed a magistrate between the citizen and the police . . . so that an objective mind might weigh the *need* to invade [the searchee's] privacy in order to enforce the law") (emphasis supplied) (internal quotations omitted).

There is a long history of courts expanding Fourth Amendment protections in response to new technologies. For example, when the telephone first appeared, the Supreme Court approved warrantless wiretapping. *Olmstead v. United States*, 277 U.S. 438 (1928). But in the ensuing years, the telephone, like email today, came into vastly wider use. Society's conception of privacy changed, and 39 years later the Court overruled *Olmstead* in *Katz*. Courts have acted similarly regarding other new technologies. *See, e.g., United States v. Karo*, 468 U.S. 705 (1984) (electronic beeper); *Kyllo v. United States*, 533 U.S. 27 (2001) (thermal imager); *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) (email); *United States v. Jones*, 132 S. Ct. 945 (2012) (GPS tracker).

Concern with intrusiveness is at the heart of the special restrictions on interception of telephone conversations, *i.e.*, wiretaps. Title 18 U.S.C. § 2518(1)(c) requires investigators to show that other investigative procedures have been tried first and have failed or are likely to fail before obtaining a wiretap warrant. The purpose is "to limit the use of wiretaps because of their highly intrusive nature". *United States v. Bailey*, 607 F.2d 237 (9th Cir. 1979). An email search might be even more intrusive than a wiretap. Not only does the government gain the same depth of personal information; they gain

years' worth of it.  Under 18 U.S.C. §2518(5), wiretap warrants authorize only thirty days

of interception.  But email messages stay saved on the server's computers forever.  That

is why protecting email searches "is as important to Fourth Amendment principles today

as protecting telephone conversations has been in the past." *Warshak v. United States*,

490 F.3d 455, 473 (6th Cir. 2007), *rev'd on other grounds,* 532 F.3d 521 (6th Cir. 2008).

The Court should consider the government's failure to disclose the grand jury

subpoenas when it evaluates the reasonableness of the search and the good faith of the

government in omitting material facts from the search warrant application.

### D.  Since The Government Has Now "Seized" 1,900 Emails, The Court Should Order The Government To Destroy Or To Return To Ms. Hou All Emails That Were Not Seized

By letter dated September 13, 2012, the government notified Ms. Hou that it has

completed its review of her emails and "seized" approximately 1,900 emails, out of the

19,523 non-privileged emails that were obtained from Google (of the approximately

38,939 seized).

We have not yet reviewed the 1,900 emails to determine whether they fall within

the scope of the search warrant.  Assuming that they do, the question remains as to what

the government intends to do with the 17,623 emails that were not "seized," plus the priv-

ileged emails.  We submit that the Court should order the government to return or destroy

the emails that fall outside the scope of the warrant. *See, e.g., United States v. Doane*,

2009 U.S. Dist. LEXIS 61908 *30 (S.D.N.Y. 2009) ("where voluminous items respon-

sive to a search warrant are intermingled with non-responsive items, the Government

may seize all containers holding responsive items without rendering the entire search un-

lawful.  However, the retention of items outside the scope of the warrant can be justified

only if the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement").

**POINT TWO**

**THE COURT SHOULD SEVER THE DEFENDANTS TO ASSURE THAT MS. HOU WILL BE ABLE TO PRESENT CRITICAL EXCULPATORY EVIDENCE NEEDED TO MEET THE CHARGES AGAINST HER**

Ms. Hou has asked this Court to sever the trial of the charges against her from the trial of co-defendant Oliver Pan. As she argued at Point Three of her opening Memorandum of Law, the severance is necessary in order to assure that she is able to call to the stand the most critical witness to her defense, Oliver Pan. This Court has (i) an obligation to see that she is given a full and fair opportunity to defend herself, (ii) the discretion to do so by granting a severance; and (iii) the means to secure the testimony she needs at a separate trial. As argued in the opening brief, (i) the sought after evidence is favorable and exculpatory; (ii) the evidence is not subject to significant impeachment; (iii) the value of judicial economy does not outweigh the benefits of severance; and (iv) the co-defendant will testify at a separate trial. In reply we address the government's principal arguments in opposition to the severance.

***The Evidence is Highly Favorable and Not Subject to Significant Cross-Examination***

Briefly, Ms. Hou is alleged to have conspired with Pan and others unnamed, to obtain for the John C. Liu 2013 mayoral campaign matching funds from the City of New York on the basis of donations from so-called "straw donors", who purported to be donating campaign funds but who were merely donating funds provided to them for the purpose by others.

11

Ms. Hou, the treasurer of the 2013 campaign, was legally responsible for the proper processing and accounting for all donations. That she may have unwittingly taken into the campaign such donations does not prove her knowing involvement in the alleged scheme. And the evidence to which the government points to demonstrate Ms. Hou's knowledge of the scheme is extremely limited. First, it will seek to demonstrate that on one occasion she asked a friend to donate funds which she offered to reimburse personally, though she did so under circumstances where that donation (which never occurred) was both unlikely actually to be reimbursed (and never was) and *by a person whose donation could never be used to trigger matching funds* because he was a resident of New Jersey.

