LAW OFFICES OF
GERALD B. LEFCOURT, P.C.
A PROFESSIONAL CORPORATION
148 EAST 78TH STREET
NEW YORK, NEW YORK 10075

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

SHERYL E. REICH
reich@lefcourtlaw.com
RENATO C. STABILE
stabile@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

April 8, 2013

**BY E-MAIL and BY HAND**

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, N.Y. 10007

*United States v. Oliver Pan, et al.*, S1 12 Cr. 153 (RJS)

Dear Judge Sullivan:

We write as counsel to Jia ("Jenny") Hou in the above matter to renew a request, previously made by letter dated January 11, 2013, asking the Court to adopt additional measures during jury selection to discern the impact on potential jurors, and specifically the biases caused thereby, of recent events published widely in print, electronic, televised and audio media.

In the January 11th application we expressed our concern that the relentless, and relentlessly negative, press coverage of the case against Ms. Hou and Mr. Pan impacted potential jurors. To understand the extent thereof in that letter we asked that jurors indicating that they had read about the case be questioned *in camera*. The Court rejected that request. However, as more fully detailed herein, the arrests last week of numerous New York elected officials, and the accompanying public comments by prosecutors that go far and above merely describing the facts of the arrests and the charges, have resulted in a tidal wave of attention on political corruption and an exhortation of the public to join the fight against it. Since the arrests, every local newspaper, as well as broadcast media, is discussing what is being called widespread political corruption. Our concern is that this will result in jurors, "fed up" with corruption, allowing that view to inform their judgment of Ms. Hou.

This is especially so considering the manner in which the press has linked the recent arrests to this very case. *See, e.g.*, April 4, 2013, *Wall Street Journal* article, attached as Exhibit "A", *quoting* United States Attorney Preet Bharara as saying that the latest series of corruption cases has convinced him that wrongdoing is "downright pervasive" in New York politics, and

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 2

that "[e]very New Yorker should be disheartened and dismayed by the sad state of affairs in our great state," and specifically referencing the instant matter as one such example of cases prosecuted by Mr. Bharara's office that have "probed and rattled every corner of New York's political infrastructure."The extensive publicity requires that the Court take steps to assure a fair and untainted jury.

In addition to the incendiary coverage of the latest arrests and the overt connection of them to this case, prior to the arrests last week there has been an onslaught of negative coverage of this case since our January 11th submission. For instance, there have been in excess of twenty articles about this case in the *New York Post*, the *New York Times*, and the *New York Daily News* since January 11th. Notably, the press has made a concerted effort to mention the instant case every time Mr. Liu or those who have worked on his campaigns is mentioned. The articles have ranged from drawing a link between this case and the implications it has for Mr. Liu's mayoral run to allegations of the use of "mafia" terminology during fundraising efforts to the granting of immunity to a prosecution witness to the filing of a federal tax lien against a Liu campaign advisor. *See* articles collected at Exhibit "B". In every article, even when the subject matter does not relate to this case, the allegations against Ms. Hou are mentioned nonetheless. Most recently, in reporting about Mr. Liu's fundraising efforts for the upcoming mayoral election, the *New York Post* reported that this trial will be monitored by the Campaign Finance Board to "determine if there is any reason they shouldn't be handing over public funds to Liu." *See* Exhibit "C".

For the reasons stated herein, separate and *in camera* questioning through the use of open-ended questions designed to probe the extent of negative views of every potential juror who indicates he or she has been exposed to these media reports is critical. The *in camera* questioning of each potential juror is necessary not only to encourage each person to gives truthful answers, but also to protect the remaining potential jurors from being tainted by the anticipated negative views that will be expressed by many of them. We also believe that we should be given additional peremptory challenges.

**The Recent Events**

On April 2, 2013, the United States Attorney for the Southern District of New York announced the unsealing of a complaint against New York State Senator Malcolm Smith; New York City Council Member Daniel Halloran; and four others, including two county party leaders, charging them with bribery, extortion and fraud. According to the United States Attorney's press release, the charges "arose from an undercover investigation of three distinct but related bribery

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 3

schemes involving public corruption". Among the charges was a claim that Mr. Smith sought to "bribe his way to a shot at Gracie Mansion", *i.e.*, corruptly sought to become mayor of New York. According to the United States Attorney, the "charges demonstrate, once again, that a show-me-the-money culture seems to pervade every level of New York government." After describing the fact of the charges, in his public announcement, the United States Attorney continued to opine on the implications of the arrests:

> After the string of public corruption scandals that we have brought to light, many may rightly resign themselves to the sad truth that perhaps the most powerful special interest in politics is self-interest. We will continue pursuing and punishing every corrupt official we find, but the public corruption crisis in New York is more than a prosecutor's problem.

Press Release dated April 2, 2013, annexed as Exhibit "D".

Two days later, on April 4, 2013, the United States Attorney for the Southern District of New York announced unrelated charges against New York State Assemblyman Eric Stevenson, alleging that he took bribes to engage in official acts. Again, the press release went far beyond announcing the fact of the arrest and the nature of the charges. In commenting on the larger implications of the charges, and the co-incidence of two cases, Mr. Bharara shared the following with the public:

> For the second time in three days, we unseal criminal charges against a sitting member of our state legislature. . . Based on these allegations, it becomes more and more difficult to avoid the sad conclusion that political corruption in New York is indeed rampant and that a show-me-the- money culture in Albany is alive and well.

Press Release dated April 4, 2013, annexed as Exhibit "E".

The press release also assured the public that "talented investigators . . . in the U.S. Attorney's office . . . will continue to do everything possible to bring alleged betrayals of the public trust to light and those responsible to justice." The "talented" persons in the United States Attorney's

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 4

Office were then named and included Brian Jacobs, the Assistant United States Attorney leading the *Hou* prosecution.

Surprising no one, both the charges themselves, as well as Mr. Bharara's comments were widely published in the press, including in the *New York Daily News*, which published Mr. Bahara's thoughts on the implications of these cases in a half page article consisting exclusively of quotes from these press releases.[1] The *New York Law Journal* carried them all but *verbatim*, as well.[2] Both the news, and discussion of "what is to be done" initiated by Mr. Bharara, cannot be escaped. We are in the process of collecting articles published on the subject and will submit them shortly.

Taken together, the articles, and certainly Mr. Bharara's statements, convey, and are clearly intended to convey, at least the following:

- There is widespread political corruption amongst elected officials of New York

- The United States Attorney for the Southern District of New York is on it

- The public ought to be sick and tired of political corruption

- It is up to the people to start doing something about it because Mr. Bahara, and including specifically Mr. Jacobs, cannot handle it alone

For those not reading carefully, Sunday's *New York Post* carried a photograph of Mr. Bharara dressed as a Wild West sheriff, with an accompanying article entitled, "Meet Preet Bharara, The Man Behind Wall Street, Albany Takedowns":[3]

---

[1] "Defending Silence From Albany Pols", *New York Daily News*, April 5, 2013, at 27 (annexed as Exhibit "F").

[2] "With Arrest of Assemblyman, U.S. Attorney Presses on Against Political Corruption", *New York Law Journal*, April 5, 2013 (annexed as Exhibit "G").

[3] http://www.nypost.com/p/news/local/high_noon_for_sheriff_preet_iqd78FLC1bknBXb1dg3LgJ

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 5



It is difficult to imagine that these articles will not affect the potential jurors who read or heard about them in thinking at least the following: New York elected officials are all corrupt; the United States Attorney's Office for the Southern District of New York is struggling mightily to combat this rampant corruption, but it cannot do it alone: he needs the help and support of the citizenry. Indeed, that is the precise message mayoral candidate Joseph Lhota is quoted in today's *New York Times* (at A.19) has articulated: "The public itself seems immune to the fact that the culture of corruption has become the norm. . .What I really wish is that people of New York become as outraged as I am".

It is not just the press releases that pose a threat to an impartial jury here. The fact of the arrests has led to widespread handwringing about what to do about political corruption, including most recently a proposal for a state commission to investigate the New York legislature. [4] The question here is not whether the press should be writing these articles or whether the public ought to be considering these issues. Our sole focus is on whether such discussions unfairly focus attention on the charges against Ms. Hou and would lead a juror to give the charges the "back of his hand" to show he is doing "something" about corruption in response to Mr. Bharara's and others call to arms.

---

[4] "Cuomo Weighs Action on Corruption", *Wall Street Journal*, April 6, 2013, at A16 (annexed as Exhibit "H").

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 6

On the basis of these recent events, we fully expect potential jurors will come to the proceedings believing that (a) politicians are corrupt; (b) at least one politician specifically targeting the mayoral ship as a goal to obtain corruptly; (c) the United States Attorney for the Southern District of New York is working particularly hard to root out corruption but he cannot do it alone; (d) Mr. Bahara has called upon citizens to work with him and Mr. Jacobs to win the struggle; and (e) this trial may be a way to "do something". Indeed, as if that expectation is not self-evident, a review of the comments sections to relevant articles in the local press confirms that the public has certainly gotten the message.

In public comments appearing in the *Daily News* in response to the Smith and Halloran arrests, for example, the following was said:

- So let me guess: Malcolm Smith, Dan Halloran, et al. will now have the best lawyers their campaign war chests can buy. It's a joke. They make back-room, shady deals and once they get caught, they still get a free ride because they can spend someone else's money to pay for high-powered attorneys.

- Kudos, kudos, kudos to Manhattan U.S. Attorney Preet Bharara. Now, let the pendulum of justice fall very hard on the heads of all corrupt politicians. They are piranhas.

**<u>What We Propose</u>**

We are extremely concerned about this turn of events. We ask that the Court take the strongest possible steps to assure that what has occurred in the last week does not deprive Ms. Hou of her constitutional rights to a fair trial.

We do not need necessarily to get to the bottom of the timing of these arrests as they may relate to the jury selection in the instant matter, or, more particularly, whether Mr. Bahara was as mindful of Local Criminal Rule 23.1 as he ought to have been when he made his statements,[5]

---

[5] Local Criminal Rule 23.1, entitled "Free Press-Fair Trial Directives" provides in pertinent part:

(a) It is the duty of the lawyer or law firm. . . and government agents and police officers. . . not to release or authorize the release of . . . opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 7

though the timing is certainly uncanny – particularly given the length of the investigations and the lack of any evident reason why another three weeks would have negatively impacted these multi-year investigations. And certainly the United States Attorney has gone well beyond merely announcing the fact of charges and the nature thereof. Whether it was intentional or whether merely coincidental, the problem is the same: the impact on the potential jurors.

The fact of extensive pre-trial publicity is customarily the basis for district courts to implement additional measures during the *voir dire* of prospective jurors in order to ensure a fair and impartial jury. As authorized by Fed.R.Crim.P. 24(a) (2), we seek a more expansive *voir dire* because of the recent events. We do not yet know what the potential jurors will say when questioned about these matters and therefore we cannot suggest every possible measure the

---

pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

(b) With respect to a her pending investigation of any criminal matter, a lawyer participating in or associated with the investigation (including government lawyers and lawyers for targets, subjects, and witnesses in the investigation) shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers or otherwise to aid in the investigation, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the administration of justice.

(c) During a jury trial of any criminal matter, including the period of selection of the jury, no lawyer or law firm associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview relating to the trial or the parties or issues in the trial which a reasonable person would expect to be disseminated by means of public communication if there is a substantial likelihood that such dissemination will interfere with a fair trial; except that the lawyer or the law firm may quote from or refer without comment to public records of the Court in the case.

The Rule goes on to provide that certain statements are presumptively permissible, including "An announcement, at the time of arrest, of the fact and circumstances of arrest".

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 8

Court ought to consider at this time. We respectfully submit that it is incumbent on this Court to determine how to proceed to assure Ms. Hou is given a fair trial by a jury untainted by such statements.

The Court has already indicated that it intends to ask potential jurors a number of questions intended to address this area. In the draft Voir Dire distributed by the Court on January 28, 2013,[6] the following questions were listed (at page 5):

- Do any of you have any general impression of or opinion about John Liu? If so, would that impression or opinion affect your ability to be fair and impartial? (Q#6)

- Do any of you have negative impressions of or opinions about politicians generally and those who work for them or support them? If so, would that impression or opinion affect your ability to be fair and impartial? (Q#7)

- Do any of you have any negative impressions of or opinions about the role money plays in political campaigns? If so, would that impression or opinion affect your ability to be fair and impartial? (Q#8)

We continue to believe these are fair and appropriate questions, and there may be others the parties might suggest. All such questions, however, should be posed under the following conditions:

1. Each potential juror who indicates, in response to a preliminary question about exposure to recent media reports of political corruption in New York should be examined in camera by posing the above questions along with whether he or she has formed an opinion as to the defendant's guilt. *See United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006); *see also United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999).In *Rahman*, for example, while the District Court's voir dire addressed jurors' specific knowledge of the case and their exposure to pretrial publicity, jurors were also asked broader "more subtle, detailed questions" to determine whether they might be prejudiced against the defendants. The Second Circuit found appropriate the

[6] The Court indicated it had prepared a more recent version but it was not distributed. We believe an additional question was intended to be inserted, as well, concerning campaign finance laws.

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 9

District Court's questioning of jurors their views of Muslims, the teaching or doctrines of Islam and people of Arab descent, as well as their prior interactions with people of Arab descent. As with the request made here, the voir dire in *Rahman* was correctly expanded beyond jurors' exposure to the specific facts of the case and pretrial publicity, to their opinions about "the subjects" that were relevant to the case. *See United States v. Rahman*, 189 F.3d at 121-22.

2. Each jury should be questioned by use of open-ended questions, as the Court has already expressed a willingness to do by the three already adopted. The use of "open-ended questions are more likely to reveal a [prospective] juror's true feelings" during *voir dire*. *United States v. Fell*, 372 F. Supp.2d 766 (D. Vt. 2005). More directed (*i.e.*, less open-ended) questions are less likely to elicit honest and candid responses from prospective jurors as they will prefer to provide answers they believe the court wants to hear. *See id.* We respectfully request that the form of the open-ended question be used to explore the areas of the prospective jurors' exposure to media discussion of the recent arrests.

