UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                              S1 12 Cr. 153 (RJS)

JIA HOU,
        a/k/a "Jenny Hou,"

                        Defendant.
-------------------------------------------------------X

## SENTENCING MEMORANDUM OF JIA (JENNY) HOU

September 24, 2013                      GERALD B. LEFCOURT, P.C.
                                       Gerald B. Lefcourt
                                       Sheryl E. Reich
                                       Renato C. Stabile
                                       148 East 78th Street
                                       New York, N.Y. 10075
                                       (212) 737-0400
                                       (212) 988-6192
                                       lefcourt@lefcourtlaw.com
                                       *Attorneys for Jenny Hou*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

Introduction ...................................................................................................................................... 1

A. Factual Background ................................................................................................................. 3

B. Ms. Hou's Objections To The Offense Level Calculation In The Presentence Report ....... 4

   1.  THERE SHOULD BE NO ENHANCEMENT FOR LOSS BECAUSE THE COURT
      SHOULD NOT CONCLUDE THAT MS. HOU WAS CONVICTED UNDER
      COUNT TWO BASED ON THE MAY 9 AND AUGUST 17 EVENTS, AS
      OPPOSED TO THE THOMAS WANG SOLICITATION .......................................... 5

   2.  THERE SHOULD BE NO ENHANCEMENT FOR BEING A MANAGER OR
      SUPERVISOR, UNDER §3B1.1(b) ............................................................................ 9

   3.  THERE SHOULD BE NO ENHANCEMENT FOR ABUSE OF POSITION OF
      TRUST, UNDER §3B1.3 .......................................................................................... 11

   4.  THERE SHOULD BE NO ENHANCEMENT FOR SOPHISTICATED MEANS,
      UNDER §2B1.1 (b)(10)(C) ....................................................................................... 12

C. MS. HOU'S BACKGROUND AND CHARACTER WARRANT A NON-JAIL
   SENTENCE IN THIS CASE .................................................................................................. 13

CONCLUSION ................................................................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States v. Booker*,
543 U.S. 220 (2005)................................................................................................................20

*United States v. Broderson*,
67 F.3d 452 (2d Cir. 1995).....................................................................................................11

*United States v. Jolly*,
102 F.3d 46 (2d Cir. 1996)......................................................................................................12

*United States v. Laljie*,
184 F.3d 180 (2d Cir. 1999)....................................................................................................11

*United States v. Lewis*,
93 F.3d 1075 (2d Cir. 1996)....................................................................................................12

*United States v. Ministro-Tapia*,
470 F.3d 137 (2d Cir. 2006)....................................................................................................20

*United States v. Nuzzo*,
385 F.3d 109 (2d Cir. 2004)....................................................................................................11

*United States v. Payne*,
63 F.3d 1200 (2d Cir. 1995)....................................................................................................10

*United States v. Sykes*,
637 F.3d 146 (2d Cir. 2011)....................................................................................................10

*United States v. Williams*,
475 F.3d 468 (2d Cir. 2007)....................................................................................................20

**STATUTES**

18 U.S.C. §1001..........................................................................................................................3

18 U.S.C. §1343..........................................................................................................................3

18 U.S.C. §1349..........................................................................................................................3

18 U.S.C. §1512..........................................................................................................................3

18 U.S.C. §3553(a) ...................................................................................................................20

18 §3553(a)(2)(B) .....................................................................................................................13

18 U.S.C. §3553(a)(2)(C) ..................................................................................................20

18 U.S.C. §3553(a)(2)(D) ..................................................................................................20

18 U.S.C. §3553 (a)(2) ................................................................................................3, 20

U.S.S.G. §2B1.1 (b)(1) ......................................................................................................9

U.S.S.G. §2B1.1 (b)(1)(C) .............................................................................................5, 4

U.S.S.G. §2B1.1 (b)(10)(C) ...............................................................................4, 12, 13, 14

U.S.S.G. §2B1.1, comment ...............................................................................................12

U.S.S.G. §3B1.1 (b) ......................................................................................................4, 9

U.S.S.G. §3B1.3 .......................................................................................................4, 11, 12

U.S.S.G. §3B1.3, comment ...............................................................................................11

U.S.S.G. §3B1.1, comment ...............................................................................................10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                      S1 12 Cr. 153 (RJS)

JIA HOU,
        a/k/a "Jenny Hou,"

                        Defendant.
--------------------------------------------------------X

### SENTENCING MEMORANDUM OF JIA (JENNY) HOU

#### Introduction

This memorandum and the accompanying character letters are respectfully submitted on

behalf of defendant Jenny Hou to assist the Court in determining the appropriate sentence in this

case. In its draft Presentence Report,[1] the United States Probation Department calculated a

United States Sentencing Guidelines' total offense level of 18. We believe the incorrect analysis

was used and that the correct offense level is nine. In Criminal History Category I, level 18 has

an advisory sentence of 27-33 months imprisonment; level nine has an advisory sentence of 4-10

months in Zone B, which allows for a non-incarcerative sentence.

The attempt to commit fraud charge was submitted to the jury on two theories – that Ms.