The second is her participation in the August 17 fundraising event, during which Pan told her, as he told another campaign worker and as he told John Liu, "this is Richard's event". That, according to the government, is "code" for "Richard is the true source of the funds purportedly being donated by these straw donors whose donations will be used to trigger matching funds".

When questioned by the FBI at a time when he was cooperating with the government, Pan told agents that he intended to convey by that statement that Richard Kong was the source of the funds but "I don't know if they [Ms. Hou, the campaign worker and Mr. Liu] took it that way". Lef. Ex. B (bates #22). In opposing the severance motion, the government disputes that the statement is "helpful" to Ms. Hou's defense, and would in any event be subject to effective cross-examination. The facts say otherwise.

Fist of all, if hearing the statement "this is Richard's event," combined with processing the donations and incorporating them into the campaign, makes the case for

knowing membership in the conspiracy, then **how is it** that the government has not charged either the other campaign worker at the August 17 event or, for that matter, Mr. Liu, both of whom stand in exactly the same shoes as Ms. Hou. Quite clearly, the government never thought that hearing that statement, even combined with taking steps to process the donations or to use them, showed knowledge of the true nature of the source of the funds, or, indeed, even if it were known, the purpose for receiving such funds.

Moreover, the government has never suggested how it is that Ms. Hou became fluent in the secret language that would decode "this is Richard's event" in the manner the government asserts. In fact, no occasion for getting clued into the meaning of that phrase is suggested: Ms. Hou did not plan the event with Pan (or Kong) and never spoke to either about it in advance of her surprise presence at the event. In fact, in the days before the event, Mr. Pan repeatedly expresses his expectation that the Campaign would send only one worker, Crystal Feng, to the event, not Ms. Hou. (bates 223, 8/15/11 recoding). So when did Pan teach Ms. Hou to speak that language, and more importantly, why would he do so? There was no other 2013 fundraising event on which they worked together either before or after August 17, 2011.

Thus, the government's claim that the testimony Ms. Hou seeks to secure by a severance is of no value to her defense is just wrong. The testimony is critical to rebutting the government's principal evidence (limited though it is) that Ms. Hou was a member of the charged conspiracy.

### *A Severance Will Assure Mr. Pan's Testimony*

The government's second point is that Ms. Hou failed to demonstrate that Pan will not testify at his own trial and therefore that he will not be available to her at a joint trial. This argument is surely disingenuous. It is not possible ever to demonstrate that a witness will or will not do something that he has the right to decide upon at a later date. *See, e.g., United States v. Freedman*, 317 Fed. Appx. 22, 24 (2d Cir. 2008) ("there was reason to doubt Hundley would make good on his promise to testify"); *United States v. Jackson*, 2005 U.S. Dist. LEXIS 27793, at *6 (S.D.N.Y. 2005) (co-defendant's affidavit no guarantee he will testify at a separate trial). Certainly, Ms. Hou's ability to mount an effective defense by securing this critical testimony should not, and in fairness ought not, depend on what decision Pan makes at the moment he either does take the stand or de- cides not to do so.

Moreover, the reality is that, as a witness at his own trial, the jury may well take into account, in assessing his credibility, whether he has a motive to lie in order to save himself. That same heightened credibility concern would not be a factor in a jury as- sessing his credibility at a separate trial of Ms. Hou. Thus, through no fault of her own, the value of the testimony that would be accorded Pan's testimony relating to Ms. Hou would potentially be undercut by the fact of a joint trial.

### *A Severance Will Not Require Significant Additional Judicial Resources*

Predictably, the government argues that a severance will require significant dupli- cation of evidence and that the value of judicial economy outweighs the potential bene- fits. of severance here. The reality is otherwise.

14

With the exception of the irrelevant evidence pertaining to Ms. Hou's conversation with an out of state resident making a donation (that he never made), there is no evidence prior to the incidents relating to the false statements and obstruction counts that in any way distinguishes Ms. Hou's conduct from that of others who engaged in at least the same conduct but who have not been charged. Thus, the focus of the evidence against Ms. Hou is not the evidence of her alleged participation in the charged conspiracy, but the obstruction and §1001 counts that concern events having nothing whatever to do with Pan. Thus, while there is likely to be some duplication, it is simply not the case that significant duplication would be required by separate trials. And certainly the Court's interest in seeing Ms. Hou have a fair trial outweighs the limited expenditure of additional resources.

### Conclusion

For all of these reasons, the fruits of the search of Ms. Hou's e-mail account should be suppressed and her trial should be severed from that of her co-defendant.

October 22, 2012

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: _____/s/_____
    Gerald B. Lefcourt
    Sheryl E. Reich
    Renato C. Stabile

*Attorneys for Jenny Hou*

15