3. As noted in (1), each juror who has been exposed to reports of recent political corruption should be questioned individually, *in camera*. It is also well settled that individual questioning is warranted where group questioning may invite a prospective juror to spread prejudicial pretrial publicity to other prospective jurors. *See Skilling v. United States*, 130 S. Ct. 2896, 2919 (2010). Here, one juror discussing how "sick and tired he is of politicians and they are all corrupt" may taint a whole pool. Given the common sense conclusion that the events of last week, and specifically, Mr. Bahara's message, are now widely know, it is difficult to imagine that we will not hear such comments. They should not be aired to the rest of the pool.

Moreover, where questioning is meant to explore the possible prejudices or biases of a prospective juror, individual questioning is also warranted because individuals are less likely to reveal unflattering qualities in a group setting. *See id.* In seeking individual *voir dire* with respect to questions that probe exposure to pretrial publicity or unflattering biases, we request a procedure routinely adopted by district courts.

4. The Court should consider allowing the questioning to be led by counsel, a request we previously made and here renew. Amongst social scientists, it is uncontroversial that prospective jurors are less likely to be candid to judges than to attorneys. *See* Susan E. Jones, Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor, 11 *Law and Hum. Behav.* 1, 13-14 (1987) ("Essentially

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

The Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
April 8, 2013
Page 10

subjects were considerably more candid in disclosing their attitudes and beliefs about a large number of potentially important topics during an attorney-conducted *voir dire*. Notably, in none of the cases were judges more effective than attorneys, a finding that contradicts previous assertions that a judge-conducted *voir dire* will elicit greater juror candor than attorney-conducted *voir dire*").

We do not request that the entire *voir dire* be conducted by the parties' attorneys; rather, we seek permission to participate directly in the questioning of prospective jurors where individual inquiry is warranted. Where an individual inquiry is warranted, we presume that either exposure to pretrial publicity or possible biases are being explored. As these are crucial areas to explore in obtaining a fair and impartial jury, we urge the Court to adopt attorney-conducted questioning as the method best calculated to elicit honest and candid responses.

5. In anticipation of pre-trial publicity and in light of what had already occurred, the Court has allowed defendants two additional peremptories and the government one. We respectfully request granted additional peremptory challenges to address these new events.

**Conclusion**

In light of the foregoing, we respectfully request the Court to take the various steps proposed, and others the Court deems appropriate, to elicit honest and candid responses to *voir dire* questions that explore prospective jurors' biases.

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: ______/s/___________
Gerald B. Lefcourt
Sheryl E. Reich

# Exhibit A

**Is Another Bear Market Around the Corner?**

If you have a $500,000 portfolio, you should download the latest report by *Forbes* columnist Ken Fisher's firm. It tells you where we think the stock market is headed and why. This must-read report includes our latest stock market forecast, plus research and analysis you can use in your portfolio right now. Click Here to Download

FISHER INVESTMENTS

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format. Order a reprint of this article now

THE WALL STREET JOURNAL.
WSJ.com

NY CRIME | Updated April 4, 2013, 2:41 p.m. ET

# Bharara Sees 'Pervasive' Corruption

By ERICA ORDEN

Even for a prosecutor given to colorful metaphors and rhetoric, U.S. Attorney Preet Bharara delivered a particularly damning appraisal of New York's political culture on Tuesday after unveiling a complaint alleging influence-peddling, secret land deals and bribery in a scheme that stretched from Albany to Queens.

Mr. Bharara, the top federal prosecutor in Manhattan, said a series of corruption cases has convinced him that wrongdoing is "downright pervasive" in New York politics. He compared a parade of arrests of elected officials to "a scene from 'Groundhog Day,'" a movie in which a weatherman is doomed to live the same day over and over again.

Agence France-Presse/Getty Images

U.S. Attorney Preet Bharara announces corruption charges against state Sen. Malcolm Smith and City Council Member Dan Halloran on Tuesday.

**Related**

- **New York State Senator, Councilman Arrested in FBI Probe**
- **Arrests Affect Many Layers Of Politics**
- **Smith Stripped of Committee Assignments in Wake of Arrest**
- **Quotes From the Bribery Complaint: 'It's All About How Much**

"Every New Yorker should be disheartened and dismayed by the sad state of affairs in our great state," Mr. Bharara said.

Since his confirmation in 2009, Mr. Bharara has pursued numerous high-profile cases involving elected officials, including the latest probe, which resulted in the arrest of New York state Sen. Malcolm Smith, New York City Council Member Dan Halloran and four other officials in connection with an alleged attempt to interfere with the New York City mayoral race.

Attorneys for all six said Tuesday that their clients deny the charges against them.

Mr. Bharara's cases have probed and rattled every corner of New York's political infrastructure.

Most recently, in July, his office won a conviction against former New York City Council Member Larry Seabrook for raiding a publicly funded nonprofit he controlled.

**Video**: New York Senator, Councilman Arrested in FBI Probe

In May 2012, former state Sen. Hiram Monserrate, also a former City Council member, pleaded guilty to conspiracy and mail fraud charges, receiving a two-year prison sentence.

One month earlier, former state Sen. Carl Kruger was sentenced to seven years in prison after having pleaded guilty in connection with a wide-ranging scheme involving seven others, including state Assemblyman William Boyland Jr. Mr. Boyland was acquitted in that case but was charged last month with additional counts of federal mail fraud.

In February 2012, Mr. Bharara's office charged Jia Hou, campaign treasurer for New York City Comptroller John Liu, a mayoral candidate, with fraud and obstruction of justice. Ms. Hou's attorney, Gerald Lefcourt, said "she's an innocent young woman going to trial."

Prosecutors had previously charged a fundraiser for Mr. Liu, Xing Wu Pan, with illegally funneling donations to the candidate.

He has pleaded not guilty, and Mr. Liu hasn't been accused of wrongdoing.

And earlier in 2012, former state Sen. Nicholas Spano pleaded guilty to tax evasion, receiving a one-year prison sentence.

Mr. Bharara's predecessors and others, of course, have had plenty of other ethical misdeeds to occupy their agendas, especially in Albany, where three of the last five state Senate majority leaders, including Mr. Smith, have been indicted, and where a former governor, Eliot Spitzer, was felled by a scandal involving a prostitution ring.

The bounty is, Mr. Bharara argued, beyond what his office can or should tackle.

"Putting dirty politicians in prison may be necessary, but is not sufficient. And the dream of honest government cannot come to pass unless there is real change in the culture," the U.S. attorney said.

"It's time for others to step up and do more," he said.

Gov. Andrew Cuomo, who took office in 2011 pledging to clean up state government, on Tuesday defended his own record of public-corruption cases during his tenure as state attorney general.

"I spent more time working on political reform and political corruption than probably any attorney general in modern political history. So I take it very seriously and they are serious allegations," Mr. Cuomo said.

**Write to** Erica Orden at erica.orden@wsj.com

**Corrections & Amplifications**
William Boyland Jr. is a current state assemblyman. An earlier version of this article incorrectly said he was a former assemblyman.

*A version of this article appeared April 3, 2013, on page A21 in the U.S. edition of The Wall Street Journal, with the headline: Bharara Sees 'Pervasive' Corruption.*

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

# Exhibit B

**NewsBank InfoWeb**

# NewsLibrary

Estimated printed pages: 1

Docs remaining: 416
Subscription until: 11/30/2013

New York Post (NY)

January 12, 2013
Edition: Sports+Late City Final
Section: News
Page: 002

**Liu's in'jury'ous rep**
Author: *Bruce Golding*

Article Text:

Embattled city Comptroller John Liu's tarnished reputation could play a role in jury selection at the campaign-finance trial of his former treasurer and a key fund-raiser. Court papers say **Jia** "Jenny" **Hou** and Xing Wu "Oliver" Pan want prospective jurors asked, "Have you heard or read anything that leads you to think John Liu is corrupt?" Liu's lawyer, Paul Shechtman, said, "If I were asked to answer that question, I would say no." Other questions proposed by both the prosecution and the defense include whether anyone has donated money to any of Liu's political campaigns or has "negative opinions about politicians generally and those who work for them or support them." A list also has questions about familiarity "with the terms 'intermediary' or 'straw donors' in the context of raising funds for political campaigns." **Hou** and Pan are charged with scheming to funnel illegal donations to Liu's mayoral war chest.

Copyright, 2013, New York Post
Record Number: NYPO10317978225

**NewsBank InfoWeb**

**NewsLibrary**

Estimated printed pages: 1

Docs remaining: 417
Subscription until: 11/30/2013

New York Post (NY)

January 14, 2013
Edition: Sports+Late City Final
Section: News
Page: 002

Topics:
**Index Terms:**
comptroller john liu mayor race campaign funds

**Liu: War chest up 500G**
Author: *Carl Campanile*

Article Text:

An embattled John Liu announced last night that he had raised more than $500,000 over the last six months for his expected run for mayor. "All systems go, full steam ahead!" the city comptroller said in a statement. While the group Friends of John Liu raised $522,000, it spent $345,000 after mid-July. The summary did not spell out the expenses. In Liu's prior financial report, about half of his expenses were for legal bills tied to his defense against a federal campaign-finance probe. His former treasurer, **Jia** "Jenny" **Hou**, and fund-raiser Xing Wu "Oliver" Pan face trial next month on charges that they schemed to funnel illegal contributions into Liu's campaign war chest.

Copyright, 2013, New York Post
Record Number: NYPO10318729878

NewsBank InfoWeb

NewsLibrary

Estimated printed pages: 1

Docs remaining: 418
Subscription until: 11/30/2013

New York Post (NY)

January 15, 2013
Edition: All Editions
Section: News
Page: 019

**Liu's top aide a tax cheat: IRS**
Author: *Carl Campanile*

Article Text:

The top campaign adviser to city Comptroller John Liu is a tax deadbeat, the federal government claims. The IRS has filed a lien against Chung Seto, claiming she owes $103,872 in back taxes, records show. The feds had previously slapped Seto with $175,000 in liens. Seto declined to comment. The timing could not be worse for Liu, who is running for mayor. His ex-treasurer, **Jia** "Jenny" **Hou**, and fund-raiser, Xing Wu "Oliver" Pan, face trial next month on charges they schemed to funnel illegal contributions into Liu's campaign war chest.

Copyright, 2013, New York Post
Record Number: NYPO10319321876

NewsBank InfoWeb

NewsLibrary

Estimated printed pages: 2

Docs remaining: 419
Subscription until: 11/30/2013

New York Post (NY)

January 22, 2013
Edition: All Editions
Section: News
Page: 003

**Liu's made ma'am Aide's Mafia line**
Author: *Bruce Golding*

Article Text:

Is he running for mayor - or godfather? A top aide to embattled city Comptroller John Liu was caught using a classic Mafia term when she was secretly recorded by a Liu fund-raiser who was cooperating with the feds, court papers reveal. Mei Hua Ru said Liu's enemies "have taken aim at this thing of ours" during a 2011 phone call, according to the Manhattan federal court filing. "This thing of ours" is a literal translation of the Italian words "La Cosa Nostra," which refers to the organized-crime hierarchy that includes New York's infamous "Five Families." The term was repeatedly mentioned on TV's hit mob show "The Sopranos." Court papers say Ru, Liu's 2009 campaign treasurer, was the subject of a "controlled call" from former Liu fund-raiser Xing Wu "Oliver" Pan, who at the time was trying to strike a deal with the feds after getting caught in a campaign-finance sting operation. During the Oct. 20, 2011, conversation - which came about a week after a published report about the same handwriting appearing on multiple donation forms for Liu's campaign - Ru repeatedly assured Pan that he wasn't the target of Liu's unidentified enemies. "So then, this isn't against you, they're not up against anyone, they're up against John, it's just John, precisely because he's the clear favorite," she said, according to a transcript translated from Mandarin. "He, he really is becoming a threat to other people, so they want to get rid of him. (Laughs) Simple as that." Later, Ru called the efforts against Liu, a Queens Democrat, "detestable," saying "they want to . . . scare off these supporters." "Everyone then goes, 'Yikes, how come you're so troublesome? . . . So they've taken aim at this thing of ours, right?" she said. Ru then suggested Liu's enemies were trying to exploit a cultural weakness. "Yeah, because we, we Chinese have . . . a commonality which is that everyone is afraid of trouble," she said. "No one wants that, and also, they're saying yeah, you're the biggest one, your biggest supporters, source, I'll scare, scare them off, who is going to dare backing you? Right?" The transcript of Ru and Pan's conversation was made public by lawyers for former Liu campaign treasurer **Jia** "Jenny" **Hou**, who's accused of conspiring with Pan to funnel

crooked contributions into Liu's mayoral war chest. Pan and **Hou**, who both maintain their innocence, are slated for trial next month. Liu's lawyer declined to comment. Neither Liu nor Ru has been charged.

Caption:
John Liu Campaign under scrutiny.

Copyright, 2013, New York Post
Record Number: NYPO10323242352

The New York Times

January 29, 2013

# Solicitations by Liu Aide to Be Focus in Fraud Case

By BENJAMIN WEISER and DAVID W. CHEN

A senior aide to John C. Liu, the New York City comptroller, solicited campaign donations on his behalf from friends and family members and offered to reimburse them, according to statements by a lawyer and a prosecutor on Tuesday in Federal District Court in Manhattan.

The aide, Sharon Lee, who once served as press secretary for the comptroller s office, is expected to testify for the government under an order of immunity at the trial next week of Mr. Liu s former campaign treasurer, Jia Hou, a federal prosecutor said in court.