Hou sought to obtain campaign matching funds through straw donors related to the fundraising

events of May 9 and August 17, and a second theory, that she sought campaign funds for a

donation solicited from her ex-boyfriend Thomas Wang. Each of these two distinct options

drives significantly different Guidelines' outcomes: the one presented in the PSR, of a level 18,

and one *at least* as equally plausible, of a level 9. For the reasons we discuss herein, we submit

---

[1] We have not yet received the final PSR.

that Ms. Hou should be sentenced on the basis of the Wang solicitation only, which would result in a total offense level of 9. Although these are two very different offense level calculations, regardless of the offense level the Court determines, we request that the Court impose a non-jail sentence on Ms. Hou.

The United States government has been investigating the Comptroller of the City of New York, John Liu, since at least 2009. The investigation continues to this very day, with a witness scheduled to appear before the grand jury shortly. To gather information on Mr. Liu, the government has employed numerous tactics including confidential sources, ten wiretaps on six different phones (none belonging to Ms. Hou), agents posing as New York City Campaign Finance Board (NYCCFB) employees to interrogate campaign donors, a staged undercover operation using an FBI Agent posing as "Richard Kong," numerous grand jury subpoenas, search warrants for emails, grants of immunity to numerous cooperating witnesses, and has sought the cooperation of both defendants in this case against Liu, but Ms. Hou had no information to provide.

For the most part, the government's relentless pursuit of Liu turned up nothing and went nowhere, except for the arrest and prosecution of Jenny Hou, who was the newest, youngest, and most inexperienced member of the Liu Campaign. Barely 24 years old when she became the Campaign Treasurer, she had no prior experience in campaign finance and no legal/financial/accounting background; indeed, she had virtually no employment history. And after working as Liu's campaign treasurer for less than one year, she alone now faces the full brunt of the government's prosecution.

As other members of the Liu Campaign – John Liu, Mei-Hua Ru, Crystal Feng, Sharon Lee, Jorge Fanjul – and all of the wealthy businessmen involved in the May 9 straw donor

scheme, go on with their lives unscathed, Ms. Hou stands before the Court, facing jail time and certain deportation to China.

## A.  Factual Background

On May 2, 2013, following a jury trial, Ms. Hou was convicted of Counts Two, Three, and Four of the Superseding Indictment in this case. Count Two charged attempt to commit wire fraud, in violation of 18 U.S.C. §1343. Count Three charged obstruction of justice, in violation of 18 U.S.C. §1512. Count Four charged the making of false statements, in violation of 18 U.S.C. §1001. Ms. Hou was acquitted of Count One, conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349.

As more fully detailed in the papers submitted in support of Ms. Hou's motion pursuant to Fed.R.Crim.P. Rule 29, at trial, the government argued alternate theories of criminal liability as to each of the counts of conviction. Since the jury delivered a general verdict of guilt as to three of the four counts, it is impossible to know the jury's factual conclusions as to each theory of guilt: Ms. Hou's conduct related to the May 9, 2011 event; her conduct related to the August 17, 2011 event; or her July 2011 solicitation of a donation from her ex-boyfriend Thomas Wang.

While the Court denied Ms. Hou's Rule 29 motion, we raise it here because for sentencing purposes, different factual determinations would result in significantly different offense level calculations under the United States Sentencing Guidelines – level 18 versus level 9. Herein, we urge the Court to adopt the factual determinations that will result in the lower offense level for Ms. Hou. Regardless of the offense level determined by the Court, however, we urge the Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. §3553 (a)(2), which we believe should be a non-jail sentence.

### B. Ms. Hou's Objections To The Offense Level Calculation In The Presentence Report

As noted above, in the August 19, 2013 draft PSR, the Probation Department calculates Ms. Hou's total offense level under the United States Sentencing Guidelines at level 18. *See* PSR ¶¶ 81-94. On September 11, 2013, we submitted our objections to the draft PSR, including to the offense level calculation. Aside from the difference in offense levels rendered by whether the attempt conviction concerns the May 9 and August 17 events or the Thomas Wang attempted fundraising – a matter of 4 points because of the difference in intended loss – we also dispute the PSR's enhancements to Ms. Hou's offense level for (i) being a manager or supervisor (+3 levels) and (ii) abuse of position of trust (+2 levels). In addition, the government has argued for an additional two-level enhancement for sophisticated means, which the Probation Department has rejected. For the reasons below, the Court should not apply any of these enhancements to Ms. Hou's offense level.

The positions of Ms. Hou, the government, and the Probation Department are summarized in the following chart:

| Adjustment | Defendant | Government | Probation Dep't |
|---|---|---|---|
| Loss, $10,000 - $30,000 (§2B1.1 (b)(1)(C)) (+4) | no | yes | yes |
| Sophisticated means (§2B1.1 (b)(10)(C)) (+2) | no | yes | no |
| Manager or supervisor (§3B1.1 (b)) (+3) | no | no | yes |
| Abuse of position of trust (§3B1.3) (+2) | no | yes | yes |

We address each of these adjustments below.

4

1. **THERE SHOULD BE NO ENHANCEMENT FOR LOSS BECAUSE THE COURT SHOULD NOT CONCLUDE THAT MS. HOU WAS CONVICTED UNDER COUNT TWO BASED ON THE MAY 9 AND AUGUST 17 EVENTS, AS OPPOSED TO THE THOMAS WANG SOLICITATION**

As the Court is aware, there was no actual loss in this case because the Liu Campaign never applied for matching funds for any of the straw donations. Therefore, the basis for the PSR's four-level enhancement is for intended loss under U.S.S.G. §2B1.1 (b)(1)(C), based on the amount the loss would have been incurred by the City of New York had matching funds been disbursed to the Liu Campaign for the straw donations made at the May 9 and August 17 events. *See* PSR ¶'s 76 and 84. The PSR calculates this amount to be $8,400 for the August 17 event (8 donations x $1,050, on the basis of the grant of $6 for each $1 of the $175 donated by each contributor) and $19,950 for the May 9 event (19 donations x $1,050). *See* PSR ¶ 76. We submit that Ms. Hou's sentence should not be informed by any intended loss associated with the May 9 and August 17 donations because the Court cannot conclude that the jury found her guilty on the basis of her participation in these events and in any case, she had no knowledge of those straw donations.