Ms. Hou and a co-defendant, Xing Wu Pan, a former fund-raiser, have been charged with conspiring to defraud the city by using so-called straw donors on behalf of Mr. Liu s campaign. In such a scheme, people contribute to a candidate with money reimbursed by others.

In the case of Ms. Lee s solicitations, only one person, her mother, made a donation, and she was not reimbursed, according to a letter to the judge from Ms. Hou s lawyer.

Ms. Lee, who still works for the comptroller s office in a research and liaison role, has not been charged with a crime. Her lawyer, Andrew M. Lankler, declined to comment.

She has been one of Mr. Liu s most trusted aides, and is a longtime loyalist from the days when he was an ambitious city councilman from Flushing, Queens. For many years, she was his primary spokeswoman, on the Council and at the outset of his tenure as comptroller. She remains a constant presence at his government and campaign events, enjoying the kind of access that few aides can claim.

The prosecutor, Justin Anderson, said nothing in court to indicate Mr. Liu had been aware of Ms. Lee s actions on his behalf. Mr. Liu s campaign finances have been under federal investigation for several years. He has denied wrongdoing; his lawyer, Paul Shechtman, declined to comment.

Mr. Anderson, responding to questions from Judge Richard J. Sullivan, said Ms. Lee had solicited the donations from family members and friends around the same time that Ms. Hou was

soliciting a straw donation. Mr. Anderson said Ms. Lee was not expected to testify that she had been instructed to make such solicitations, but because she and Ms. Hou had both performed senior roles for the comptroller, a jury could "infer that their actions were coordinated."

Sheryl E. Reich, one of Ms. Hou s lawyers, said in a letter to the judge that government materials made available to the defense show that only one person made a donation in response to Ms. Lee s requests her mother and that she was never reimbursed.

Ms. Reich said the materials also show that Ms. Lee, whom she called a campaign volunteer, never told Ms. Hou "of either the solicitations or, specifically, the offer to reimburse her mother."

ON (1 OF 28 ARTICLES)
Bronx Is Now
etraying It

The New York Times

January 30, 2013

# 2 Campaign Aides Going on Trial, but Comptroller May Face Judgment

By BENJAMIN WEISER, DAVID W. CHEN and WILLIAM K. RASHBAUM

In 2009, a confidential informer who had been providing information to the Federal Bureau of Investigation for more than a decade told the authorities about an illegal campaign finance scheme that was benefiting John C. Liu, a councilman from Flushing, Queens, who would soon be elected New York City comptroller.

The informer said that an acquaintance of his, a large Liu donor, was moving ―money around" because he could not legally contribute money in a single lump sum, and Mr. Liu ―was aware" that he was trying to ―conceal the nature" of his contributions, a court filing shows.

That tip led to a sprawling federal investigation into Mr. Liu s campaign finances, and the filing of criminal charges, not against Mr. Liu, but against two allies a former campaign treasurer and a fund-raiser who are scheduled for trial in Manhattan next week.

The F.B.I. and federal prosecutors have not said whether their exhaustive investigation of Mr. Liu is nearing an end, but people briefed on the inquiry who spoke on the condition of anonymity because they were not authorized to discuss the matter, have said the investigation has all but concluded. They noted that while agents and prosecutors were far from exonerating Mr. Liu, the undercover phase of the investigation and the wiretaps had failed to yield evidence that could support charges against him.

Nonetheless, court filings have already presented an unflattering portrait of Mr. Liu, a Democrat who is running for mayor, and his campaign finances, raising questions about his management style, his character and what he might have known about any misconduct.

In essence, the trial could render a public judgment on him.

Mr. Liu, 46, has insisted that he committed no wrongdoing. He has continued to attend political events, raise money and tend to the daily demands of his comptroller s post, in which he oversees the city s $70 billion budget and helps manage its more than $120 billion in pension funds. Last year, he almost seemed to be challenging prosecutors when he told an interviewer

that his campaign staff, which is separate, had acted –with the highest level of ethics."

–If there s anything that my campaign is guilty of, or my supporters or my staff or, by extension, me, then prove it," he added in the interview with NY1.

Preet Bharara, the United States attorney in Manhattan, declined to comment, as did the F.B.I. Mr. Bharara has previously alleged that the former treasurer, Jia Hou, was –a central figure in a coordinated scheme to break the city s campaign finance laws," and that the fund-raiser, Xing Wu Pan, had sought to –subvert" the campaign finance laws.

Ms. Hou and Mr. Pan have been accused of conspiring to illegally funnel campaign contributions to Mr. Liu through –straw donors" people whose contributions are reimbursed by others.

A criminal complaint charges that Mr. Pan, for example, used straw donors to arrange for a $16,000 contribution to Mr. Liu s campaign from a purported Texas businessman who called himself Richard Kong but who was actually an undercover F.B.I. agent participating in a sting operation.

Related allegations were apparently raised against another senior Liu aide, Sharon Lee. A court hearing this week revealed that Ms. Lee was expected to be compelled to testify for the government under an immunity order to say she solicited campaign contributions from friends and family members and offered to reimburse them. She has not been charged with a crime.

Court filings show that the authorities obtained judicial approval to listen in on Mr. Liu s phone conversations for a year and a half, starting in 2010, and that the government obtained 10 wiretaps on 6 phones belonging to Mr. Liu; a top aide, Mei-Hua Ru; Mr. Pan, and others.

Mr. Liu s lawyer, Paul Shechtman, said last week that the original 2009 tip from the informer that appears to have prompted the investigation remained –uncorroborated." An F.B.I. affidavit says the informer, who has been convicted of federal crimes, was not a paid source and –has never been found to be untruthful in any material respect."

–Whatever the outcome of the trial," Mr. Shechtman said, –the evidence will show that John Liu has tried as much as anyone ever in public life to run a clean campaign." He said the jury would hear a recording of Mr. Pan telling an undercover F.B.I. agent who was posing as a campaign donor that –if he contributes to John Liu s campaign, John will do nothing in return."

–That speaks volumes about John Liu," Mr. Shechtman added.

Still, despite Mr. Shechtman s characterization of Mr. Liu s efforts, his campaigns both for comptroller in 2009 and the current race for mayor have been criticized for refusing to make required disclosures under the city s campaign finance law, including reporting the names of people, known as bundlers, who collected contributions for Mr. Liu from other donors.

A 2011 article in The New York Times cited some two dozen irregularities in Mr. Liu s campaign finance reports. In some instances, people listed as having given to Mr. Liu said that they had not or that someone else gave for them, or were listed as employees of companies they did not work for.

Court documents filed in the Hou and Pan case suggest Mr. Liu was actively involved in managing his campaign, and was among those who had access, for example, to the campaign s shared online Google document, one filing shows.

Mr. Pan s lawyers have told Judge Richard J. Sullivan of Federal District Court that they may call Mr. Liu as a defense witness. Even if he does not testify, his name is likely to be cited by witnesses and in documents introduced before the jury.

The defendants, Ms. Hou and Mr. Pan, are each charged with conspiracy and attempted wire fraud; Ms. Hou, 26, also faces counts of obstruction of justice and making false statements. Each count carries a maximum 20-year prison sentence.

Ms. Hou and Mr. Pan are longtime supporters of Mr. Liu, who was the first Asian-American elected to a citywide office in New York.

In a court affidavit, Mr. Pan, who is in his mid-40s, called himself ―a minor fund-raiser" for Mr. Liu and described what he portrayed as almost overbearing efforts by the government to win his cooperation in the Liu investigation. He said F.B.I. agents visited him about a month before his arrest in November 2011. ―They told me that I had to do whatever they demanded of me, such as allowing them to listen in on my telephone conversations with Mr. Liu and his staff, and even wearing a recording device when I met with anyone from the Liu campaign," Mr. Pan said.

In interviews with the F.B.I. before their arrests, neither Mr. Pan nor Ms. Hou implicated Mr. Liu in wrongdoing, the agency s summaries show.

Ms. Hou s lawyer, Gerald B. Lefcourt, has contended in court papers that the government undertook an ―obsessive pursuit" of Mr. Liu.

–As each tactic failed to find evidence of criminal conduct, rather than abandoning the quest, the government simply came up with a new tactic," he wrote. –Yet for all the resources expended, a case against John Liu has never been made."

ON (1 OF 28 ARTICLES)
Bronx Is Now
etraying It

**NewsBank InfoWeb**

**NewsLibrary**

Estimated printed pages: 1

Docs remaining: 421
Subscription until: 11/30/2013

New York Daily News (NY)

January 30, 2013
Edition: SPORTS FINAL REPLATE
Section: NEWS
Page: 12

**Liu ex-aide named in donation scam**
Author: *Robert Gearty*

Article Text:

CITY CONTROLLER John Liu's former press secretary was involved in a scheme to solicit illegal donations for his mayoral campaign, prosecutors revealed Tuesday.

Sharon Lee, who was a fixture at Liu's side during public appearances in his first years as controller, has been granted immunity by federal prosecutors to testify in the upcoming conspiracy trial of Liu's former campaign treasurer and one of his fund-raisers.

Prosecutor Justin Anderson said Lee would testify that she offered to reimburse family members and others in 2011 if they would make a donation to Liu's campaign.

Anderson said the solicitation took place at the same time the ex-campaign treasurer **Jia** (Jenny) **Hou** was soliciting her ex-boyfriend for a straw donation.

"We don't expect her to say anyone instructed her," Anderson told Manhattan Federal Court Judge Richard Sullivan.

**Hou** and Liu fund-raiser Xing Wu (Oliver) Pan face trial next week for conspiring to use straw donors to evade campaign contribution limits.

Caption:
NLVL

Copyright, 2013 Daily News L.P. All Rights Reserved.
Record Number: 11667471

**NewsBank InfoWeb**

**NewsLibrary**

Estimated printed pages: 1

Docs remaining: 420
Subscription until: 11/30/2013

New York Post (NY)

January 30, 2013
Edition: Sports+Late City Final
Section: News
Page: 006

**Liu aide set to jaw about $traw**
Author: *Bruce Golding*

Article Text:

Embattled city Comptroller John Liu's former press secretary is poised to testify that she sought illegal "straw donations" for his mayoral campaign from her family and friends, prosecutors revealed yesterday. Sharon Lee would be forced to admit the alleged wrongdoing under terms of an "immunity order" that would keep her safe from criminal charges, Manhattan federal prosecutor Justin Anderson said in court. Lee, since promoted to a higher post in the comptroller's office, allegedly promised to reimburse donations to Liu's campaign. Anderson said Lee made the offers during phone calls that "took place either inside or just outside" the Queens apartment of **Jia** "Jenny" **Hou**, Liu's campaign treasurer at the time. **Hou** and a key Liu fund-raiser, Xing Wu "Oliver" Pan, face trial next week on charges that they schemed to defraud the city of campaign matching contributions by funneling illegal donations into Liu's war chest. Defense lawyer Sheryl Reich said that while one person Lee contacted made a donation, there was no reimbursement and Lee "never discussed this with Ms. **Hou**." Lee's lawyer didn't respond to a request for comment, but Liu's lawyer, Paul Shechtman, insisted Liu "knew nothing" about Lee's actions. With David Seifman

Copyright, 2013, New York Post
Record Number: NYPO10327936540

NewsBank InfoWeb

NewsLibrary

Estimated printed pages: 1

Docs remaining: 423
Subscription until: 11/30/2013

New York Daily News (NY)

February 1, 2013
Edition: METRO
Section: NEWS
Page: 6

**Anything for my Liu**
Author: *Robert Gearty*

Article Text:

A TOP AIDE to city Controller John Liu told prosecutors she knew it was against the rules to solicit straw donations but did so because she wanted to help her boss' mayoral campaign.

Sharon Lee, Liu's former press secretary, admitted hitting up family members and friends for illicit contributions and offering to reimburse them.

"At the time of the offer, my mental state was to do anything and everything I could (to help the campaign)," Lee said, according to FBI notes from interviews with Lee in 2012. She said Liu had no knowledge of her actions.

Lee, who still works for Liu as his labor relations coordinator, has been granted immunity to testify at the upcoming conspiracy trial of former Liu campaign treasurer **Jia** (Jenny) **Hou** and a Liu fund-raiser.

Caption:
NLVL

Copyright, 2013 Daily News L.P. All Rights Reserved.
Record Number: 11671314

## NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 2

Docs remaining: 422
Subscription until: 11/30/2013

New York Post (NY)

February 1, 2013
Edition: All Editions
Section: News
Page: 002

Topics:
**Index Terms:**
john liu fund-raising scandal

**Not so fast: Liu still feds' target**
Author: *David Seifman*

Article Text:

Embattled city Comptroller John Liu is not yet out of the woods in the criminal probe of his campaign fund-raising activities, sources said yesterday. A report published yesterday suggested that Liu would not be personally charged in the case. Prosecutors are far from clearing Liu or shutting the door on the case - and still haven't ruled out filing charges against him or his campaign manager, Chung Seto, at a later date, a federal law-enforcement insider told The Post. "The investigation isn't getting closed. It will remain active. There are still things that can be done," the source said. Liu's former campaign treasurer **Jia** "Jenny" **Hou** and key fund-raiser Xing Wu "Oliver" Pan face trial next week on charges they schemed to defraud the city of matching taxpayer-contribution funds by funneling illegal donations into Liu's campaign war chest. As The Post reported last year, the FBI and federal prosecutors were trying to convince Pan and **Hou** to roll over on Liu or Seto to directly connect them to illicit campaign donations. The feds' theory was that Pan and **Hou** solicited illegal donations and hid them at the direction - or at least with the prior knowledge - of Liu or Seto, sources said. But without documents or testimony that directly tie Liu to the donation conspiracy, the feds determined they did not have the evidence to file charges against Liu or additional people at this time, sources said. It's always possible that **Hou** or Pan could flip on Liu if they're found guilty, but the feds rarely cut deals after trials with convicted defendants, sources said. That's because convicts' assertions of innocence raise questions about credibility, as opposed to those who fess up before trial and agree to cooperate. Liu last night said he expected that the fund-raising scandal would be used against him in a "no holds barred" campaign. "I think my opponents will certainly bring it up," he said. "I expect for

my opponents to try to make it an issue." Meanwhile, prosecutors and lawyers for the defendants argued over whether the government could present former Liu press secretary Sharon Lee as a witness. Lee has admitted she sought illegal "straw" donations from family and friends. Additional reporting by David Seifman --- Cast of characters * Comptroller John Liu (right) Has not been charged with wrongdoing, but federal probe continues * Campaign treasurer **Jia** "Jenny" **Hou** Charged with of obstruction of justice in probe of campaign irregularities * Campaign fund-raiser Xing Wu "Oliver" Pan Accused of illegally collecting "straw" donations to sidestep contribution limits ccampanile@nypost.com

Caption:
John Liu.