### May 9

The evidence at trial demonstrated that the straw donations for the May 9 event were concealed from Ms. Hou by the main organizers of the event, each of whom testified that he did not disclose to Ms. Hou that donors were being reimbursed. (*See* X.J. Chen Tr. 733:5-7; M.H. Wang Tr. 838:1-12; Y.L. Lu Tr. 808:10-17.)

To overcome the fact that there was no evidence that Ms. Hou knew about the May 9 straw donations, the government has repeatedly pointed to the fact that no intermediaries were reported for the May 9 event as evidence that Ms. Hou sought to hide this information from the NYCCFB. The evidence at trial demonstrated, however, that there was no intermediary

5

disclosure required for the May 9 event because the Liu Campaign paid for the event. (*See* Connor Tr. 612:15-19; DX I-44, Connor Intermediary Memo 6). The term "intermediary" does not include the hosts of a campaign sponsored fundraising event paid for in whole or in part by the campaign. *See* GX 1303, NYC Campaign Finance Act 3-702 (12). There was simply no legal requirement for the disclosure of any intermediaries for the May 9 event.[2]

The government continues to press an incomplete and legally erroneous definition of an intermediary, one that is completely contradicted by the statute (NYC Campaign Finance Act 3-702 (12)) and the testimony of the government's own witnesses. Besides Martin Connor, government witness Adam Schafenberg – who worked at the CFB for 4 ½ years and conducted at least 100 trainings for campaign staffers on CFB rules – agreed that if the campaign paid for a fundraising event, the hosts were not intermediaries. *See* Schafenberg Tr. 202:5-10. Government witness Dan Cho, the Director of Candidate Services at the NYCCFB who has worked at the NYCCFB for seven years, also agreed that a host of a fundraising event is not an intermediary if the campaign pays for the fundraising event. *See* Cho Tr. 1337:4-6 ("Q. But if just the hosts invite people and the campaign pays for the event, no intermediary, right? A. Technically there's that exception, correct. No."). And yet the government obstinately insists that Ms. Hou's failure to disclose any intermediaries for the May 9 event – which the Liu Campaign paid for – is somehow evidence of her guilty knowledge. It is just absurd.

Ms. Hou was so ignorant of the May 9 straw donor scheme that she sought to take out a newspaper advertisement thanking the individuals who helped organize the event. (*See* GX 520).

---

[2] For the same reason, Ms. Hou's statement to the FBI that the list of intermediaries publicly disclosed by the Candidate's campaign on or about January 17, 2012, contained the names of all intermediaries that Ms. Hou knew about and no one was left off, could not have formed the basis for her conviction on Count Four because Ms. Hou's statement was *true* – all individuals who satisfied the legal definition of an intermediary were disclosed on or about January 17, 2012. (Connor Tr. 632:3 – 633:2).

This was conduct entirely inconsistent with the government's argument that she took steps to *conceal* the involvement of the very individuals whom she encouraged to agree to be thanked publicly for their fundraising efforts.

### August 17

With respect to the August 17 event, the evidence at trial demonstrated that Ms. Hou was in China during the week before the fundraising event (*see* GX 107-T) and had no role in planning the event or obtaining straw donations. In fact, her presence at the fundraising event was unexpected. *See* Chiue Tr. 449:18-22. All of the planning discussions between Pan and undercover FBI Agent John Chiue discussed that "Crystal" [Feng] would be the person from the Liu Campaign who would be at the August 17 fundraising event accepting the donor forms. *See* GX 105-T; GX 106-T; Chiue Tr. 447:1-14.

Codefendant Oliver Pan, while cooperating with the government, told the FBI that he was the one who came up with the idea to reimburse donors for the August 17 event; that "nobody helped him; it was his idea, his plan;" and that "he told the campaign that it was Richard's event to imply that all the money was Richard's money. He said he didn't know how the campaign took it, but that's what he meant by the statement." (*See* Bell Tr. 1040:8-18). Pan reiterated those facts in his September 7, 2012 affidavit in support of his September 10, 2012 Motion to Dismiss the Superseding Indictment. *See* September 7, 2012 Pan Affidavit at ¶ 32 (Dkt. No. 44).

While the recorded conversations admitted into evidence showed that Pan understated to Agent Bell the role played by "Richard Kong," the tapes entirely and unequivocally corroborated that Ms. Hou played no role in planning the event or recruiting donors or being told the source of the donations. In fact, Pan was recorded telling undercover FBI Agent Chiue that John Liu was

the person who knew that the money from the August 17 event was from "Richard Kong," and did not say that anyone else at the Liu Campaign knew this. *See* GX 105-T.