Copyright, 2013, New York Post
Record Number: NYPO10329277999

**NewsBank InfoWeb**

**NewsLibrary**

Estimated printed pages: 1

Docs remaining: 425
Subscription until: 11/30/2013

New York Post (NY)

February 2, 2013
Edition: All Editions
Section: News
Page: 018

Topics:
**Index Terms:**
Liu and Oliver

**Liu-case no-show**
Author: *Bruce Golding and Josh Margolin*

Article Text:

The prospect of spending 40 years in the slammer is apparently too much to face for Oliver Pan. The former fund-raiser for city Comptroller John Liu was a no-show in court yesterday after questions were raised about his mental health. Manhattan federal court Judge Richard Sullivan delayed Monday's scheduled trial of Xing Wu "Oliver" Pan and former Liu campaign treasurer **Jia** "Jenny" **Hou** for at least one day. The judge cited "privacy issues," and revealed no details of Pan's condition or whereabouts. Pan's lawyers declined to comment, but a law-enforcement source told The Post that officials feared that the New Jersey real-estate developer might try to kill himself. "People around him felt he was suicidal," the source said. "It was things he said to people around him, and those people around him were talking about it." Pan and **Hou** stand accused of scheming to obtain public campaign-finance matching funds by funneling illegal contributions into Liu's political war chest.

Copyright, 2013, New York Post
Record Number: NYPO10329856146

**NewsBank InfoWeb**

**NewsLibrary**

Estimated printed pages: 1

Docs remaining: 426
Subscription until: 11/30/2013

New York Daily News (NY)

February 2, 2013
Edition: SPORTS FINAL REPLATE
Section: NEWS
Page: 2

**Psych delay in Liu aide's trial**
Author: *Robert Gearty*

Article Text:

A FUND-RAISER for City Controller John Liu is being treated for a psychiatric condition, prompting a judge Friday to delay the start of the moneyman's conspiracy trial for at least two days.

Xing Wu (Oliver) Pan was supposed to go on trial Monday for allegedly conspiring in 2011 to funnel illegal contributions to Liu's mayoral campaign. But at a hastily called conference on Friday, Manhattan Federal Court Judge Richard Sullivan postponed the trial through Tuesday after being told Pan is suffering from a psychiatric problem.

Irwin Rochman, a lawyer for the New Jersey businessman, declined comment.

Pan and former Liu campaign treasurer **Jia** (Jenny) **Hou** have been charged with using straw donors to evade limits on campaign contributions.

Caption:
NLVL

Copyright, 2013 Daily News L.P. All Rights Reserved.
Record Number: 11673339

# NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 4

Docs remaining: 427
Subscription until: 11/30/2013

Associated Press Archive

February 2, 2013

Topics:
**Index Terms:**
U.S. Domestic

**Ex-aides' trial puts NYC politician in spotlight**
Author: *JENNIFER PELTZ and LARRY NEUMEISTER; Associated Press*

Dateline: NEW YORK

Article Text:

A mayoral hopeful's reputation and popularity may be at stake when his former campaign treasurer and a fundraiser go on trial this week on charges of conspiring to break campaign finance laws to raise ever more money for him.

City Comptroller John Liu has not been charged and is not expected to testify at his ex-aides' conspiracy trial. But the prosecution, coming as the city's most heated mayoral race in years gets into full swing, is making the case into something of a trial of his political prospects.

Liu's ex-campaign treasurer, **Jia** "Jenny" **Hou**, and former Liu fundraiser Xing "Oliver" Wu Pan are facing federal charges of conspiring to break campaign finance laws. Federal prosecutors say the two circumvented a $4,950 contribution limit by using straw donors -- essentially, funneling money from one contributor through another -- and by allowing the candidate to claim greater matching funds, so they could boost the Democrat's campaign war chest.

Both **Hou**, 26, of Queens, and Pan, of Hudson County, N.J., have pleaded not guilty to conspiracy and attempted wire fraud; **Hou** also has pleaded not guilty to obstructing justice and making false statements. The trial was scheduled to begin Monday but was delayed until at least Wednesday because of questions raised about the mental health condition of Pan.

The trial, likely to last several weeks, comes as campaigning gears up in the race to replace term-limited Mayor Michael Bloomberg, who is finishing his third term.

As the trial looms, the 46-year-old Liu has not avoided the subject, sometimes joking that his nickname is "embattled comptroller."

In recent years, he has tried to project an image as a strong mayoral contender who can draw support from two important Democratic constituencies, minority communities and labor unions. A former city councilman, he has striven as comptroller to position himself as a fiscal watchdog, putting more city spending records online and sharply criticizing a scandal-plagued city payroll technology project.

While pundits and analysts have seen the investigation as a body blow to his mayoral chances, Liu is attending candidate forums and otherwise signaling he plans to run, though he hasn't yet formally entered the race. Polls show him and several other announced and likely contenders significantly behind City Council Speaker Christine Quinn in the Democratic matchup. Several Republicans also are in the mix.

His attorney, Paul Shechtman, said he doesn't expect Liu to be called as a witness at the trial, but he'll be "an interested observer."

"Whatever the outcome of the trial, I do think that the public will learn that John Liu has always sought to run an honorable campaign," Shechtman said, adding that he was confident that no witness would testify Liu was aware of any wrongdoing.

Still, the cloud over Liu's campaign operation deepened a week before the trial, when prosecutors revealed that his former press secretary, Sharon Lee, had been granted immunity and would be compelled to testify about her solicitation of donations from as many as 10 family members and friends, half of whom she agreed to reimburse if they sent money.

At a pre-trial hearing Friday, Judge Richard Sullivan seemed less than impressed by Lee's potential testimony and said he would decide later whether it was relevant to the charges. He said a prosecutor seemed "squirrelly" when the lawyer was reluctant to say whether Lee was an unindicted co-conspirator, though he eventually acknowledged that she was.

**Hou**'s lawyer, Gerald Lefcourt, said in a letter to Sullivan that Lee has maintained that the campaign did not ask her to solicit friends and family and that it was "her own doing."

Lefcourt said some contributors might have arranged among themselves to channel money through straw donors, but his client knew nothing of it.

Lawyers for Pan have argued that prosecutors developed a sting operation against Pan and manufactured a criminal case despite knowing -- from Pan's repeated rejection of the government's advances -- that he was not predisposed to violate campaign finance laws.

Defense lawyers also said authorities terrorized Pan with the threat of arrest to coerce him to help the government

manufacture a crime that it could say Liu had committed. The attorneys said the government had been investigating Liu's fundraising since 2009 and began an undercover sting operation directed at the comptroller and Pan in early 2011.

"Mr. Pan was entrapped by the undercover sting into violating the campaign finance law, but Mr. Liu was not ensnared by the operation," the lawyers wrote in court papers.

The investigation has taken a toll on Liu's campaign, which has spent more than $433,000 on legal fees in the past two years, about one-seventh of the money he's raised for this election cycle, campaign finance records show. Liu's job approval rating hit a high of 57 percent a few months before questions surfaced about his campaign practices and plunged to 38 percent the month after Pan's arrest. It stood at 46 percent earlier this month, according to the Quinnipiac University Polling Institute.

"Bad headlines produce bad polls," said the institute's director, Maurice Carroll.

Still, if the trial concludes relatively quickly and without eliciting damning information about Liu, it might not ultimately be defining for a politician who hasn't yet formed a firm impression in many voters' minds. Some 46 percent of respondents in a Quinnipiac poll this month said they didn't know enough about Liu to have an opinion of him; the rest were close to evenly split among favorable and unfavorable views.

Clearly, the trial is "not the kind of attention that you want when your campaign is trying to get its grounding," said Lee Miringoff, director of the Marist College Institute for Public Opinion. "The saving grace is: Presumably it ends, and maybe he's able to turn the page and move on."

The case is a fraught one for Asian-Americans, many of whom cheered the Taiwan-born Liu's emergence as the community's first member to win citywide office in New York City. The city is home to about 1.5 million Asians, including the largest Chinese population outside Asia.

Asian-Americans hoped Liu would help raise their political profile, so "this thing happening is a tremendous shock and disappointment," said Peter Kwong, an Asian-American studies and urban affairs professor at Hunter College.

Some feel that Asian-American donors and fundraisers have gotten unfair scrutiny after other campaign finance allegations during the past two decades, said Kwong. In one example, former Democratic fundraiser and Hong Kong native Norman Hsu was convicted in a case that prompted Hillary Rodham Clinton to return more than $800,000 in contributions years ago.

But whatever those sentiments, some Asian-Americans also lament that Liu didn't see to it that no such allegations could be made against his campaign, Kwong said.

"For such an astute politician, this is not very elegant management, in terms of fundraising. So that's very unfortunate," he said.

Copyright 2013 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or

redistributed.
Record Number: DA46K84G0

The New York Times

February 5, 2013

# Hospitalization Delays Trial of Liu Fund-Raiser

By BENJAMIN WEISER

The trial of two allies of the New York City comptroller, John C. Liu, has been delayed, potentially until April, after one defendant was involuntarily committed and hospitalized, the judge said on Tuesday.

Mr. Liu s former campaign treasurer, Jia Hou, and a fund-raiser, Xing Wu Pan, were both scheduled to stand trial beginning this week in Federal District Court in Manhattan on charges of conspiring to funnel money to Mr. Liu s campaign through an illegal campaign-finance scheme.

But the judge, Richard J. Sullivan, said in court that Mr. Pan, a New Jersey real estate developer who is also known as Oliver, had been involuntarily committed in connection with a mental health condition.“

He s currently hospitalized,“ the judge said, and is undergoing treatment of an undetermined and potentially indefinite duration.“

Irwin Rochman, a lawyer for Mr. Pan, told the judge he had spoken with Mr. Pan and found him to be coherent. We ve seen no diminution in his ability to understand and communicate with us,“ Mr. Rochman said.

The trial has been widely anticipated because it follows an exhaustive investigation into the campaign finances of Mr. Liu, a Democrat, who is likely to run for mayor, and who has not been charged with wrongdoing.

A delay that pushes the trial into April could prove to be a distraction for Mr. Liu as the campaign heats up.

The judge said that he had directed a court officer to ask Mr. Pan s doctors for more details about his condition. He said that he also wanted their opinion on whether Mr. Pan would be competent to stand trial, and if so, whether his treatment needs could interfere with his ability to assist in his defense.

Judge Sullivan indicated he might also appoint an expert to examine Mr. Pan. There appeared to be a possibility that the trial could start later this month, but the judge set April 15 as a fallback option.

Mr. Pan s lawyers would not elaborate after the hearing on where he had been hospitalized or about his condition. Are we concerned about our client? Yes,“ Mr. Rochman said. He s a human being in distress.“

*David W. Chen contributed reporting.*

ON (1 OF 28 ARTICLES)

**Bronx Is Now etraying It**

NewsBank InfoWeb

NewsLibrary

Estimated printed pages: 1

Docs remaining: 428
Subscription until: 11/30/2013

New York Post (NY)

February 6, 2013
Edition: Sports+Late City Final
Section: News
Page: 010

**Stay in psych ward delays Liu pal's trial**
Author: *Amy Stretten , Bruce , Golding and Carl Campanile*

Article Text:

The former fund-raiser charged with scheming to funnel illegal campaign contributions to embattled city Comptroller John Liu has been sent to a mental ward, further delaying his trial. Xing Wu "Oliver" Pan is "involuntarily committed in connection with a mental-health condition" and undergoing treatment, Manhattan federal Judge Richard Sullivan said in court yesterday. Sources have told The Post that Pan was locked up Friday over fears he was suicidal. Sullivan put off Pan's trial, which was supposed to be under way already, until April 15, unless Pan is determined fit before then. Defense lawyer Irwin Rochman said he would be ready for trial within a few days of Pan's release. A lawyer for co-defendant **Jia** "Jenny" **Hou**, Liu's former campaign treasurer, said she didn't wouldn't request a separate trial before Pan's because she was planning to use his expected testimony as part of her defense.

Copyright, 2013, New York Post
Record Number: NYPO10331963240

The New York Times

February 8, 2013

# Trial of 2 Liu Supporters Is Set in Campaign Fund-Raising Case

By DAVID W. CHEN

The trial of two allies of the New York City comptroller, John C. Liu, will start on April 15, a judge said Friday after ruling that one defendant, now in the hospital, was competent to stand trial.

Jury selection had been scheduled to begin this week in Federal District Court in Manhattan in the case against Mr. Liu s former campaign treasurer, Jia Hou, and a fund-raiser, Xing Wu Pan. They have been charged with conspiring to funnel money to Mr. Liu s campaign through an illegal campaign-finance arrangement. But it was delayed on Tuesday after the judge, Richard J. Sullivan, announced that Mr. Pan, a New Jersey real estate developer who is also known as Oliver, had been involuntarily committed in connection with a mental health condition."

On Friday, Judge Sullivan said that he had received a sealed report from Mr. Pan s doctor, dated Feb. 7. The report said Mr. Pan was competent but would continue to receive inpatient treatment for the foreseeable future."