This is confirmed by the undercover agent's efforts to draw out from Ms. Hou her knowledge of the scheme when he questioned her at the August 17 event. For example, when FBI agent "Richard Kong" asked Ms. Hou if all of the "people on the list will be getting matching funds," Ms. Hou replied, "uhm…that I'm not sure…we have to take it back to our office to sorta re…just to…by looking at the names…I…I have no way of telling." (GX 107-T, p.18).

Ms. Hou's post-event conduct was also unequivocally consistent with, and demonstrative of, her innocence and lack of knowledge: when the $800 check of August 17 donor Sing Pun bounced, Ms. Hou contacted Mr. Pan to get a new check. She did not say "hey, this person who was reimbursed $800 is making off with the money because his check bounced." Ms. Hou even pursued the Sing Pun donation *after* the *New York Times* article was published on October 11, 2011, accusing the Liu campaign of accepting straw donations, evidencing Ms. Hou's complete lack of knowledge of the August 17 straw donor scheme. (*See* GX 292).

So, not only was there no evidence that Ms. Hou had knowledge of the straw donor schemes on May 9 and August 17, but the evidence that was admitted demonstrated her utter lack of knowledge.

Because the jury returned a general verdict of guilty on Count Two, there is no way of knowing whether Ms. Hou was convicted on the basis of the May 9 and August 17 events or for the Thomas Wang solicitation. We submit, however, that in light of the slim and equivocal evidence against Ms. Hou for May 9 and August 17, it is far more likely that the jury convicted Ms. Hou on the basis of her solicitation of her ex-boyfriend, Thomas Wang. That is so because

there is no basis to dispute that she solicited a donation with an offer of reimbursement. Accordingly, we submit that she should be sentenced on the basis of the Wang solicitation and not May 9 or August 17.[3]

Sentencing Ms. Hou based on the Wang donation would result in a lower offense level because there would be no enhancement for loss. Assuming Ms. Hou would have supplied a phony New York City address for Wang – a highly speculative inference that we dispute[4] – only $175 of Wang's donation would have been eligible for matching funds. At a matching rate of $6 to $1, the maximum intended loss for the Wang donation would be $1,050 ($175 x $6), which would result in no enhancement to the offense level. *See* U.S.S.G. §2B1.1 (b)(1). Accordingly, we submit that the Court should not impose the loss enhancement calculated in the PSR because Ms. Hou should be sentenced on the basis of the Wang solicitation only. *See* PSR at ¶ 84.

## 2.    THERE SHOULD BE NO ENHANCEMENT FOR BEING A MANAGER OR SUPERVISOR, UNDER §3B1.1(b)

The PSR applies a three-level enhancement to Ms. Hou's offense level for being a manager or supervisor (but not an organizer or leader) for criminal activity that involved five or more participants, pursuant to U.S.S.G. §3B1.1 (b). *See* PSR ¶ 87. According to the

---

[3] While the Court has concluded in its September 10, 2013 Rule 29 Decision and Order that the evidence was sufficient such that a reasonable fact finder *could* conclude that Ms. Hou intended to use straw donors to elicit campaign matching funds from the City of New York (*see* September 10, 2013 Order at 3), that does not mean that the Court must or should accept all possible factual conclusions for purposes of sentencing, since the jury was presented with an alternative basis of conviction. The Court must make its own factual findings for sentencing, even having concluded that Ms. Hou was unable to satisfy the heavy burden carried by a defendant making a Rule 29 motion.

[4] Alex Lu testified at trial that phony addresses for the May 9 were supplied because "[he] was very busy" and "just wanted to get it over with," **not** because it was part of the scheme to obtain matching funds or conceal the identities of straw donors from NYCCFB. *See* Lu Tr. 765:3-5.

government's September 13, 2013 response to our objections to the draft PSR, the government agrees that there should be no three-level enhancement for being a manager or supervisor.

For this enhancement to apply, the evidence must demonstrate that Ms. Hou managed or supervised "one or more other participants" §3B1.1, comment (n.2); *see also United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995). Only those "criminally responsible for the commission of the offense" qualify as a "participant." *See* §3B1.1, comment (n.1); *United States v. Sykes*, 637 F.3d 146, 157 (2d Cir. 2011). To be a manager or supervisor, the evidence must demonstrate that Ms. Hou "'exercise[d] some degree of control over others involved in the commission of the offense,'" *see Payne*, 63 F.3d at 1212 (quoting *United States v. Liebman*, 40 F.3d 544, 548 (2d Cir. 1994) or "'play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *Payne*, 63 F.3d at 1212 (quoting *United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir. 1995). Notably, the PSR does not identify who Ms. Hou managed or supervised.

It is clear that for the Wang solicitation, the only conduct upon which we believe Ms. Hou should be sentenced, Ms. Hou did not "supervise" him, nor was he a "participant" in the criminal conduct, since Wang never actually made a straw donation or completed a false donation form. But even if the Court were to sentence Ms. Hou on the basis of the May 9 and August 17 events, she did not manage or supervise anyone there, either. Although the PSR identifies the straw donors as "participants in the offense" (PSR at ¶ 87), Ms. Hou certainly did not manage or supervise any of the straw donors. She exerted no control over them whatsoever and was not responsible for recruiting them. Accordingly, the Court should reject this argument.

### 3.   THERE SHOULD BE NO ENHANCEMENT FOR ABUSE OF POSITION OF TRUST, UNDER §3B1.3

The PSR includes a two-level enhancement for abuse of position of trust, pursuant to

U.S.S.G. §3B1.3, based on Ms. Hou's position as treasurer of the Liu Campaign. *See* PSR ¶ 88.