As a result, Judge Sullivan set the new start date, and ordered Mr. Pan s lawyers to inform him when he was released from the hospital.

The trial has been widely anticipated because it follows an exhaustive investigation into the campaign finances of Mr. Liu, a Democrat who is likely to run for mayor. Mr. Liu has not been charged with wrongdoing.

The case could prove to be even a greater distraction for Mr. Liu in April, when voters will be paying more attention to politics as the mayoral campaign heads toward a September primary.

(1 OF 28 ARTICLES)

onx Is Now
raying It

**NewsBank InfoWeb**

# NewsLibrary

Estimated printed pages: 2

Docs remaining: 429
Subscription until: 11/30/2013

TimesLedger Newspapers (Queens, NY)

February 8, 2013
Section: Crime

**Trial for Liu aides likely to drag well into city s election season**
Author: *Joe Anuta; TimesLedger Newspapers*

Article Text:

The trial for two aides to the city comptroller was delayed after one of them was forcefully hospitalized with an unspecified illness, news reports said.

**Jia** –Jenny" **Hou** and Xing Wu –Oliver" Pan, who worked on Liu s fund-raising campaign for an unannounced but widely anticipated run for mayor, are facing federal wire fraud charges in Manhattan federal court. The trial was set to begin Monday, but last Friday U.S. District Judge Richard Sullivan received information about the health of Pan, who was taken for a mental evaluation against his will, according to the Associated Press.

On Tuesday Sullivan adjourned the court until April 15, according to AP, but if an evaluation indicates Pan is fit to proceed with the trial, he reserved the right to begin earlier.

Pan and **Hou** are accused of employing straw donors false donors used to conceal the real source of money to funnel money into the campaign coffers of Liu. Both have pleaded not guilty.

The delay is not good news for the comptroller since the trial could likely drag well into the campaigning season for this year s Democratic p rimary in the spring.

Liu discussed these implications during a recent sit-down interview with TimesLedger Newspapers.

–It s been somewhat surreal," he said. –We have nothing to hide, and I m very proud of how we are conducting our fund-raising."

To demonstrate his stringent methodology of gathering funds, he said the campaign did not accept contributions

from anyone who does business with the city, nor anyone who is looking to do business with the city.

Liu also initially established a limit of $800, which is far less than the maximum donation of $4,950. The number was picked because the No. 8 is auspicious in Chinese culture, according to Liu.

But after The New York Times published an article in October 2011 detailing the federal investigation of Liu and his campaign, the comptroller said his self-imposed limit became twisted into ―some freaky Chinese scheme to get more straw donors."

As subsequent articles detailed the arrests of Pan and **Hou**, their indictments and the time leading up to their trial, it was also revealed that Liu s cellphone had been tapped for more than a year, he said.

―I don t spend my days and nights figuring out who is behind this or what they are after," Liu said of the investigation.

He later dropped the $800 limit, and his campaign has been dogged by constant press coverage of the trial ever since. He has not been charged.

―It s been a weird and wild feeling," he said in late January. ―I just hope they can resolve as quickly as possible."

That does not look like it will be the case.

Reach reporter Joe Anuta by e-mail at januta@cnglocal.com or by phone at 718-260-4566.

Caption:
**Jia** "Jenny" **Hou**, former aid to city Comptroller John Liu, leaves federal court in Manhattan after the judge postponed the trial due to her codefendant's illness.

Copyright, 2013, TimesLedger Newspapers (Queens, NY). All Rights Reserved.
Record Number: 8981a63ee4e3c9f63fc6a82c18bc839c7a56a9a

**NewsBank InfoWeb**

# NewsLibrary

Estimated printed pages: 1

Docs remaining: 430
Subscription until: 11/30/2013

New York Post (NY)

February 9, 2013
Edition: Sports+Late City Final
Section: News
Page: 011

**Liu pal to stay in psych ward**
Author: *Bruce Golding*

Article Text:

An indicted fund-raiser for embattled city Comptroller John Liu will remain in a mental ward "for the foreseeable future," court papers revealed yesterday. Xing Wu "Oliver" Pan's shrink told Judge Ricjard Sullivan that Pan is competent to stand trial but still receiving treatment after being involuntarily committed on Feb. 1, according to the Manhattan federal-court filing. Sullivan ordered that the trial of Pan and co-defendant **Jia** "Jenny" **Hou** - which was supposed to be under way already - would start on April 15. Sources have told The Post that Pan was locked up to keep him from killing himself.

Copyright, 2013, New York Post
Record Number: NYPO10333868515

The New York Times

February 28, 2013

# Liu Denounces Inquiry Into His Fund-Raising

By MICHAEL BARBARO

John C. Liu, New York City s comptroller, turned his performance at a neighborhood forum for mayoral candidates into an ultimatum to federal officials investigating his campaign fund-raising, demanding on Thursday night that they ―put up or shut up already" after a multiyear inquiry.

Mr. Liu s forceful critique of the federal agents looking into the legality of his donations, unprompted by a moderator or his rivals, captured his mounting frustration with an investigation that has cast a shadow over his fledgling campaign.

―Despite my record and despite my vision for the city, which I think is the right vision, there are still whispers about this cloud hanging over my head," Mr. Liu said in his closing statement at the forum, focused on poverty and income inequality.

His voice rising in anger, Mr. Liu listed his grievances: ―Three years of investigating. They wiretapped my phones for 18 months. They reviewed a million documents and messages. They interrogated thousands of my supporters. And yet, what do they have to show for it? It s time to put up or shut up already. Because I have an election to win!"

The investigation dates back to 2009 and has resulted in the arrest of two associates Mr. Liu s former 2013 campaign treasurer and a fund-raiser. Both are accused of conspiring to illegally funnel campaign contributions to Mr. Liu through ―straw donors," or people whose contributions are reimbursed by others. Their trial is set to begin on April 15.

Mr. Liu has not been accused of wrongdoing, but documents and interviews have raised unflattering questions about his management style and integrity.

His decision to raise arguably his biggest political liability at a forum focused on issues like the minimum wage clearly caught his rivals by surprise.

―I was shocked," Tom Allon, a Republican candidate, said in an interview afterward. He compared Mr. Liu s sentiment to a dare.

–Catch me if you can," Mr. Allon said.

Mr. Liu s remarks, which drew loud applause from a crowd that seemed to be filled with his supporters, capped a lively and at times raucous forum at the First Corinthian Baptist Church in Harlem.

The City Council speaker, Christine C. Quinn, the perceived front-runner in the race, endured pointed and bipartisan barbs about her unwillingness to allow for a vote on paid sick leave and her fund-raising ties to developers.

Both Bill de Blasio, the city s public advocate and a Democratic mayoral candidate, and Mr. Allon demanded that Ms. Quinn reverse her position on legislation that would require many employers to provide paid sick leave to workers across the city. Ms. Quinn, who has kept the legislation from reaching the floor of the Council, has argued that such a requirement would hurt small businesses at a time when the economy is fragile.

–You have to give us a vote," Mr. de Blasio told Ms. Quinn.

Mr. Liu joined in on the jabbing. –There is no conclusive research," he said of Ms. Quinn s argument, –that paid sick leave is actually detrimental to the economy."

At one point, the moderator of the forum, Brian Lehrer, asked whether there was anyone on stage besides Ms. Quinn who opposed paid sick leave now. No one raised their hand.

Ms. Quinn said she was carefully studying when the city might be ready for such a measure, which she supports in theory. But when Mr. Lehrer asked her which specific economic metric she would use to determine the right time, she replied, –We are evaluating that; I can t tell you that there is one."

All but one of the candidates said that New York should follow President Obama s plan to raise the minimum wage to $9 an hour. Mr. Liu, to ferocious applause, called for the state to raise the minimum wage to $11.50 an hour over the next few years, over the current $7.25.

Two major Republican candidates, Joseph J. Lhota and John Catsimatidis, did not attend, a fact that Mr. Lehrer noted.

The night was filled with unexpected glimpses into the candidates personal lives. William C. Thompson Jr., the Democratic mayoral nominee in 2009 and a candidate again this year, recalled warning his 15-year-old stepson how to react if he were stopped and frisked by the

police.

"If I am not doing anything wrong," Mr. Thompson recalled the boy asking, "why would I be stopped?" Mr. Thompson said that the police tactic "has been misused and abused."

*David W. Chen contributed reporting.*

ON (1 OF 28 ARTICLES)

**Bronx Is Now etraying It**

The New York Times

March 15, 2013

# New York Mayoral Hopeful Forges Ahead, Undeterred

By DAVID W. CHEN

John C. Liu is the most ubiquitous of New York City officeholders, with a voracious appetite for retail politics, ever smiling, hugging everyone he meets and sampling all the food along the way. He has been the brightest political hope of the city s fast-growing Asian-American community, which propelled him first onto the City Council, and then to citywide office as comptroller.

But he is also scarred by a federal criminal investigation that has led to fraud charges against two associates.

On Sunday, Mr. Liu plans to announce his candidacy for mayor a seemingly quixotic bid, given his troubles, but one that he says is still winnable.

―There s no shortage of doubters and naysayers," he said in a recent interview. ―But the persistence of the support from all different quarters fuels my adrenaline."

To spend time on the road with Mr. Liu, a Democrat from Flushing, Queens, is to marvel at a human dynamo who obsesses over every minute as if he were on a limited cellphone plan. Ricocheting around in his city-provided car, which has logged 53,421 miles in 13 months, he compulsively scans his schedule on an iPad. He asks his assistants which community leaders and staff members will attend the next event.

―Make a right here; we re in a rush," he instructed his police detail when he was running a few minutes late to a news conference on child-care budget cuts.

After cannonballing out of the car, Mr. Liu sprinted across City Hall plaza, demonstrating his technique from when he was a long-distance runner at the Bronx High School of Science and Binghamton University.

Of all the mayoral candidates, Mr. Liu may be the most comfortable with the public. He speaks off the cuff, grasps every hand, leans forward or crouches to hear what people are saying, and lingers for photos. On one day, he uttered Yiddish at a Starrett City senior center; Bengali at a

Jamaica mosque; Cantonese at a Chinatown restaurant; and Spanish at a Dominican party in the Bronx.

Small wonder, then, that on a recent morning, when he arrived late to a new small-business center in Harlem, Representative Charles B. Rangel joked: ―Why am I not surprised that you are here?"

Mr. Liu said his days involved ―pretty much nonstop eating," because he did not want to be impolite. After attending a ribbon-cutting ceremony in Harlem, he hustled to a nearby restaurant, ordered some fried seafood and then devoured everything, including his assistant s leftovers, in transit.

The whiff of whiting and shrimp still clinging to his car, he addressed a lunchtime crowd at a Brooklyn senior center. After a 92-year-old woman who said that Mr. Liu resembled her grandson asked him to stay, he obliged, and wolfed down some roast chicken and potato kugel.

He was the first mayoral candidate ever to eat lunch at the center, said Zina Bobrovsky, its project director.

―I couldn t say no," Mr. Liu said afterward, beaming. ―Juiciest chicken I ve ever had."

As Mr. Liu travels the city he estimates that he spends half his time on the road he is shadowed, invariably, by questions. On April 15, two associates, including his former treasurer, are scheduled to stand trial on fraud charges stemming from a long-brewing federal investigation. His former press secretary, a key member of his inner circle, has been ordered to testify for the prosecution, with immunity.

Mr. Liu, 46, has not been accused of wrongdoing, but court documents have left little doubt that prosecutors have been questioning his conduct.

Mr. Liu has recently been visibly angry about the investigation, daring prosecutors during a recent mayoral forum to ―put up or shut up already because I have an election to win." And he has not dismissed chatter, particularly among Asians and African-Americans, that he is a victim of a conspiracy, or of bias.

―Clearly, something is driving this so-called investigation," said Mr. Liu, who in 2009 became the first Asian-American to win citywide office.

He has kept about his business, undaunted. He ladles out commendations, despite prosecutors

suspicions of an unsavory link to contributions.

He has performed strongly at debates. He is the only candidate who has called for eliminating the Police Department s stop-and-frisk practice, and increasing the minimum wage to $11.50 per hour, significantly higher than the $9 supported by President Obama. He is also the harshest critic of Mayor Michael R. Bloomberg; he describes Mr. Bloomberg as a –grumpy" man who –checked out a long time ago."

A Sylvester Stallone fan, he draws parallels between Mr. Bloomberg s New York and –Demolition Man," in which the beautiful citizens of the future only ate salad, never cursed and had virtual sex to avoid dealing with body fluids.

–That s what everything reminds me of," he said, after munching on Moroccan flatbreads from Hot Bread Kitchen, an East Harlem business incubator.

Mr. Liu s stump speech blends tidbits about his Taiwanese immigrant background and his office s work to root out wasteful spending and promote government transparency. He can be funny, as well: at the Wadleigh Secondary School for the Performing and Visual Arts in Harlem, which he fought to keep open, he noted the historical debate over whether he should be called –comptroller" or –controller."

–I prefer comptroller," he told the students. –I d rather comp people than con people."

On another day, as he toured the Hudson Guild community center in Chelsea, he was bear-hugged by several people, with one woman saying, –We ll see you again when you become mayor, right?"

–Yes, absolutely," Mr. Liu smiled.

Later, after walking past a piano, he was asked by a reporter whether he knew music. He pivoted, opened the fallboard and played a few bars of –The Entertainer."

ON (1 OF 28 ARTICLES)

Bronx Is Now
etraying It

The New York Times

March 17, 2013

# Criticizing Bloomberg, Liu Enters Race to Succeed Him

By DAVID W. CHEN

Brushing off his legal troubles as the price of taking on powerful interests, an exuberant John C. Liu, the city comptroller, officially began his campaign for mayor on Sunday with a vow to represent the –100 percent," not –the 1 percent."