According to the PSR, "[Ms. Hou's] position facilitated both the commission of the offense and

its concealment." *Id.* The enhancement does not apply here.

The application of the abuse of trust enhancement requires two inquiries: (1) whether the

defendant occupied a "position of trust," and (2) whether she abused that position to commit or

conceal her crimes. *See United States v. Nuzzo*, 385 F.3d 109, 115 (2d Cir. 2004). A position of

public or private trust is "characterized by professional or managerial discretion," and is

ordinarily "subject to significantly less supervision" than a "non-discretionary" position. *See*

U.S.S.G. §3B1.3, comment (n.1).

Whether a position is one of trust within the meaning of the guideline is to be viewed

from the perspective of the offense victims. *See United States v. Laljie*, 184 F.3d 180, 195 (2d

Cir. 1999). A defendant's position of trust is insufficient to support the enhancement absent "a

direct nexus" between the position, "the abuse of [the] trust, and the facilitation of the

commission or concealment" of the defendant's offense conduct. *Nuzzo*, 385 F.3d at 117. Here,

there is no such nexus.

The intended victim in this case was the City of New York, from which matching funds

were to be sought. Ms. Hou did not hold a position of trust with respect to the City. As the

treasurer of the Liu Campaign, the only entity to which Ms. Hou held any position of trust was

the Liu Campaign itself. If, for example, Ms. Hou had embezzled money from the Liu

Campaign, the abuse of position of trust enhancement would apply. *See*, *e.g.*, *United States v.*

*Broderson*, 67 F.3d 452, 454-56 (2d Cir. 1995) (high-ranking executive at aerospace corporation

would have qualified for adjustment if his crime had victimized the company, but did not qualify

when his fraud victimized the government); *see also United States v. Jolly*, 102 F.3d 46, 48-49

(2d Cir. 1996) (enhancement inapplicable to company president who defrauded corporate

lender).

Contrary to being in a position of trust, Ms. Hou and the Liu Campaign were subject to

extensive reporting and auditing by the NYCCFB. While Ms. Hou owed duties to the Liu

Campaign to administer the finances properly and fulfill reporting requirements of the campaign,

she was not in a position of trust with respect to the City of New York. Accordingly, there should

be no two-level enhancement for abuse of position of trust, under U.S.S.G. §3B1.3.

### 4. THERE SHOULD BE NO ENHANCEMENT FOR SOPHISTICATED MEANS, UNDER §2B1.1 (b)(10)(C)

The Probation Department has rejected the government's argument to include a two-level

enhancement for sophisticated means, pursuant to U.S.S.G. §2B1.1 (b)(10)(C). We agree with

the Probation Department that there should be no enhancement for sophisticated means.

A "sophisticated means" enhancement is appropriate where there is "especially complex

or especially intricate offense conduct pertaining to the execution or concealment of an offense."

*See* U.S.S.G. §2B1.1, comment (n.8). Examples of such offense conduct listed in the

commentary to 2B1.1 include (i) the use of fictitious entities or offshore accounts to hide assets

or transactions, and (ii) the location of a main office of a scheme in one jurisdiction while

locating soliciting operations in another. U.S.S.G. §2B1.1, comment (n.8). These are intended to

illustrate that the provision "is designed to increase punishment in those cases that, because of

their sophistication, might be harder to detect and therefore require additional punishment for

heightened deterrence." *United States v. Lewis*, 93 F.3d 1075 (2d Cir. 1996).

12

Again, we urge the Court to sentence Ms. Hou based on the Wang solicitation, which was the more likely basis for conviction. Ms. Hou's solicitation of a donation from her ex-boyfriend with an offer to reimburse him could not have been more basic and straightforward. There was certainly nothing "sophisticated" about it.

But even were the Court to sentence Ms. Hou based on the May 9 and August 17 events, those straw donor schemes were also incredibly simplistic – individuals were reimbursed for their donations to the Liu Campaign. Moreover, the personal contact information of the donors was supplied by the Liu Campaign to the NYCCFB, making the scheme easy to detect simply by calling and interviewing the donors, which is precisely what happened. Just because the campaign finance rules themselves are complex, does not add anything to the complexity of the straw donor fraud. There was nothing "especially complex or especially intricate" about that conduct to justify an enhancement under §2B1.1 (b)(10)(C).

## C. MS. HOU'S BACKGROUND AND CHARACTER WARRANT A NON-JAIL SENTENCE IN THIS CASE

A jail sentence is not necessary in this case to afford adequate deterrence to criminal conduct, pursuant to §3553(a)(2)(B). There is no basis whatever to imagine that Ms. Hou must be jailed in order to teach her respect for the law. Nor would a non-jail sentence undermine the goals of general deterrence.

Although the Presentence report accurately describes Ms. Hou's background, we wish to emphasize a few points and to provide the Court with information about how Ms. Hou became the treasurer of the Liu Campaign.

Ms. Hou comes from a hardworking family of Chinese immigrants who came to the United States seeking a better life. In 1986, when Ms. Hou was just two months old, her father immigrated to the United States. PSR ¶ 103. Her mother followed in 1989, after the Tiananmen

Square protest. *Id.* Ms. Hou remained in China and was raised by her paternal grandparents, until she was eleven years old. *Id.* Unlike her parents and brother, she is not a United States citizen. Needless to say, Ms. Hou is especially close with her grandparents and, prior to her arrest and the travel restrictions imposed as part of her bail, she visited China frequently. Her inability to visit her grandparents, who are elderly and in failing health, has been an added burden for Ms. Hou during this case. As will her forced lifetime separation from her parents and brother once she is deported.