In a 10-minute speech at City Hall, Mr. Liu, a Taiwanese immigrant, cited a Chinese tale to assail Mayor Michael R. Bloomberg –and his enablers" for issuing an –imperial edict" skewed against all but the wealthiest of New Yorkers.

–A struggling town begs the emperor to send relief, and the emperor replies, 'Just tighten your belts,' " he said, before a jostling crowd of several hundred, the vast majority of whom were Asian-Americans, Latinos and African-Americans. –The town replies, 'Send belts,' " he added.

Then, alluding to a looming federal trial of associates over his campaign fund-raising, in a case that has damaged his reputation, Mr. Liu, a Democrat, said: –When you go after powerful people and rich corporations, they're going to come after you. They have certainly made my life challenging. But let me be clear. We are not backing down."

Mr. Liu's speech was part of a daylong, five-borough, 15-event sprint that seemed an apt political corollary of the New York City Half marathon on Sunday.

The frenetic day was typical for Mr. Liu. But his announcement at City Hall and its barbed populist pitch, aimed at the current occupant, suggested that he wanted to send clear notice: Yes, he has the support, and yes, he has the message, to work there full-time in January 2014.

–There is no denying that the guy has a fervent band of supporters he brings a rock star dynamic to the race, unlike almost anyone in the field," Neal Kwatra, a Democratic consultant, said.

–The challenge for him will be getting over the viability hump. If he can't make the sale to key institutional forces that he has a road map to a runoff, then he becomes more of a spoiler than a

legitimate contender," Mr. Kwatra said.

Mr. Liu joins other major Democrats who have officially entered the race. A week earlier, Christine C. Quinn, the City Council speaker, who has been leading comfortably in early polls, announced her candidacy through Twitter and a video, then visited all five boroughs for a ―walk and talk" tour. A month ago, Bill de Blasio, the public advocate, made his announcement outside his row house in Park Slope, Brooklyn, to emphasize his outer-borough appeal. William C. Thompson Jr., who lost a close race to Mr. Bloomberg in 2009, said in 2010 that he would run again.

Mr. Liu's kickoff was far more raucous and chaotic, with the City Hall announcement as a microcosm. There were so many people trying to squeeze onto the City Hall steps that aides to Mr. Liu asked supporters to move aside, saying Mr. Liu, his wife and their son would be unable to pass through. Then Mr. Liu delivered his remarks twice once for the people at City Hall, and then for several dozen more at City Hall Park who could not get closer. And finally, he held an unscheduled news conference, before answering even more questions, on his way to his next event, from reporters with Mexican and Chinese television stations.

Virtually every question was about the federal investigation into his fund-raising. On April 15, two associates, including his former treasurer, are scheduled to stand trial on fraud charges. And though Mr. Liu, 46, has not been accused of wrongdoing, court documents have left little doubt that prosecutors have questioned his conduct.

On Sunday, Mr. Liu maintained his defiant posture, saying, ―People have said there's a witch hunt; the problem is, there's no witch."

Asked if he was concerned about his fund-raising, which has lagged, Mr. Liu said: ―What are you guys talking about? You guys don't understand campaign financing at all, do you?"

Earlier in the day, at the Staten Island St. Patrick's Day parade, Mr. Liu was speed-walking down the sidewalk and passed Mr. Bloomberg, who was walking in the street.

Selassie Samuel, 27, saw Mr. Liu coming with his small retinue of photographers, reporters and staff members. He turned, smiled and asked to have his picture taken with Mr. Liu. Afterward, Mr. Samuel asked a reporter, ―Who was that?"

*Christopher Maag contributed reporting.*

ON (1 OF 28 ARTICLES)

**ironx Is Now etraying It**

# Exhibit C



# $3.4M is Liu's to lose

By DAVID SEIFMAN
*Last Updated:* 2:41 AM, March 24, 2013
*Posted:* 12:54 AM, March 24, 2013

Operating largely under the radar, Comptroller John Liu has pulled off an amazing feat in the race for mayor by filing claims that would entitle him to $3.4 million in public matching funds.

Liu s accomplishment is impressive on several fronts.

The $564,400 he has amassed for matching purposes is second only to the $637,038 rounded up by City Council Speaker Christine Quinn, who leads in the polls and has raised twice as much overall as her less successful rival.

Liu has concentrated on smaller contributions and has tapped donors outside the wealthy Manhattan core particularly in Asian-American strongholds that include his base in Flushing, Queens to haul in about $3.2 million. He s got $2 million left.

That was our whole fund-raising strategy," confided one Liu ally.

Donations from city residents are matched on a generous six-to-one basis, up to $1,050 for every $175 contributed.

So the more small donations, the higher the match.

In fact, Liu has received only 11 checks at the maximum $4,950 level. In comparison, Quinn has 440, Public Advocate Bill de Blasio has 268 and Bill Thompson has 221.

So if there s a grass-roots contender in this race, it s as much Liu as it is the lesser-known Sal Albanese, who emphasizes as often as possible that he s not beholden to big-money special interests.

Under normal circumstances, Liu would be sitting pretty.

But this year s mayoral contest is anything but normal.

Two of Liu s associates, former treasurer Jenny Hou and contributor Oliver Pan, are scheduled to go on trial in federal court next month on charges of trying to game the campaign-finance system the same system in which Liu hopes to cash in his pile of matching chits.

The agency that s supposed to hand over that money is the Campaign Finance Board, which is still working to complete audits of both Liu s and de Blasio s 2009 campaign accounts.

CFB officials will be monitoring the trials to determine if there s any reason they shouldn t be handing over public funds to Liu.

Liu hasn t been accused of any wrongdoing himself.

But the CFB rules cover staffers as well as candidates.

In Chapter 5 of the CFB regulations, one reason cited for an "ineligibility determination" would be "if the participant or an agent of the participant has been found by the Board to have committed fraud in the course of the program . . ."

If Hou gets convicted, the Campaign Finance Board will be in a difficult position with regards to Liu.

As a guardian of the public funds, it ll have to decide if there was enough evidence to trigger the ineligibility provision. At the same time, the agency doesn t want to be accused of disenfranchising voters who are supporting one of the four major contenders in the Democratic race.

Liu insists he s in the race to the end. But if he doesn t collect the $3.4 million, he ll be limping to the finish line.

david.seifman@nypost.com

NEW YORK POST is a registered trademark of NYP Holdings, Inc.

nypost.com , nypostonline.com , and newyorkpost.com are trademarks of NYP Holdings, Inc.

Copyright 2013 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use

# Exhibit D

# Manhattan U.S. Attorney And FBI Assistant Director-In-Charge Announce Federal Corruption Charges Against New York State Senator Malcolm Smith And New York City Council Member Daniel Halloran

**FOR IMMEDIATE RELEASE**
Tuesday, April 2, 2013

### *Two New York City Party Leaders and Two Elected Officials in the Village of Spring Valley Also Charged in Bribery Schemes*

### *Charges Include Cash Bribes of More Than $100,000 Changing Hands in Connection With Republican Mayoral Ballot, City Council Discretionary Funds, and Spring Valley Development Project*

Preet Bharara, United States Attorney for the Southern District of New York, and GEORGE VENIZELOS, the Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced today the unsealing of a Complaint charging New York State Senator MALCOLM SMITH, New York City Council Member DANIEL HALLORAN, and four others with bribery, extortion, and fraud charges. The charges against the defendants arise from an undercover investigation of three distinct but related bribery schemes involving public corruption. In the first scheme, SMITH allegedly arranged for cash bribes totaling $40,000 to be paid to VINCENT TABONE and JOSEPH SAVINO, two New York City Republican county leaders, as part of an effort by SMITH, who is a Democrat, to appear on the Republican primary ballot as a mayoral candidate in the 2013 election. HALLORAN is alleged to have received approximately $20,500 in cash bribes to act as an intermediary with TABONE and SAVINO on SMITH's behalf. In the second scheme, HALLORAN allegedly received approximately $18,300 in cash bribes and $6,500 in straw donor campaign contribution checks in exchange for agreeing to steer up to $80,000 of New York City Council discretionary funding to a company he believed was controlled by those who paid him the bribes. The final scheme involved NORAMIE JASMIN and JOSEPH DESMARET, the Mayor and Deputy Mayor of the Village of Spring Valley in Rockland County, and their alleged receipt of financial benefits, including JASMIN's receipt of a hidden interest in a real estate project and DESMARET's receipt of approximately $10,500 in cash bribes, in exchange for official acts. All six defendants were arrested this morning and will be presented later today in White Plains federal court before U.S. Magistrate Judge Lisa Margaret Smith.

Manhattan U.S. Attorney Preet Bharara said: "Today's charges demonstrate, once again, that a show-me-the-money culture seems to pervade every level of New York government. The complaint describes an unappetizing smorgasbord of graft and greed involving six officials who together built a corridor of corruption stretching from Queens and the Bronx to Rockland County and all the way up to Albany itself. As alleged, Senator Malcolm Smith tried to bribe his way to a shot at Gracie Mansion – Smith drew up the game plan and Councilman Halloran essentially quarterbacked that drive by finding party chairmen who were wide open to receiving bribes. After the string of public corruption scandals that we have brought to light, many may rightly resign themselves to the sad truth that perhaps the most powerful special interest in politics is self-interest. We will continue pursuing and punishing every corrupt official we find, but the public corruption crisis in New York is more than a prosecutor's problem."

FBI Assistant Director-in-Charge George Venizelos said: "Elected officials are called public servants because they are supposed to serve the people. Public service is not supposed to be a shortcut to self-enrichment. People in New York, in Spring Valley -- in any city or town in this country -- rightly expect their elected or

appointed representatives to hold themselves to a higher standard. At the very least, public officials should obey the law. As alleged, these defendants did not obey the law; they broke the law and the public trust. There is a price to pay for that kind of betrayal."

According to the allegations in the Complaint unsealed today in White Plains federal court:

### *Scheme to Bribe New York City Republican Party Committee Leaders*

Under New York State law, a person seeking to run for a citywide position in New York City may not have his or her name listed as a candidate on the ballot if he or she is not a registered member of the party having the primary contest unless he or she receives the approval of at least three of the five chairmen of the county committees for that party. The approval is given in the form of what are known as Wilson Pakula certificates, which are signed by the approving chairmen.

SMITH, a Democrat, was first elected to the New York State Senate in March 2000, and represents the 14th Senatorial District in Queens, New York. He is chairman of the Independent Democratic Conference of the State Senate and, among other positions, has served as the State Senate's minority and majority leader. SMITH has spoken publicly about his desire to run for Mayor of New York City in 2013.

HALLORAN, a Republican, was elected to the New York City Council in 2009, and represents the City Council's 19th District in Queens, New York. HALLORAN ran unsuccessfully for the United States Congress in 2012. TABONE and SAVINO are New York City Republican Party officials. SAVINO is the Chairman of the Bronx County Republican Party and TABONE is the Vice Chairman of the Queens County Republican Party. Their duties include endorsing candidates for public office and voting on Wilson Pakula certificates.

In November 2012, SMITH agreed with HALLORAN, an undercover FBI agent posing as a wealthy real estate developer (the "UC"), and a cooperating witness ("CW") to bribe New York City Republican Party county leaders in exchange for their issuance of Wilson Pakula certificates that would enable SMITH to run as a Republican candidate for New York City Mayor in 2013. When asked by the UC what he wanted in exchange for his help securing the certificates, HALLORAN said that he wanted to get his "mortgage situation resolved," and that if SMITH was elected mayor, he would expect to be named Deputy Police Commissioner if he asked for the job. He also solicited and received from the UC and the CW approximately $20,500 in cash for himself.

In furtherance of the scheme, HALLORAN arranged for the UC and the CW to meet TABONE and SAVINO, and negotiated the amounts of the cash bribes to be paid by the UC and the CW to TABONE and SAVINO on SMITH's behalf. HALLORAN told the UC and the CW that, "you gotta get [SAVINO] business but put twenty-five in an envelope....TABONE is twenty-five up front, twenty-five when the Wilson Pakula is delivered." After his meeting with the UC and the CW, SAVINO accepted $15,000 in cash and agreed to accept another $15,000 after he formally approved Smith's appearance on the 2013 Republican ballot for New York City Mayor. After meeting with the UC and the CW, TABONE accepted $25,000 in cash and agreed to accept another $25,000 after his committee approved Smith's appearance on the 2013 Republican ballot for New York City Mayor.

In exchange for the payment of bribes to TABONE and SAVINO by the UC and CW, in his capacity as a New York State Senator, SMITH agreed to help obtain $500,000 in New York State funds for road work that would benefit a real estate project in Spring Valley that SMITH understood was being developed by a company controlled by the UC and CW ("the Company").

### *Bribery of HALLORAN to Steer City Council Discretionary Funding*

Since August 2012 to the present, HALLORAN accepted approximately $18,300 in cash bribes and approximately $6,500 in straw donor campaign contribution checks from the UC and the CW in exchange for agreeing to steer up to $80,000 in New York City Council discretionary funding to the Company.

For example, at a meeting on September 7, 2012, at which HALLORAN and the UC discussed HALLORAN's need to raise money for his congressional campaign, HALLORAN agreed to hire someone of the CW's choosing for a congressional staff or some equivalent position, and to help him raise money for his campaign. During the discussion, HALLORAN said: "That's politics, that's politics, it's all about how much. Not whether or will,

it's about how much, and that's our politicians in New York, they're all like that...And they get like that because of the drive that the money does for everything else. You can't do anything without the f***ing money." During the meeting, the CW paid HALLORAN $7,500. And near the end of the meeting, HALLORAN remarked: "Money is what greases the wheels – good bad, or indifferent."

In furtherance of this scheme, HALLORAN wrote two letters on New York City Council letterhead about this funding, one to civic organizations and the other to the Company. Despite suggesting in these letters that work would be done by the Company to support the allotment of up to $80,000, HALLORAN agreed with the UC and the CW that the Company would provide no services.