During the time she lived in China, Ms. Hou infrequently saw her parents. *Id.* Although Ms. Hou's parents struggled at first to establish themselves in the United States, through hard work and determination they founded and built a fire protection business that supplies and services commercial kitchens. *Id.* at ¶ 102.

In their letters to the Court, each of Ms. Hou's parents each describe how the family came to the United States in search of the American dream and how this case has devastated that dream. As Ms. Hou's father recalls:

> In September of 1986, at Beijing, I was granted a student visa to study in the United States. At the time, Jenny was only one month old. Looking at her adorable smile, I was indecisive about whether or not I should come to America, and even wanted to give up on my visa. My parents and my wife encouraged me that I should continue to work hard so that my child would have a brighter future. At that moment, I promised myself that I would do whatever it takes to bring happiness to my family and my child. As time passed by, our 'American Dream' is gradually coming true. I thank America, and I thank God. However, this case is almost like a horrible thunderstorm that torn this 'American Dream' apart. At times, I look up at the Star Spangled Banner, and try to remember the vows I made when I was sworn in to become an American citizen. But now everything becomes blurry as tears rush down my face.

*See* Letter of Jian Li Hou, father of Jenny Hou.

14

When Ms. Hou finally moved to the United States, she did her best to assimilate like any other newcomer to this country. She advanced English in only half a year, and attended the prestigious Bronx High School of Science and Rutgers University.

Ms. Hou first met John Liu in Spring 2008, when she helped organize a rally to build support for the 2008 Olympics in Beijing, China. At that time, Liu was a City Council member representing District 20, which includes Flushing, Queens. Ms. Hou's father was the founding president of the Beijing Association of New York, based in Flushing, and was active in the Flushing community. When Ms. Hou spoke to her father about organizing a rally for the Beijing Olympics, her father suggested she contact Liu to ask for help.

Ms. Hou and some other students contacted Liu and met with him at his City Hall office to discuss their plans for a rally and ask for help obtaining a permit. Liu gave his support and the rally took place on May 4, 2008 in Foley Square. John Liu was the featured speaker.

During the summer of 2008, Ms. Hou travelled to Beijing to work as a volunteer at the Olympics and Paralympics. A letter from Qing Ge, who worked at the Paralympics with Ms. Hou, offers a glimpse into her kindhearted spirit. As Ge writes:

> Among them all, it was Jenny's interactions with the athletes that left me the deepest impression. Due to the special circumstances of the Paralympics, all volunteers were trained to treat each and every athlete with respect. Staring at certain handicapped body parts of athletes was strictly prohibited, as well as offering assistance when it is not required by the athletes. Jenny not only showed her respect through these actions, but she further provided her emotional encouragement and spiritual support to the athletes. She provided her abundant enthusiasm and gave 120% support and solicitude to every athlete, regardless of which country she or he represented, regardless of what place she or he got in the race. Competitions are cruel, and there will always only be one winner, flowers and glories will always just be for that one person, the others are often left with disappointment. Jenny would feel empathetic as to how much each athlete had sacrificed behind the scenes, and you could tell from her eyes and her actions. She tried so hard to make sure that the athletes who didn't win medals receive the

same amount of respect and attention.

*See* Letter of Qing Ge, friend.

After the Olympics, Ms. Hou returned to New York and searched for a job, without success. She travelled back to China in December 2008. Living again with her grandparents, she sought work in China. She left in May 2009 when it was apparent she had no future there.

Coming from a sheltered background and without any real job experience, when Ms. Hou returned to New York, at her father's urging, she contacted the 2009 Liu Campaign for New York City Comptroller, seeking a volunteer position. Since Ms. Hou is able to read, write, and speak Chinese, she was initially hired as a volunteer by the Liu Campaign to work on Chinese community outreach, including translating written campaign materials into Chinese. Gradually, she would help contact other Chinese community organizations and occasionally attend fundraising events with other campaign staffers, including the treasurer of the 2009 Liu Campaign, Mei-Hua Ru.

After John Liu was elected Comptroller, Ms. Hou was offered a job in the Comptroller's Office, in the Office of Planning and Special Events. Mei-Hua Ru was the Director of that office. Ms. Hou's employment in the Comptroller's Office began in January 2010 at an annual salary of $37,000. *See* PSR ¶ 128. Ms. Hou worked hard at the Comptroller's Office. Adaku Aharanwa, her direct supervisor and manager at the Comptroller's Office writes:

> Few young women of Ms. Hou's age have done so much for their community. While working as a Community Organizer at the NYC Comptroller's Office, Ms. Hou worked tirelessly on behalf of New Yorkers through her work with local Community Boards, community based organizations, local Business Improvement Districts to name a few. Most notably, Ms. Hou dedicated her time to increase voter registration within the Asian community and among eligible youth in our City.

*See* letter of Adaku Aharanwa, former Deputy Director, Office of Planning and Special Events, Office of the Comptroller of the City of New York.

During her time in the Comptroller's Office, Ms. Hou accumulated vacation time, known as "comp time," due to her hard work and frequent overtime. By June 2010, she had accumulated over 1 month's worth of comp time and took vacation for the month of July 2010 to visit her grandparents in China.