### ***Bribery of the Spring Valley Mayor and Deputy Mayor***

NORAMIE JASMIN and JOSEPH DESMARET were sworn in as Mayor and Deputy Mayor of the Village of Spring Valley, New York in December 2009. From September 2011 through the date of the Complaint, JASMIN and DESMARET accepted financial benefits from the UC and the CW in exchange for official acts. DESMARET accepted approximately $10,500 worth of cash bribes from the UC and the CW in exchange for, among other things, his vote in favor of a sale of land owned by Spring Valley to the Company a company he believed was controlled by the UC and that would be used to build a community center (the "Real Estate Project").

In exchange for her vote awarding the Real Estate Project to the Company, JASMIN demanded a partnership interest in the Company, stating: "So for me, it's better for us to partner, that's what I said to you before; a partnership will be best." When the CW later suggested that JASMIN have a 20% stake in the project, she replied: "Partnership is fifty fifty, right?"

In support of the scheme, JASMIN coached the UC on how to make his presentation to the Spring Valley Village Board of Trustees about why the board should award the Real Estate Project to his company. She also coached two other individuals, whom she understood were associates of the UC and who would pose as competing developers, but who were actually undercover FBI agents, on how to make their presentation to the Village Board. In addition, both JASMIN and DESMARET agreed to steer to the UC's company the New York State funding for road work that SMITH agreed to help the CW and the UC obtain.

*         *         *

Charts containing the names, ages, residences, charges, and maximum penalties for the defendants are attached.

Mr. Bharara praised the investigative work of the FBI. He also thanked the Rockland County District Attorney's Office and the Spring Valley Police Department for their invaluable assistance to the investigation.

This case is being handled by the Office's White Plains Division and Public Corruption Unit. Assistant U.S. Attorneys Douglas B. Bloom and Alvin Bragg are in charge of the prosecution.

The charges contained in the Complaint are merely accusations and the defendants are presumed innocent unless and until proven guilty.

13-110

**United States v. Malcolm A. Smith et al.**

| DEFENDANT | RESIDENCE | AGE |
|---|---|---|
| MALCOLM SMITH | Queens, NY | 56 |
| DANIEL HALLORAN | Queens, NY | 42 |
| VINCENT TABONE | Queens, NY | 46 |
| JOSEPH SAVINO | Rockland County, NY | 45 |
| NORAMIE JASMIN | Spring Valley, NY | 49 |
| JOSEPH DESMARET | Spring Valley, NY | 55 |

| COUNT | CHARGE | DEFENDANTS | MAXIMUM PENALTY |
|---|---|---|---|
| 1 | Wire fraud and Travel Act bribery conspiracy | MALCOLM SMITH<br>DANIEL HALLORAN<br>VINCENT TABONE<br>JOSEPH SAVINO | Five years in prison |
| 2 | Wire fraud | MALCOLM SMITH<br>DANIEL HALLORAN<br>VINCENT TABONE<br>JOSEPH SAVINO | 20 years in prison |
| 3 | Hobbs Act | MALCOLM SMITH | 20 years in prison |
| 4 | Wire Fraud | DANIEL HALLORAN | 20 years in prison |
| 5 | Mail Fraud | NORAMIE JASMIN | 20 years in prison |
| 6 | Mail Fraud | JOSEPH DESMARET | 20 years in prison |

# Exhibit E

PRESS RELEASES

Printer Friendly

# Manhattan U.S. Attorney Announces Bribery Charges Against New York State Assemblyman Eric Stevenson In Connection With Alleged Scheme To Sell Legislation For Cash

**FOR IMMEDIATE RELEASE**
Thursday, April 4, 2013

***Four Others Charged in Bribery Scheme in Which Stevenson Drafted and Sponsored Legislation in Exchange for More Than $22,000 in Cash and Campaign Contributions***

***Second Assemblyman Cooperated in the Investigation and Has Agreed to Resign***

Preet Bharara, United States Attorney for the Southern District of New York, and Robert T. Johnson, the District Attorney for Bronx County, announced today the unsealing of a Complaint charging New York State Assemblyman ERIC STEVENSON with accepting bribes in exchange for official acts. STEVENSON is charged with taking more than $22,000 in bribes from IGOR BELYANSKY, ROSTISLAV BELYANSKY (a/k/a "SLAVA"), IGOR TSIMERMAN, and DAVID BINMAN, all of whom are also charged, in exchange for STEVENSON's official acts, which include drafting, proposing, and agreeing to enact legislation. Specifically, BELYANSKY, SLAVA, TSIMERMAN, and BINMAN, who were interested in operating and constructing adult day care centers in the Bronx, allegedly paid STEVENSON to sponsor, and ultimately cause to be enacted, legislation that would declare a three-year moratorium on the construction of adult day care centers in New York City, but from which their current centers would be exempted. In connection with one of the defendants' adult day care centers on Jerome Avenue in the Bronx (the "Jerome Avenue Center"), STEVENSON is also alleged to have used his office to facilitate the issuance of a certificate of occupancy and the installation of a gas line. In addition, he is alleged to have held events in his official capacity to recruit senior citizens to attend a second center on Westchester Avenue in the Bronx (the "Westchester Avenue Center"). Four of the defendants were arrested this morning and the fifth, TSIMERMAN, self-surrendered . All of the defendants will be presented in Manhattan federal court later today.

Manhattan U.S. Attorney Preet Bharara said: "For the second time in three days, we unseal criminal charges against a sitting member of our state legislature. As alleged, Assemblyman Eric Stevenson was bribed to enact a statutory moratorium to give his co-defendants a local monopoly – a fairly neat trick that offends core principles of both democracy and capitalism, simultaneously, and it is exactly what the defendants managed to do. The allegations illustrate the corruption of an elected representative's core function – a legislator selling legislation. And based on these allegations, it becomes more and more difficult to avoid the sad conclusion that political corruption in New York is indeed rampant and that a show-me-the- money culture in Albany is alive and well."

Bronx County District Attorney Robert T. Johnson said: "The conduct alleged in these charges can only shake public confidence in those who have been entrusted to govern and deliver taxpayer funded services fairly and honestly. What is most disturbing here is that an elected official allegedly acted not only to personally enrich himself, but was willing to limit the community's access to a needed service by advancing legislation designed to effectively bar any other providers of day care for seniors from operating in a specified geographical area.

While it is our hope that every prosecution of this type should help drive home the message that honest, hard-working citizens will not tolerate elected officials who serve themselves rather than the members of the communities who put them into office, the message is sometimes ignored. These bribes allegedly were solicited even with the knowledge of successful past prosecutions of a long list of corrupt politicians. If there

Manhattan U.S. Attorney Announces Bribery Charges Against New York State Assemblyman Eric Stevenson In Connection With Alleged Scheme To Sell Legislati...

is any good news regarding today's arrests, it is that talented investigators, such as those in my office and the U.S. Attorney's office, will continue to do everything possible to bring alleged betrayals of the public trust to light and those responsible to justice."

According to the Complaint unsealed today in Manhattan federal court:

STEVENSON has served as a member of the New York State Assembly since 2011 representing District 79, which includes various neighborhoods in the Bronx. ASSEMBLYMAN-1 is another member of the New York State Assembly who has been cooperating in this investigation since January 2012. ASSEMBLYMAN-1 has been charged with multiple felonies in a sealed Indictment in Bronx County Supreme Court (the "Bronx Indictment"), but has entered into a non-prosecution agreement under which he has agreed to continue to cooperate and to resign his office with the New York State Assembly. BELYANSKY, SLAVA, TSIMERMAN, and BINMAN are individuals who, during 2012 and 2013, were seeking to open and manage adult day care centers in the Bronx, New York, including the Westchester Avenue Center, within STEVENSON's Assembly District and the Jerome Avenue Center, within ASSEMBLYMAN-1's District. During that time period, they made multiple bribe payments to STEVENSON and ASSEMBLYMAN-1, who was cooperating with the government at the time, in connection with efforts to open and operate both centers.

For example, at a meeting on July 23, 2012, STEVENSON, BELYANSKY, and TSIMERMAN discussed the opening of the Westchester Avenue Center. During this meeting, STEVENSON said that on the following Thursday, July 26, 2012 he was "having a night [event]" for "my reelection" and that [he needed] the support and help like everyone else." Subsequently, on July 25, 2012, SLAVA provided a cooperating witness (the "CW") with a check for $2,000 made out to STEVENSON's political action committee, which the CW provided to STEVENSON.

At a September 7, 2012 meeting at a steakhouse in the Bronx, BELYANSKY and SLAVA offered to pay STEVENSON $10,000 in exchange for calling Con Edison to expedite the installation of a gas line and assisting with obtaining a Certificate of Occupancy from the New York City Buildings Department at the Jerome Avenue Center, and for assistance recruiting senior citizens to attend the Westchester Avenue Center. STEVENSON agreed, but when BELYANSKY attempted to hand him the $10,000 in an envelope, STEVENSON indicated that he was concerned that there might be surveillance cameras in the restaurant, so the transaction was conducted outside. On September 18, 2012, STEVENSON gave the CW a $1,500 cut of the $10,000 bribe in exchange for the CW's assistance, and promised to pay the CW an additional $500.

On December 27, 2012, the CW met with STEVENSON and showed STEVENSON a copy of an email dated December 26, 2012, sent from the contractor for the Jerome Avenue Center to SLAVA and TSIMERMAN. In the email, the contractor stated that "[i]t is urgent . . . that we call the State Senator Eric Stevenson so that he can call the building department at once and ask them to have this application reviewed" in connection with getting "a permit to install the gas lines into the building." After reviewing this email, STEVENSON stated, "he's not a smart guy . . . he's not too bright, this guy" because "he put this in writing . . . why he got to put my name in it? . . . He shouldn't have said that." STEVENSON said they needed to avoid creating a "paper trail."

During that meeting, the CW and STEVENSON also discussed the possibility of STEVENSON introducing legislation that would establish a temporary moratorium on the construction and/or opening of new adult day care centers (the "Moratorium Legislation"), which would have the effect of eliminating competition with the Jerome Avenue Center and the Westchester Avenue Center, thereby substantially increasing the profits earned by those two centers. STEVENSON told the CW: "All you gotta do is tell me what you want in the bill, and the bill drafter will put it together...I just need you to tell me what they [the co-defendants] want; we prepare the bill . . . . You can write down the language, basically what you want." STEVENSON then asked: "Are Igor [BELYANSKY] and them putting together a nice little package [of money] for me, huh?" He said: "I got my inauguration I gotta take care of, I got a lot of sh*t man." STEVENSON then said to the CW, in reference to the legislation, "I'm telling you, it's done. It's no problem." Subsequently, the CW met with TSIMERMAN and BELYANSKY. TSIMERMAN said that as a result of the Moratorium Legislation, the value of their adult day care centers was "gonna skyrocket. . . . As long as [there's a] moratorium, I can guarantee you at least a triple [in profits]."

On January 1, 2013, the CW and STEVENSON spoke on the telephone and STEVENSON referred to "Igor" [BELYANSKY] as "Santa," in reference to the money he expected to receive. In a subsequent meeting on the

http://www.justice.gov/usao/nys/pressreleases/April13/Stevensonetal.php?print=1[4/8/2013 12:12:44 PM]

Manhattan U.S. Attorney Announces Bribery Charges Against New York State Assemblyman Eric Stevenson In Connection With Alleged Scheme To Sell Legislati.

same day in the CW's car, STEVENSON sought assurances that "Igor" [BELYANSKY] was going to "bless everything," meaning pay STEVENSON. He added that: "I got the inauguration, I want a blessing [payment] in place, man." Two days later, the CW gave BELYANSKY and SLAVA a copy of a document titled "Proposed Adult Day Care Center Bill," which contained a proposal for the Moratorium Legislation. On January 7, 2013, the CW provided the same proposal to STEVENSON. Later that day, TSIMERMAN provided STEVENSON with another copy of the proposal containing TSIMERMAN's notes. On January 9, 2013, the CW told BELYANSKY that STEVENSON wanted $10,000 for the Moratorium Legislation, with $5,000 paid up front. Two days later, on January 11, 2013, at the Westchester Avenue Center, BELYANSKY, SLAVA, TSIMERMAN, and BINMAN gave the CW $5,000 cash. The CW then left the Westchester Avenue Center with the envelope of money and got in his car where STEVENSON joined him, at which time the CW gave the envelope of money to STEVENSON, after taking out his $500 cut.

On January 27, 2013, STEVENSON met with the CW and told the CW that he was concerned that TSIMERMAN might be cooperating with law enforcement officials and recording their conversations. STEVENSON expressed a concern that if "they bring me down... somebody's going to the cemetery."

STEVENSON had a draft of the Moratorium Legislation prepared by January 31, 2013 which he showed the CW at a meeting in his office and which was consistent with the bullet points. On February 11, 2013, STEVENSON told the CW: "We got the bill [the Moratorium Legislation] back today . . . [t]he bill is done now, it's going out to the members . . . to the committee and . . . we're gonna . . . try to push it to get it to the floor." On February 16, in a hotel room in Albany, SLAVA gave $5,000 in cash to the CW, which the CW gave to STEVENSON after taking a $500 cut. While the CW took out his $500 cut, STEVENSON walked into the bathroom of the CW's room and left the door open so that he could receive the $4,500 cash in the bathroom.

STEVENSON introduced and sponsored Bill Number A05139, which places a temporary moratorium on the construction and/or opening of new adult day care centers within New York City on February 20, 2013 and it is currently pending before the New York State Assembly's Committee on Aging. Two days later, in a meeting between the CW and BELYANSKY, TSIMERMAN and BINMAN, BELYANSKY said that the legislation would double the value of his share in the Jerome Avenue and Westchester Avenue Centers from approximately $350,000 to $700,000.