Upon her return, Ms. Hou continued to work hard at the Comptroller's Office and by November 2010 had accumulated another month's worth of comp time, which she wanted to use to return to China to see her grandparents. As a matter of policy, the Comptroller's office was unwilling to permit Ms. Hou to take all of her earned vacation at one time. Coincidentally, however, the 2013 Liu Campaign for Mayor was being formed and was looking for a treasurer. The treasurer job was offered to Ms. Hou, despite the fact that she had no experience in fundraising, no significant job experience of any kind, no legal/financial/accounting background, and was just 24 years old at the time. Nevertheless, Ms. Hou was appointed campaign treasurer in November 2010, filed some preliminary paperwork with the NYCCFB, and promptly left for China for another month.

Ms. Hou returned from China on January 7, 2011 and began working as treasurer for the Liu Campaign. Her first training for the job was with the NYCCFB on March 29, 2011.

Although Ms. Hou accepted the job as campaign treasurer – motivated in part by her desire to travel to China to see her grandparents – she was clearly unqualified for the job, as many people around her have observed. For example, Nancy Ozeas, who served as Deputy Director of Community Affairs for Comptroller Liu from January 2010 to September 2011 and worked with Ms. Hou, has submitted a letter to your Honor observing the following:

> At the time I remember thinking that she was taking on a big job and had been
> very generous to offer her home to the campaign. Jenny had no idea what she was

getting into and no plan to learn the important and complicated laws governing political donations, a critical part of a treasurer's job.

*\*\**

I moved to Santa Monica, CA in 2011 after leaving the Comptroller's office and tried to keep abreast of the campaign and stay in touch with a few people from the office and campaign. I started to hear about the controversy surrounding the Comptroller's campaign and was shocked and heart sick when I learned that Jenny was the one person from the campaign that was being held accountable for the campaign's management. I know that Jenny accepted the position without any knowledge of what the job of treasurer entailed or how to begin. Jenny didn't know enough to know what she didn't know. I recently read a quote from John Liu that said Jenny was in ongoing and frequent contact with the campaign finance regulation board, who helped her learn how to do the job. That doesn't make sense to me. I would think that anyone running for Mayor of the most important city in the world would want to hire a seasoned professional with years of experience in the complicated laws governing campaign finance. It made me wonder what kind of people the other mayoral candidates hired to be their treasurers, so I did some research. Every other candidate's treasurer is an experienced accountant, lawyer or professional, in their 40's, 50's or 60's, most with the support of a firm and decades in the field.

Jenny was in over her head from day one, not given the training or support she needed to do the job, and unfortunately unaware of all that she didn't know. I ask the Court to take these facts and circumstances into consideration when sentencing Jenny and to impose the most lenient sentence permissible under the law.

*See* Letter of Nancy Ozeas, former Deputy Director of Community Affairs, Office of the New York City Comptroller.

Even government witness Adam Schafenberg told the government during an interview on

January 8, 2013 that he "thinks someone else masterminded the scheme, not Hou. She wasn't

running/doing (?) scheme. Ru was more sophisticated." *See* 3514-1, January 8, 2013 interview

notes of Adam Schafenberg.

Similarly, Martin Adelman, Esq., who represented Ms. Hou when she was interviewed by

the government, writes:

In short, it was clear to me that she was overwhelmed by the tasks she faced and I was truly concerned for her mental and physical health during this period. As far

18

as I knew, she had no prior experience at the types of tasks she confronted and was under great pressure to produce the materials which each request entailed.

I believe Jenny was 'in over her head' in the job function she undertook, was ill prepared and frankly unqualified. She was naive and trusting and did not have a firm grip on the complexities of the Campaign Finance Board rules and regulation and relied on the campaign attorney and others for advice.

*See* Letter of Martin B. Adelman, Ms. Hou's former attorney.

Martin Connor, Esq., an attorney for the Liu Campaign, writes:

During the course of my work with Jenny several things became apparent to me: (i) she was a very conscientious and intelligent young woman; (ii) she was totally naïve about the way business people sometimes approach raising funds for candidates; (iii) she worked very hard for long hours, seven days a week, trying to keep up with the demands placed on her as treasurer; and (iv) she did not have a firm, let alone complete, understanding of the very technical legal requirements and definitions necessary to insure total compliance with all of the Campaign Finance Board reporting requirements. This was particularly true with respect to what made someone an intermediary.

\*\*\*

With respect to continuing compliance after I was retained, Jenny asked frequent questions of me and continually expressed a desire to comply fully with all legal requirements. There were a many occasions when Jenny called me about contributions being delivered that she thought were not as they appeared. I confirmed her instincts and she rejected those donations. Of course, rejected contributions are not reportable since they are never deposited. So, no one ever heard about her diligence in trying to avoid unlawful contributions.

*See* Letter of Martin Connor, Esq., attorney for the Liu Campaign.

Everyone who knows Ms. Hou well was surprised by the charges in this case. Adam B.

Murphy, a government witness who was the paralegal at Zuckerman Spaeder who helped Ms.

Hou to comply with the grand jury subpoena, wrote: "I was stunned to learn that Jenny was

convicted. Regardless of the verdict, I believe that Jenny is among the finest people I know." *See*

Letter of Adam B. Murphy.

Of course, Ms. Hou's family was completely shocked by the charges in this case. As Ms.