In the course of recorded conversations between STEVENSON and the CW, STEVENSON repeatedly referenced the convictions and sentences of other New York officials for corruption crimes, even as STEVENSON himself requested bribe payments. For example, during one meeting between STEVENSON and the CW on December 27, 2012, STEVENSON observed, "if half of the people up here in Albany was ever caught for what they do . . . they . . . would probably be in [jail] . . . so who are they bullsh**ing?" During the same meeting, STEVENSON and the CW discussed the sentences imposed on New York City Councilman Miguel Martinez, New York State Senator Efrain Gonzalez, and New York State Senator Carl Kruger. During another meeting, on January 1, 2013, after discussing the convictions of former New York State Senator Carl Kruger, former New York State Senator Pedro Espada, Jr., and former New York State Comptroller Alan Hevesi, STEVENSON commented on being "careful" about "the recorders and all those things" that informants wear in order to be careful not to "put yourself in jail."

*        *        *

Charts containing the names, ages, residences, charges, and maximum penalties for the defendants are attached.

Mr. Bharara praised the work of the investigators from the United States Attorney's Office for the Southern District of New York and the District Attorney's Office for Bronx County.

This prosecution is being handled by the Office's Public Corruption Unit. Assistant U.S. Attorneys Paul M. Krieger and Brian A. Jacobs and Special Assistant United States Attorney Elizabeth A. Brandler of the Bronx County District Attorney's Office are in charge of the prosecution.

The charges contained in the Complaint are merely accusations and the defendants are presumed innocent unless and until proven guilty.

13-114

http://www.justice.gov/usao/nys/pressreleases/April13/Stevensonetal.php?print=1[4/8/2013 12:12:44 PM]

# Exhibit F

# Deafening Silence From Albany Pols

*Excerpted from US Attorney Preet Bharara's remarks yesterday, announcing his case in US v. Eric Stevenson.*

SO here we go again. This is getting to be something of a habit.

For the second time in three days, we unseal criminal charges against a sitting member of our state Legislature. And based on what is alleged in this latest complaint, it becomes more and more difficult to avoid the sad conclusion that political corruption in New York is indeed rampant and that a show-me-the-money culture in Albany is alive and well.

Today we announce federal corruption charges against one assemblyman and the resignation of another — who himself was previously caught breaking the law, wisely decided to cooperate with the government, and whose efforts (including wearing a wire) helped lead to today's charges.

Today's 36-page criminal complaint alleges that state Assemblyman Eric Stevenson accepted over $22,000 in bribes from four businessmen in exchange for helping them open and operate adult day-care centers in The Bronx.

He allegedly not only helped the businessmen obtain necessary permits and recruit clientele, but also — in exchange for cash bribes — introduced actual legislation barring the opening of competing adult day-care centers in the city.

Since the beginning of 2012, four businessmen were trying to open and manage adult day-care centers in The Bronx. As alleged, they wanted help to get their centers opened more quickly. But ultimately they also wanted legislation that would effectively grant them monopoly status.

And, as alleged, Assemblyman Stevenson was only too happy to oblige — for the right price:

- When they needed help getting a certificate of occupancy, Stevenson essentially said, *Show me the money.*
- When they needed help getting a gas line for their center, he essentially said, *Show me the money.*
- And when they needed a bill to protect against competition, he essentially said, *Show me the money.*

And money was shown, time after time after time.

Let me say a bit more about the moratorium bill that the defendants allegedly paid for — because those allegations, if proven, represent an especially breathtaking bit of corruption, even by Albany standards.

Those allegations represent the corrupt sale of an elected representative's core duty — a legislator selling legislation.

Stevenson was brazen and blunt in putting his core function up for sale:

PREET BHARARA

- In one recorded meeting in December, Stevenson tells the CW: "I just need you to tell me what they want; we prepare the bill... You can write down the language, basically what you want."
- He also says, making the *quid pro quo* clear: "Are Igor and them putting together a nice little package for me, huh?"
- There are discussions about how long the moratorium should be, what the draft should say, and other details.

How pervasive is corruption in New York government? We are provided something of an answer from the mouth of Assemblyman Stevenson, as recorded in this case: "Bottom line . . . if half of the people up here in Albany was ever caught for what they do . . . they . . . would probably be [in jail], so who are they BS-ing?"

That is Stevenson talking about his own colleagues.

The people of New York should be more than disappointed. They should be angry. When so many of their leaders can be bought for a few thousand dollars, they should be angry.

When it is more likely for a New York state senator to be arrested by the authorities than to be defeated at the polls, they should be angry.

And they should ask some pointed questions: How many other pending bills were born of bribery? How many *passed* bills were born of bribery? How about items in the budget? How much of the work of city and state government is tarnished by tawdry graft?

What has been perhaps most disheartening is the deafening silence of the many who, over the course of this investigation (and others), saw something and said nothing. They learned of suspicious and potentially criminal activity being conducted in the halls of the Capitol and elsewhere, and they said nothing.

No one made a call. No one blew the whistle. No one sounded the alarm. Rather, too many people looked the other way.

What does it say about the culture in our system of government when officials are aware of criminal conduct around them and they remain silent?

# Exhibit G

New York Law Journal

# With Arrest of Assemblyman, U.S. Attorney Presses on Against Political Corruption

Larry Neumeister and Tom Hays

The Associated Press

04-05-2013

For the second time this week, a political corruption scandal has resulted in the arrest of a New York politician, leading a prosecutor to say yesterday that political corruption in the state "is indeed rampant" and people should be angry about it.

Assemblyman Eric Stevenson, a Democrat from the Bronx, was arrested in a bribery investigation that also led another state assemblyman from the borough charged with crimes to cooperate with the understanding that he would resign his position with the arrests of Stevenson and four businessmen.

Stevenson and the others were charged in part with conspiring to pass a bill in the state Legislature to protect a new Bronx adult center from competitors for three years.

**See the complaint.**

Assemblyman Nelson Castro, D-Bronx, said yesterday that his cooperation with prosecutors led to the charges against Stevenson and that he is resigning from office effective April 8.

Castro, elected to the Assembly in 2008, says he was indicted a year later for perjury from an earlier civil case and agreed to cooperate with Bronx and federal prosecutors "in conjunction with various investigations aimed at rooting out public corruption."

Assembly Speaker Sheldon Silver, D-Manhattan, yesterday called for the resignation of Stevenson, saying the charges he faced would be a "clear violation of the public trust and cannot be tolerated."

The arrests came two days after federal authorities arrested state Senator Malcolm Smith, D-Queens, in an alleged plot to bribe his way into the New York City mayor's race. Smith, released

on bail, said he'll be vindicated. Several other politicians also were charged in that case.

At a news conference yesterday, Southern District U.S. Attorney Preet Bharara highlighted some of Stevenson's quotes heard by investigators, including one in which the assemblyman allegedly said "if half of the people up here in Albany was ever caught for what they do…they…would probably be in (jail)."

Bharara, who two days earlier said corruption in New York politics "seems downright pervasive," said yesterday that "it becomes more and more difficult to avoid the sad conclusion that political corruption in New York is indeed rampant and that a show-me-the-money culture in Albany is alive and well."

He added: "The people of New York should be more than just disappointed. They should be angry…When it is more likely for a New York state senator to be arrested by the authorities than to be defeated at the polls, they should be angry. And they also should ask some pointed questions: Given the allegations in today's case, how many other pending bills were born of bribery? And worse, how many passed bills were born of bribery?"

It was not immediately clear who would represent Stevenson, 46, at a court appearance on bribery, conspiracy and other charges.

In court papers, the government said Stevenson accepted more than $22,000 in bribes in exchange for drafting, proposing and agreeing to enact legislation to aid his codefendants' businesses, including an adult day care center in the Bronx called the Westchester Avenue Center, which opened a month ago. In return for bribes, the government said Stevenson agreed to propose legislation that would ban new adult centers from opening for three years.

The government said it had audio and videotaped conversations between the defendants, including a video of Stevenson accepting an envelope containing $10,000 in cash last September outside a steak house after the assemblyman had balked at receiving the money inside the restaurant because he feared it would be captured by the business' surveillance system.

According to court papers, law enforcement officers videotaped Stevenson stuffing the envelope into his front pants pocket and covering the pocket with the bottom of his shirt.

Besides the steak house, Bharara said cash was exchanged at the cooperating witness' car and in the bathroom of an Albany hotel.

"Assemblyman Stevenson was only too happy to oblige for the right price," Bharara said. "He basically said, 'Show me the money'…And the money was shown over and over and over again."

The government described Stevenson as growing increasingly paranoid about the possibility of being caught as the plot proceeded in the ensuing months, alleging that he said it was important not to "put yourself in jail" and other times boastful of the seemingly light prison sentences given to corrupt politicians. Referring to one of them, he said: "They got him in the, the easiest federal

penitentiary you could ever be in," the government alleged.

In a Jan. 27 conversation described in court papers, the government quoted Stevenson as expressing concern that one of the businessmen he was dealing with might be cooperating with law enforcement.

According to court papers, Stevenson said he was worried that they could "bring me down." If so, "somebody's going to the cemetery," the government said Stevenson told a cooperator in a recorded conversation.

*@|Associated Press writers Michael Virtanen and George M. Walsh in Albany contributed to this report.*

---

Copyright 2013. ALM Media Properties, LLC. All rights reserved.

# Exhibit H

Case 1:12-cr-00153-RJS Document 123 Filed 04/09/13 Page 76 of 76

# Cuomo Weighs Action on Corruption

## *In Wake of Lawmaker Arrests on Bribery Charges, Governor Considers a Special Commission to Investigate the Legislature*

BY ERICA ORDEN

Gov. Andrew Cuomo is discussing several legislative and policy options to address corruption in the capital following two federal bribery cases in recent days that involved Albany lawmakers, according to people familiar with the matter.

Among the possibilities under examination: an executive order to establish a commission under the Moreland Act that would investigate the state Legislature, according to two people familiar with the matter.

It is unclear how seriously that option is being considered.

Mr. Cuomo, a Democrat, took office in 2011 vowing to clean up Albany. The two federal corruption cases unveiled this week involving state lawmakers have prompted calls for the governor to seize the opportunity to enact sweeping change.

Democratic State Sen. Malcolm Smith, Republican New York City Council Member Dan Halloran and four others were charged Tuesday in a wide-ranging corruption scheme. All the defendants have denied wrongdoing. Bronx County GOP Chairman Jay Savino, one of those charged, has since announced his plans to resign.

And on Thursday, federal prosecutors charged Democratic Bronx Assemblyman Eric Stevenson and a group of businessmen with bribery, a case that has already resulted in the announced resignation of a second assemblyman. The defendants have denied wrongdoing.

Federal prosecutors "are doing everything we can to proactively attack the corruption problem," said U.S. Attorney Preet Bharara. "It's time for others to step up and do more."

As New York City Mayor Michael Bloomberg put it Friday: "I don't think it can get worse."

In a radio appearance on Friday, Mr. Cuomo characterized the week's developments as "sort of the age-old story. It's greed. It's arrogance. It's power. It's people thinking they're smarter than anyone else and they're going to beat the system."

He said the state needed "a lot of reforms going forward," including revised laws for state prosecutors that would match federal laws and result in "prosecutors who are actually empowered to bring the case," and also needed to "get the money out of politics."

In his first year in office, Mr. Cuomo coaxed the state Legislature into passing changes to ethics laws that forced lawmakers to disclose the sources and amount of their outside income, and required advocacy organizations to disclose their large donors.

Some of the provisions—including the online posting of disclosure forms and a requirement that lawmakers disclose clients who have business before the state—go into effect next month.

Still, there is mounting insistence that he do more. "The governor has outlined an ambitious agenda to deal with what we all recognize is a corrupting culture in Albany, and he has put some of that in place," said Susan Lerner, executive director of Common Cause New York, an advocacy group.

"But this really puts pressure on the governor to complete his agenda," she said.

A central element remaining on that agenda is possible changes to the state's campaign-finance laws, which the governor has identified as a priority for

*Please turn to page A17*

# Cuomo Weighs Corruption Fight

*Continued from page A15*

the current legislative session.

Mr. Cuomo said in March he was "cautiously optimistic" he could persuade the Legislature to overhaul those laws.

He is seeking to lower limits on political contributions and require disclosure of them within hours of when they are made.

But he has cast doubt on the likelihood that the Legislature would pass a public-financing system for state elections, a measure Senate Republicans have opposed.

Mr. Cuomo also could pursue legislation that would make lawmakers full-time employees of the state and therefore prevent them from earning income from outside sources. Theoretically, that would dissuade some of the conflicts of interest that many believe prompt lawmakers to engage in unethical activity.

Or he could propose changes to the law that would make it easier for the state to prosecute bribery cases that have a political context.

No matter what laws are proposed, those versed in the ways of Albany agree few legislative or other tactics could curb the activity of elected officials who are willing to break the law.

"There's no question that there's no perfect solution to old-fashion corruption. We're not talking about misuse of campaign dollars. We're talking about straight-out bribery," said Ms. Lerner, referring to this week's cases. "But we believe there is a pay-to-play culture in Albany that is encouraging the worst aspects of an individual's culture. Unfortunately, fair elections is not going to change human nature. But it can discourage it."

A spokesman for Senate Majority Coalition Co-leader Dean Skelos, Scott Reif, said: "While no legislation would prevent someone from committing corrupt acts, using one's public office for personal gain is never acceptable. Senator Skelos will be working closely with the Governor and Assembly to root out corruption so New Yorkers have a government they can be proud of."

On Friday, Mr. Cuomo sounded as if he took personal offense to the idea that Albany hadn't reformed its ways under his watch.

"For me, it was very painful, because we've been working so hard for the past couple of years to tell the story that I was just talking about: making the government work, restoring integrity, restoring pride," he said. "And this is truly tarnishing that image. And it's frustrating, it's hurtful and it's appalling."