19

Hou's mother writes:

> When I first heard about Jenny's case, I didn't believe that my daughter would
> commit such a crime, because she grew up as a very obedient child. Ever since
> she was in High School, she would look for a place to work during every
> vacation, from volunteering at our community library, to waiting tables at a
> restaurant, from accounting firm, to campaign volunteer. Jenny took every job
> seriously and with great diligence, and she always got many praises from every
> boss.

*See* Letter of Sui Xiang Zhu, mother of Jenny Hou.

Much of the criminal conduct in this case occurred during the approximately first six

months of Ms. Hou's tenure as treasurer for the Liu Campaign and especially around the time of

Ms. Hou's first NYCCFB filing on July 15, 2011, when she and other campaign staffers were

working long hours and Ms. Hou was completely overwhelmed by her responsibilities as

treasurer. Ms. Hou's criminal conduct is a surprising blip in an otherwise law abiding life.

Under *United States v. Booker*, 543 U.S. 220 (2005), after calculating the applicable

sentencing range under the Guidelines, a sentencing court must consider all of the 18 U.S.C.

§3553(a) factors to determine "a sentence sufficient, but not greater than necessary, to comply

with the purposes" of §3553(a)(2). *United States v. Williams*, 475 F.3d 468, 477 (2d Cir. 2007).

As the Second Circuit has held, ". . . if a district court were explicitly to conclude that two

sentences equally served the statutory purpose of §3553, it could not, consistent with the

parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d

Cir. 2006). Therefore, the Court should impose the lowest sentence to do justice, consistent with

the parsimony clause, which we submit is a non-jail sentence.

Nor is a jail sentence necessary to protect the public from Ms. Hou under §3553(a)(2)(C).

Ms. Hou is not in need of educational or vocational training, medical care, or other correctional

treatment, as contemplated by §3553(a)(2)(D).

Attached hereto are numerous letters asking the Court for mercy in imposing sentence

and expressing the horror and devastation experienced by Ms. Hou and her family over her legal

situation. As her childhood friend from China, Xue Gao, writes:

> More than one year has passed since the day Jenny was arrest, to the end of her
> triall. Being her close friend, I am far away in China, but there's very little I can
> do. The only thing I can do is be there for her, care for her, chat with her, and
> share with each other the small updates in our lives. The composure and strength
> she demonstrated have made friends around her truly admire her. A lot of times, it
> is Jenny who's consoling us. She asked us to keep our chins up. In the public's
> eye, Jenny is always calm and smiling. Being her close friend, I can truly
> understand how much pressure she has been put under, emotionally,
> psychologically and financially. Jenny is just a normal girl who had just joined the
> work force not long ago. How can she not be affected by this tremendous event?
> Jenny, being heart-hearted and considerable as she is, doesn't want her parents to
> worry, doesn't want her grandparents to China to worry, and doesn't want friends
> like us to worry. Jenny always tells us she's fine, and everything's OK. But all
> these years of friendship have made us connected at mind as well as at heart. I
> know how many lonely and horrified nights she had been through, and I know
> how many tears have shed that nobody else saw. I know all of this, but despite
> how upset I am, I cannot do anything to change it.

*See* Letter of Xue Gao, childhood friend.

Ms. Hou's friend and former supervisor at the Comptroller's office, Adaku Aharanwa,

also asks your Honor to consider Ms. Hou's character in imposing sentence:

> It is my hope that when you decide how it is Jia "Jenny" Hou should be held
> accountable, that you please consider the type of woman she always sought to be,
> and most often truly was; caring and of benefit to others. Kindly consider Ms.
> Hou's character, when making your decision. She is a good person who deserves
> a chance and I humbly ask you to provide Ms. Hou this opportunity so she may
> continue to make positive contributions to our society.

*See* letter of Adaku Aharanwa, former Deputy Director, Office of Planning and Special Events,
Office of the Comptroller of the City of New York.

Ms. Hou's father, Jian Li Hou, also asks for leniency at sentencing:

> Now I want to put away a man's pride, and I just want to send a sincere request
> from the heart of a father to the heart of another father. I ask you, whatever you

can do that's within your limits of authority, please give Jenny another chance.

*See* Letter of Jian Li Hou, father of Jenny Hou.

Finally, Ms. Hou's mother writes:

A 25-year-old young girl who just started working in our society, full of sunshine for the future, full of goodness for people, full of passion for work. This case has brought so much damage to her, and it has definitely brought so much damage to our entire family. I sincerely ask Your Honor to be lenient when you sentence.

*See* Letter of Sui Xiang Zhu, mother of Jenny Hou.

## Conclusion

For all the reasons stated herein, we urge the Court to impose a non-jail sentence in this case. If the Court believes that additional punishment is necessary, we ask that the Court consider imposing a condition of community confinement or home detention, with a significant community service component, so that Ms. Hou can begin to put her life back together as quickly as possible.

We thank the Court for its consideration.

Dated: September 24, 2013

> Respectfully submitted,
>
> GERALD B. LEFCOURT, P.C.
>
>
> By: _____/s_____
>     Gerald B. Lefcourt
>     Sheryl E. Reich
>     Renato C. Stabile
> 148 East 78th Street
> New York, N.Y. 10075
> (212) 737-0400 (phone)
> (212) 988-6192 (fax)
> lefcourt@lefcourtlaw.com
> reich@lefcourtlaw.com
> stabile@lefcourtlaw.com
> *Attorneys for Jenny Hou*

22