UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

JIA HOU,

  a/k/a "Jenny Hou,"

               Defendant.

S1 12 Cr. 153 (RJS)

---

## THE GOVERNMENT'S SENTENCING SUBMISSION



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 1, 2013

**BY ECF AND EMAIL**

The Honorable Richard J. Sullivan
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 2104
New York, New York 10007

>       Re:    **United States v. Jia Hou, a/k/a "Jenny Hou,"**
>              **S1 12 Cr. 153 (RJS)**

Dear Judge Sullivan:

        The Government respectfully submits this letter in advance of the sentencing of defendant Jia Hou, which is scheduled for October 10, 2013, at 12:30 p.m.  Hou was found guilty of attempted wire fraud, making false statements, and obstruction of justice, following a three-week jury trial.  The United States Probation Office has determined that Hou's sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 18 to 24 months.  For the reasons that follow, the Government respectfully disagrees with that calculation and recommends that the Court find the applicable Guidelines range to be 24 to 30 months.

        The Government further recommends that the Court impose a sentence within the Guidelines range of 24 to 30 months.  Hou, as treasurer for John Liu's mayoral campaign (the "Campaign"), coordinated a multi-step scheme to cheat the City of New York out of public matching funds and thereby undermine the fairness of an election.  Hou then withheld evidence from the grand jury and lied to federal agents in a transparent effort to conceal her misconduct.  Hou's criminal conduct is all the more egregious in light of her position as the Campaign's treasurer, entrusted with ensuring compliance with the City's campaign finance laws.  Based on the extent of Hou's misconduct, a Guidelines sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence generally to criminal conduct.  *See* 18 U.S.C. § 3553(a)(1), (2)(A), and (B).

## BACKGROUND

**A.      The Offense Conduct**

        From late 2010 to early 2012, Hou served as treasurer for the Campaign.  (United States Probation Office Presentence Investigation Report ("PSR") ¶ 13).  Almost immediately after assuming that position, she began to communicate with the New York City Campaign Finance Board (the "CFB") regarding the affirmation statement on donation forms, which stated that,

1

under state law, donations must be from a donor's own funds and cannot be reimbursed in any manner. (PSR ¶ 15). At that time, Hou emailed John Liu to ask for advice on how to respond to a warning from the CFB that having "check boxes" in the affirmation statement could cause the "contribution to be invalidated for matching purposes." (*Id.*). In an email, Liu told Hou to change the check boxes to bullet points in order to maintain the contribution's eligibility for matching funds.[1] (*Id.*).

On March 29, 2011, Hou was trained by CFB staff on how to comply with the City's campaign finance laws. (PSR ¶ 17). That training was a personal, one-on-one session. (*Id.*). At the training, Hou learned that the CFB (i) enforces certain rules and limits on fundraising and spending to level the playing field among candidates, (ii) facilitates disclosures so that the public can be informed about where campaign money is coming from, and (iii) verifies that public money provided under the matching funds program is awarded correctly, awarded based only on valid, eligible contributions. (*Id.*). Hou's March 2011 training educated her about the following aspects of New York City's campaign finance regulations:

    a.   Nominee contributions—contributions from straw donors using someone else's money—were prohibited;

    b.   No single donor could contribute more than $4,950;

    c.   Donations were supposed to be recorded on contribution cards that served an important purpose in keeping elections clean. The cards allowed the CFB to (i) keep track of who was donating, (ii) make sure that donation limits were being honored, and (iii) determine whether the contribution was eligible for matching funds;

    d.   The CFB reviewed the contribution cards for "red flags" indicating that fraud might be taking place. Such red flags included inconsistent handwriting on the contribution cards. On this point, Hou was cautioned that only donors should fill out the form;

    e.   An "Intermediary" is the formal name for someone who solicits or delivers donations to a campaign from someone else. Informally, intermediaries are known as "bundlers." If someone either delivers or solicits a contribution from a non-relative, that person typically has to be disclosed to the CFB on a special form, along with a list of the donations delivered or solicited by that person for the campaign;

    f.   Matching funds is money that the City provides to candidates. The first $175 each donor gives can be matched by the City at a 6 to 1 ratio, up to a $1,050 maximum, thereby turning a $175 donation into $1,225 in funds for a campaign;

---

[1] Subsequently, in early 2012, Hou failed to produce these emails in response to a grand jury subpoena.

g.  Campaigns are required to disclose certain information to the CFB a few times a year in periodic disclosure statements.  Those statements are sent to the CFB through a computer program called C-Smart.  Campaigns use the disclosure statements to make claims for matching funds, identify their intermediaries, and disclose their donors.  At the time of Hou's March 2011 training, the next disclosure deadline was in July 2011;

h.  Disclosure statements (i) provide the public with information about the candidates, (ii) enable the CFB to monitor compliance with the law, and (iii) enable campaigns to make claims for matching funds; and

i.  A campaign should indicate on the periodic disclosure statements which contributions it claimed were eligible for matching funds from the City.

(PSR ¶ 18).[2]

On April 15, 2011, Hou provided advice to volunteers on how to avoid CFB scrutiny. Hou emailed Crystal Feng, one of the campaign's volunteers and told her to:  "keep one person's handwriting persistent on each donation form" to avoid a CFB audit.  Hou wrote, "The CFB is [now] starting to audit donation forms with different [people's] handwriting (insane…)."[3]  (PSR ¶ 19).

## The W&L, Kang Kang, and Super Plumbing Contributions

In late April 2011, Meng Hua Wang of W&L Construction ("W&L"), Jian Kang Chen of Kang Kang and others had a dinner with a businessman named Jeffrey Wu.  (PSR ¶ 21).  Wu owned a chain of grocery stores and sponsored the construction of Victoria Towers, a major real estate development that provided Wang and Chen with work.  (*Id.*).  At the April 2011 dinner, the men were assembled around the table, discussing business, trying to curry favor with Wu. Wu then brought John Liu and Mei Hua Ru, a senior advisor to Liu, over to the table where Wang, Chen and others were sitting.  Wu told the businessmen that they should support Liu, and he told them to find a certain number of donors apiece for an upcoming fundraiser.  (*Id.*).  Wang agreed to find 30 donors, and Chen agreed to find 10, as did other businessmen at the table. Later, Chen told his son Leon, the owner of a company called Super Plumbing, that Wu also expected him to recruit ten donors to support Liu.  (*Id.*).

In early May 2011, Hou exchanged emails with Alex Lu of W&L to plan the upcoming fundraising event that Wu had organized.  (PSR ¶ 22).  Lu, an English-speaking employee of W&L, took the lead in gathering and delivering the W&L, Kang Kang, and Super Plumbing contributions to the Campaign.  (PSR ¶¶ 22, 24).  In one email, Lu asked whether he should bring the forms to the event or mail them, and Hou responded that bringing the forms was acceptable.  (PSR ¶ 23).  In another email, Lu asked whether green card holders could donate,

---

[2] Hou attended a second, identical training on October 28, 2011.  (PSR ¶ 64).

[3] Hou also failed to produce this email in response to the grand jury subpoenas.

and Hou said they could.  (*Id.*).  Lu also asked whether the Campaign could accept money orders or out-of-state donations, and Hou responded it could accept both.  (*Id.*).

Meanwhile, Wang, Chen, and Leon rounded up donors.  (PSR ¶ 22).  Each of them reimbursed employees, friends, and family for their donations to Liu.  Wang reimbursed approximately 5 or 6, Chen reimbursed 6, and Leon reimbursed 7.  (*Id.*).

On May 7, 2011, Lu sent Hou W&L's guest list for the fundraising event.  (PSR ¶ 24).  The list identified Wang as the president of W&L.  (*Id.*).  Later that day, Ru told Hou to send Lu a blank contribution form presumably because Lu was responsible for collecting and delivering contributions from W&L, Super Plumbing, and Kang Kang.  (*Id.*).

On May 9, 2011, Lu sent Super Plumbing's attendee list to Hou.  (PSR ¶ 25).  That same day, Lu sent Hou completed forms, checks, and credit card information for some donors.  (*Id.*).  Hou told Lu to bring the "already collected" forms to the fundraising dinner, thereby instructing Lu to play the role of an intermediary by delivering those contributions to the Campaign.  (*Id.*).  Later that evening, the Wu Event was held at a restaurant. (PSR ¶ 26).

After the event, Hou created lists of follow-up items for Lu to handle.  (PSR ¶ 31).  Hou and Lu also exchanged numerous emails to make sure the Campaign received all the money that had been promised.  (PSR ¶ 32).  In a May 16, 2011 email, Hou referred to an "agreement" under which W&L and Super Plumbing were expected to supply 30 and 50 donors, respectively.  (*Id.*).  In response to one of Hou's emails about Super Plumbing, Lu stated that he would see whether Super Plumbing would get the "7 additional contributors" that Hou had asked for.  (PSR ¶ 33).  On May 27, 2011, Hou asked Lu to continue helping with straw donors even though Lu asked that someone else be the contact for Super Plumbing.  (PSR ¶ 34).  Hou wrote "John doesn't like the idea that we have to chase down other people who don't respond to us.  If possible, please remain as the contact."  (*Id.*).

One month later, the Campaign still had not received all the money due under the agreement.  On June 17, 2011, Hou emailed Ru, expressing concern about collecting all of the Super Plumbing donations.  (PSR ¶ 36).  In that email, Hou acknowledged the role played by Super Plumbing's "boss" in soliciting and collecting contributions, thereby revealing the fact that she knew that the boss of Super Plumbing was acting as an intermediary.[4]  (*Id.*).

In early July 2011, Wu asked Wang to find more straw donors, and Wang found them.  (PSR ¶ 37).  Some of them worked at a car service called XYZ.  (*Id.*).  All of them were reimbursed for their donations by Wang.  (*Id.*).  On July 8, 2011, Hou had questions about these new straw donors but as usual she did not call the donors to ask them questions.  (PSR ¶ 38).  Instead she contacted Lu by email.  That same day, Hou made plans to pick up 15 more donations from Lu.

---

[4] Hou later withheld this email from the grand jury.  In addition, Hou never disclosed an intermediary for the Super Plumbing donations, despite knowing that the boss of Super Plumbing was an intermediary and that the contributions came in before and after the Wu fundraising event.

Based on fundraising prior to the event, at the event, and after the event, (i) W&L furnished 19 contributors, several of whom were straw donors, with total contributions of $15,200 and potential matching funds of $19,950; (ii) Super Plumbing had 20 contributors, many of whom were straw donors, with total contributions of $16,000 and potential matching funds of $21,000; and (iii) Kang Kang had 10 contributors, many of who were straw donors, with total contributions of $8,000 and potential matching funds of $9,450. (PSR ¶¶ 27-29).

For all the donations, from W&L, Super Plumbing, and Kang Kang, no intermediary was disclosed despite the roles played by Wang, Lu, and Leon, even though Hou was aware that each of these individuals was playing the role of an intermediary by soliciting or delivering contributions to the Campaign. (PSR ¶ 30).

### The July 2011 Filing Deadline, Hou's Offer to Reimburse
### Thomas Wang, and Lee's Offer to Reimburse Donors

In early July, the Campaign was approaching a July 14 CFB filing deadline, for which the Campaign had set a million-dollar fundraising goal. (PSR ¶ 39). Sharon Lee, a longtime employee of Liu, took two weeks off from work to volunteer full-time for the campaign in the run-up to the filing. (*Id.*). During that time, Lee communicated with Hou by an instant messaging system call "gchat." (*Id.*).

On July 9, 2011, Lee and Hou were discussing by gchat contributions and contribution cards. (PSR ¶ 40). Lee was concerned that some of the contribution cards contained information about the fundraiser and host that were responsible for the card. (*Id.*). Based on that concern, Lee wrote to Hou that the presence of those notations presented "another reason to cover the top of the cntrb form . . . " in order to conceal the identities of intermediaries from the CFB. (*Id.*). On July 10, 2011, Lee again expressed her concerns to Hou about host information on the contribution cards. (PSR ¶ 41). Hou responded, "I know what you mean and what your concerns are" regarding concealing information from the CFB about the source of donations. (*Id.*).

On July 12, 2011, Lee and Hou discussed cash donations and how they are virtually untraceable. (PSR ¶ 42). At the end of that gchat, Lee hypothesized, "so what if an unscrupulous committee got 100 people and had them all contribute 100 each? $10k! shady . . ." (*Id.*). Lee confirmed that she was referring to a hypothetical scenario where $10,000 in cash would be funneled into a campaign using 100 straw donors. (*Id.*).

During this time, Hou instructed another campaign volunteer named Jorge Fanjul that it was important to imitate donor's handwriting as carefully as possible in order to avoid CFB scrutiny. (PSR ¶ 43). In a series of gchats, Hou warned Fanjul that "CFB auditors look very carefully at the handwriting . . . so if you're doing that, just make sure the handwriting looks as close to the donors' as possible . . . if too difficult, don't take risk." (*Id.*). In these gchats, Hou counseled Fanjul to forge parts of the form only if he was certain that he could do it well and get away with it. (*Id.*). Otherwise, "it's not worth the risk" because Hou knew that the CFB was looking "very carefully at the handwriting" on the forms. (*Id.*).

Also in the days leading up to the July 14 filing deadline, Hou reached out to Thomas Wang ("Thomas"), a friend, whom she asked to make a straw donation. (PSR ¶ 44). Hou promised to pay Thomas back by check for the amount he contributed. (*Id.*). After that conversation, Hou sent Thomas a blank contribution form, which contained the affirmation statement regarding a donation being from a donor's own funds. (*Id.*). Hou asked Thomas to sign that statement, knowing it was a lie. (*Id.*). Meanwhile, Thomas sent Hou his credit card information.[5] (*Id.*). On July 15, 2011, Thomas followed up with Hou to see how much money the Campaign had been able to raise before the deadline. (PSR ¶ 47). Hou told Thomas that she did not need to use his credit card but would "use it some day in the future." (*Id.*).

At the same time that Hou solicited a straw donor, Lee did the same thing, asking five people to donate to the Campaign, and offering to reimburse them for their donations. (PSR ¶ 45). Lee placed these calls from Hou's apartment building or just outside of it. (*Id.*).

### The Oliver Pan-Richard Kong Contributions

During the relevant time period, Oliver Pan, Hou's co-defendant, was a fundraiser or "bundler" for the Campaign. (PSR ¶ 13). In July 2011, Pan met with Richard Kong, an undercover agent with the Federal Bureau of Investigation ("FBI"), who sought advice on how to buy influence with New York City politicians. (PSR ¶ 48). Kong said that he hoped to get help establishing restaurant chains in the city. During that meeting, Pan told Kong that Ru was in charge of fundraising, serving as chief of staff. (*Id.*). Pan also identified Hou and Crystal Feng as campaign workers involved with fundraising. (*Id.*). During this meeting, Pan suggested that Kong make a large, illegal donation to the Campaign and funnel it through straw donors so that it would appear lawful. (PSR ¶¶ 49-51). Pan also informed Kong that he would convey to Liu and the Campaign staff that Kong had provided all the donated money by saying that it was "Richard's event." (PSR ¶¶ 53-54).

Pursuant to their plan, Kong gave Pan $16,000. (PSR ¶ 55). Pan, in turn, recruited a number of straw donors and arranged with the Campaign for a fundraising event to take place. (PSR ¶ 56). That event was held on August 17, 2011. (PSR ¶ 57). At the event, Pan introduced Kong to Hou, saying "this is Richard's event," so that Hou would know that Kong had provided all the money being donated that night. (*Id.*). Pan used that code again when he introduced Kong to Feng and to Liu. (*Id.*).

### Hou's Efforts to Obtain Intermediary Forms from W&L

On August 23, 2011, Hou sent intermediary statements to Lu for Wang's signature. (PSR ¶ 58). Hou believed these statements were required because of Wang's solicitation, collection, and delivery of contributions to the Campaign. (*Id.*). Lu did not respond. Two weeks later, Hou again asked Lu to have Wang fill out intermediary statements. (PSR ¶ 59). Again, there was no response. Looking for a way out of this problem, Hou emailed a CFB representative on September 29, 2011, to confirm her understanding of what an intermediary is. (PSR ¶ 60). Hou was told that "[i]ntermediaries are any individuals or entities who either deliver or solicit

---

[5] Hou later withheld from the grand jury her gchats and emails with Thomas.

contributions on behalf of your campaign.  If an individual solicits contributions separate from a fundraiser or even without a request by the campaign, s/he is considered an intermediary." (*Id.*).

### Hou's False Statements and Obstruction of Justice

On October 24, 2011, FBI agents interviewed Hou.  (PSR ¶ 63).  Hou stated that since she had been treasurer, there had not been any contribution or contributor that made her feel uncomfortable or raised any suspicions.  (*Id.*).

On October 31, 2011, FBI agents contacted Leon (the president of Super Plumbing) because they had questions about his employee's donations.  (PSR ¶ 65).  Leon lied to the agents about reimbursing his employees and then contacted Hou and Lu to alert them to the FBI's investigation.  (*Id.*).  Hou asked Leon for details about the agents' questions.  (*Id.*).

On November 3 and 4, 2011, the grand jury issued subpoenas to Hou and the Campaign. (PSR ¶ 66).  As the treasurer of the Campaign and the sole officer of Liu's political committee, Hou played a critical role in making sure that Campaign documents were produced to the Government.  (*Id.*).

On November 16, 2011, Pan was arrested.  (PSR ¶ 67).  Later that day, Hou contacted Wu in order to refund the costs of the May 9th fundraiser, so that she could avoid making any intermediary disclosures in connection with the straw donations provided by W&L, Kang Kang, Super Plumbing and others.[6]  (*Id.*).

On December 15, 2011, the grand jury issued another subpoena, which was broader than the earlier subpoenas.  (PSR ¶ 68).  It made clear that all records pertaining to the Campaign's fundraising had to be produced.  (*Id.*).  Among other things, the subpoena ordered the production of all "written and electronic (e-mail) correspondence" and "instant message 'chats'" relating to "campaign contributions," "fundraising," "communications about campaign contributions and fundraising," "'hosts' of events," and "fundraising 'intermediaries' and/or 'bundlers.'" (*Id.*).

To ensure subpoena compliance, an attorney for the Campaign advised Hou to provide him with any document that even touched on fundraising.  (PSR ¶ 69).  That attorney then produced to the Government every document that he received from Hou.  (*Id.*).

On January 17, 2012, the Campaign filed a disclosure statement listing all the intermediaries purportedly known to the Campaign.  (PSR ¶ 70).  The disclosure had no record of Wang of W&L, Leon of Super Plumbing, Chen of Kang Kang, Lu of W&L, or Wu of the Victoria Towers Project.  (*Id.*).  In fact, no one whatsoever was disclosed as an intermediary in connection with the contributions from those entities.  (*Id.*).

After Hou and other Campaign staff members represented that they had identified all documents responsive to the subpoena, the Campaign's attorney undertook to draft a letter documenting the Campaign's subpoena compliance.  (PSR ¶ 72).  To ensure accuracy, the

---

[6] Hou later withheld this email from the grand jury.

attorney had drafts of the letter sent to Hou for her review and approval.  (*Id.*).  For example, on February 8, 2012, the attorney circulated a revised draft which stated that Hou had produced all responsive emails and gchats.  (PSR ¶ 73).  Despite her knowledge of the falsity of that representation, Hou stated that the letter was "accurate." (*Id.*).  On February 13, 2012, the final version of the compliance letter, which contained the same representation about Hou's subpoena compliance, was sent to the Government.  (PSR ¶ 74).  Prior to submitting the letter, one of the Campaign's attorneys read it to Hou, and Hou again stated falsely that the letter was accurate. (*Id.*).

On February 27, 2012, Hou met with the Government to discuss the Campaign's fundraising practices and her own compliance with the subpoena.  (PSR ¶ 75).  During this meeting Hou stated the following:

     a.   With respect to intermediaries, Hou claimed to have prepared an intermediary list containing 59 intermediaries that constituted all the intermediaries she was aware of.  When asked whether anyone was left off, Hou lied.  She said that no intermediary had been left off that list of 59.

     b.   With respect to subpoena compliance, Hou claimed that she had produced all the items that were required by the subpoena and that her production was complete.  Describing how she conducted her search, Hou claimed to have sorted her stored emails by reverse chronological order and browsed through every single email.  She then allegedly searched all her chats, going through them "line by line."  These statements were also false.  As noted above, Hou withheld several incriminating emails in order to conceal the straw donor scheme.

(*Id.*).

### The Potential Impact on the City's Matching Funds Program

In CFB filings, Hou indicated that the Campaign would seek matching funds for all of the donations from W&L, Kang Kang, Super Plumbing, and XYZ.  (PSR ¶ 76).  The evidence also established that Hou would have claimed at least eight of Pan's donations for matching funds, had Pan not been arrested.  (*Id.*).

If matching funds had been disbursed by the City in connection with the contributions from W&L, Kang Kang, Super Plumbing, and XYZ, the Campaign would have received at least $19,950 based on at least 19 illegal straw donations.  (PSR ¶ 76).  If matching funds had been disbursed by the City in connection with Pan's event, the Campaign would have received $8,400 based on those 8 illegal straw donations.  (*Id.*).  Altogether, the fraudulently obtained matching funds would have exceeded $28,000.

## B.    The Superseding Indictment and the Conviction

On April 26, 2012, Superseding Indictment S1 12 Cr. 153 (RJS) was filed in four Counts.  Count One charged Hou and Pan with participating in a conspiracy to commit wire fraud in connection with the straw donor scheme, in violation of Title 18, United States Code, Sections 1349 and 1343.  Count Two charged Hou and Pan each with attempting to commit wire fraud, in

violation of Section 1343.  Count Three charged Hou with obstruction of justice, in violation of Title 18, United States Code, Section 1512.  Count Four charged Hou with making false statements to a federal agent, in violation of Title 18, United States Code, Section 1001.

On May 2, 2013, following a three-week jury trial, Hou was found guilty of Counts Two, Three, and Four.

## C.    The Presentence Report

The Probation Office calculates the Guidelines range for Hou as follows:  Counts Two, Three, and Four are grouped pursuant to Section 3D1.2(c) because Counts Three and Four embody conduct that is treated as an obstruction-of-justice adjustment to Count Two. (PSR ¶ 82). The base offense level is seven, pursuant to Section 2B1.1(a)(1).  (PSR ¶ 83).  Because the intended loss amount in matching funds attributed to Hou's personal activities was more than $10,000, but not more than $30,000, the offense level is increased by four levels, pursuant to Section 2B1.1(b)(1)(C).  (PSR ¶ 84).  The Probation Office did not apply a two-level enhancement, pursuant to Section 2B1.1(b)(10)(C), for sophisticated means (PSR ¶ 85), but it did impose a two-level adjustment, pursuant to Section 3B1.3, for abuse of a position of trust (PSR ¶ 87).  Finally, the Probation Office applied a two-level enhancement, pursuant to Section 3C1.1, for obstruction of justice.  (PSR ¶ 88).  Accordingly, the PSR sets Hou's adjusted Offense Level at 15, which, in criminal history category I, results in a Guidelines range of 18 to 24 months' imprisonment.  (PSR ¶ 134).

## DISCUSSION

## A.    Applicable Law

Although no longer mandatory, the Sentencing Guidelines continue to provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005).  Under Supreme Court precedent, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  As the Second Circuit has remarked en banc, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted).  The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives,"  *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions,"  *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2).  To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and

ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 188 (quoting *Gall*, 552 U.S. at 50).

## B.  The Loss Amount Recorded in the PSR Is Correct

The Probation Office determined that Hou's attempted wire fraud offense resulted in an intended loss to the City of between $10,000 and $30,000, in light of the matching funds that corresponded to the straw donations provided by W&L, Kang Kang, Super Plumbing, XYZ, and Pan.[7]  Hou challenges this calculation, arguing that she should be held responsible only for the intended loss associated with her solicitation of Thomas Wang on the eve of the July 2011 filing deadline.  (Hou Mem. 9).  Hou's argument ignores the weight of the evidence and runs counter to this Court's previous findings on the question.

As an initial matter, Hou is wrong to suggest that this Court must attempt to divine the reasoning behind the jury's guilty verdict in order to determine the appropriate loss amount. (Hou Mem. 5, 8-9).  For purposes of determining loss, the Court need only find loss by a preponderance of the evidence.  *See United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009). Indeed, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  *United States v. Watts*, 519 U.S. 148, 157 (1997).

Here, of course, the jury did not acquit Hou of attempted wire fraud; it found her guilty of that offense.[8]  Hou nevertheless urges this Court to take a crabbed view of the evidence, holding her responsible only for the Thomas Wang solicitation and not the straw donations provided by Wang, Lu, Leon, Chen, and Pan.  This Court has already held that sufficient evidence established Hou's participation in the broader straw donor scheme based in part on: (i) Hou's knowledge of "the mechanics of a straw donor scheme," (ii) the existence of illegal straw donations made by certain donors, (iii) Hou's "fail[ure] to disclose . . . the identities of fundraising intermediaries who coordinated these straw donations and submitted them to Hou," and (iv) Hou's "affirmative steps to avoid CFB scrutiny by directing campaign operatives to mimic donor handwriting when they augmented donor contribution forms."  (Sept. 10, 2013 Order 2-3).  This evidence is sufficient to establish by a preponderance of the evidence that Hou attempted to obtain matching funds by facilitating straw donations from W&L, Kang Kang, Super Plumbing, XYZ, and Pan.

Faced with this evidence, Hou repeats arguments previously rejected by the jury and this Court.  Hou contends that she never failed to disclose intermediaries because none needed to be disclosed in connection with the W&L, Kang Kang, Super Plumbing, and XYZ donations.  (Hou Mem. 5-7).  Hou claims to have relied on the advice that the Campaign's attorney, Martin Connor, provided about those donations, but the trial evidence established that she lied to Connor and withheld material information from him that rendered his advice about those donations worthless.  (Tr. 1564-71).  In point of fact, Connor testified that he told Hou that "after an event

---

[7] Even excluding the matching funds associated with the Pan contributions, the intended loss would remain greater than $10,000.

[8] Hou was found not guilty of wire fraud conspiracy.

[if] someone was delivering contributions to the campaign from nonrelatives, . . . that person's an intermediary." (Tr. 1564). The evidence established that Alex Lu did exactly that. Hou's claimed lack of knowledge about how the W&L, Kang Kang, Super Plumbing, and XYZ donations came into the Campaign's coffers rings as hollow now as it did at trial.[9]

Hou also contends that the evidence did not establish her involvement in Pan's use of straw donors, but that ignores (i) Pan's use of the code "this is Richard's event" when introducing Hou to Kong, (ii) Hou's review of the forms, captured on video, to ensure that they appeared to comply with CFB regulations, and (iii) Hou's questioning Pan about the forms, rather than Kong, as the putative host, or the straw donors themselves. In support of her argument, Hou relies on Pan's claim that he acted alone, but that was demonstrably false, as Kong, at least, was also involved. Indeed, Hou acknowledges that Pan's statements to the FBI cannot be fully credited. (Hou Mem. 7). Even if Hou is not held responsible for the intended loss associated with Pan's straw donors, Hou would nevertheless be subject to the same offense level adjustment because the intended loss would still exceed $10,000. Accordingly, Hou's challenge to the Probation Office's loss amount calculation should be rejected.

## C.     An Enhancement for Abusing a Position of Trust Is Warranted

Hou also challenges the Probation Office's decision to impose a two-level enhancement, pursuant to Section 3B1.3, for Hou's abuse of a position of trust. (Hou Mem. 11-12). In Hou's view, the adjustment is unwarranted because she "did not hold a position of trust with respect to the City" (Hou Mem. 11) and "owed duties to the Liu Campaign" only (Hou Mem. 12). Hou is mistaken. Describing the parameters of this enhancement, the Second Circuit has explained that "[w]hether someone occupies a position of trust turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and does not require a legally defined duty such as fiduciary duty [to the victim]." *United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also id.* ("[T]his standard requires that the defendant's position must involve discretionary authority and that this discretion must have been entrusted to the defendant by the victim." (internal quotation marks, brackets, and ellipses omitted)).

In the context of the City's campaign finance laws, campaign treasurers are entrusted with "discretionary authority" by the City, and the City relies on the treasurer's faithful performance of her duties when it provides City money under the matching funds program. Specifically, the regulations require that, when submitting the disclosure statements that provide the basis for awarding matching funds, "[t]he treasurer or candidate shall verify that the electronic submission is true and complete, to the best of his or her knowledge, information, and belief." CFB Rule 9-03(a). Another regulation requires that "[t]he disclosure report shall contain a verification from the elected candidate, treasurer, or other officer designated in the registration that the disclosure report is true and complete to the best of his or her knowledge,

---

[9] Hou's reliance on Adam Schafenberg's testimony is even less persuasive. (Hou Mem. 6). Rather than agree with Hou about the implications of her hypothetical scenario that bore little resemblance to the facts of this case, Schafenberg testified that he could not answer her hypothetical question, referring her to the "legal unit." (Tr. 202).

information, and belief."  CFB Rule 11-03(c)(5).  Under these regulations, the City entrusts the campaign treasurer with authority to compile, certify, and submit periodic filings that, in the normal course, will result in an award of matching funds.  Unless the CFB is able to detect fraud independently, it will rely on the treasurer's certification of the records as a basis to award funds.  Under this regulatory scheme, the City entrusts campaign treasurers with "freedom to commit a difficult-to-detect wrong" and "discretionary authority" that when abused, as here, results in financial harm to the victim.  *Thorn*, 317 F.3d at 120.  Under the circumstances an enhancement under Section 3B1.3 is warranted.

## D.     A Sophisticated Means Enhancement Is Warranted

Hou's offense level should be increased by an additional two levels pursuant to Section 2B1.1(b)(10)(C) because her offense involved sophisticated means.  The Probation Office declined to impose this enhancement because, in its view, the offense was not "especially complex or especially intricate," and did not "utilize[e] methods of concealment comparable to the examples provided" in the Application Notes to the Guidelines.  (PSR ¶ 85).  Hou agrees with the Probation Office's position, arguing that the offense conduct was "incredibly simplistic" and in any event, Hou's role was limited to soliciting Thomas Wang.[10]  (Hou Mem. 12-13).

This analysis is flawed.  Pursuant to Section 2B1.1(b)(10)(C), a two-level enhancement is warranted where the offense "involved sophisticated means."  The commentary to that provision of the Guidelines defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of that offense."  U.S.S.G. § 2B1.1 cmt. n. 8(B).  The commentary also makes clear that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . ordinarily indicates sophisticated means."  *Id.*  The Second Circuit has recognized that the enhancement "targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine [criminal offense of the same variety]."  *United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir. 1996).  The Second Circuit has also recognized that "even if each step in [a] scheme was not elaborate," the sophisticated means enhancement nevertheless applies where "the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way."  *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).

Hou's offense conduct involved the kind of complexity and sophistication that warrants an enhancement under Section 2B1.1(b)(10)(C).  Based on her knowledge of CFB regulations and practices, Hou concealed the use of straw donations to obtain matching funds by ensuring that campaign staff, volunteers, and bundlers maintained the appearance of compliance and regularity in the forms and records they prepared.  She instructed them to forge handwriting and concealed the involvement of individuals who bankrolled the straw donors in an effort to reduce the odds that the CFB would detect the wrongdoing.  Her efforts to ensure that the straw donor scheme was not detected were "more complex," involved "greater intricacy," and

---

[10] Hou's argument that she knew nothing about the straw donations provided by Wang, Lu, Leon, Chen, and Pan should be rejected for the reasons provided in the previous section.

"demonstrate[ed] greater planning than a routine" wire fraud offense. *United States v. Lewis*, 93 F.3d at 1080.

Moreover, the straw donor scheme itself was complex. This was not the run-of-the-mill benefits fraud case where applicants fraudulently obtain government benefits by filling out a form falsely, submitting it, and hoping nobody catches the lies. Rather, it entailed recruiting scores of straw donors, determining whether they were eligible to contribute, paying them cash, having them write checks that would not raise flags, and coaching them to make sure they would provide false answers if questioned about their donations. The Second Circuit has upheld the application of the sophisticated means enhancement in cases involving schemes of comparable if not less complexity. *See, e.g., United States v. Yager*, 209 Fed. Appx. 48, 49 (2d Cir. 2006) (summary order) (affirming sophisticated means enhancement where defendant's scheme— selling fraudulent art on online—involved "the use of false names, or the names of his accomplice's unwitting relatives, mail forwarding services, and a voice modulation device"); *United States v. Amico*, 416 F.3d 163, 169-70 (2d Cir. 2005) (affirming sophisticated means enhancement where loan fraud scheme involved submission of fraudulent loan documents, creation of false bank documents, solicitation and creation of false appraisals, and false blueprints).

Even if certain individual steps in the scheme, standing alone, were not especially complex, the straw donor scheme, as a whole, nevertheless warrants the sophisticated means enhancement. The Second Circuit has repeatedly upheld the application of the enhancement even where the individual steps in a scheme were not especially intricate, if the scheme as a whole involved a complex plan with numerous steps. *United States v. Jackson*, 346 F.3d at 25 (rejecting defendant's argument in credit card fraud case that sophisticated means enhancement does not apply because "the specific acts of his criminal activity . . . were each individually no more intricate than 'a game of Three-Card Monte,'" because "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way"); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir.1996) (holding, in tax case, that sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return"). When viewed together, the numerous steps taken to ensure the success of the scheme—such as the recruitment and reimbursement of numerous straw donors, the collection of fraudulent contribution forms, the organization of the fundraising dinners, the use of code words, and the coaching of straw donors to lie—all comprise a complex plan that justifies the enhancement.

Further still, the goal of the scheme was to create the appearance of numerous legitimate donations (several of which would be eligible for matching funds) that were less than the maximum legal individual contribution, and to hide from the authorities the true source of what was actually a single large donation. Hou was particularly involved in this aspect of the scheme. The Guidelines commentary makes clear that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n. 8(B). Here, the scheme relied on straw donors, instead of fictitious corporate entities, to hide the true source of campaign donations. But that distinction does not change the fundamental nature of the conduct, which was the use of elaborate means (in this case, numerous

straw donors recruited), to conceal the nature of criminal financial transactions.  Such conduct warrants the sophisticated means enhancement.  *See, e.g.*, *United States* v. *Amico*, 416 F.3d at 170 (affirming sophisticated means enhancement where "sophisticated means were being used to conceal the scheme," such as the "selection of certain loan documentation to reduce the likelihood that lenders would obtain from the Internal Revenue Service copies of the borrowers' tax returns and thereby discover the fraud").

Because Hou's conduct involved a complex and intricate scheme, because it involved greater planning than a routine wire fraud offense, and because her conduct involved hiding the nature of financial transactions using straw donors, Hou's conduct warrants a two-level enhancement for the use of sophisticated means pursuant to Section 2B1.1(b)(1)(C).

Incorporating this enhancement into the calculation set forth in the PSR results in an adjusted offense level of 17 and a Guidelines range of 24 to 30 months' imprisonment.

**E.     A Sentence within the Guidelines Range Is Appropriate**

A sentence within the advisory Guidelines range of 24 to 30 months' imprisonment is reasonable and appropriate in this case principally due to the nature and circumstances of the offense, the need to promote respect for the law, and the need for adequate deterrence to criminal conduct.

Starting with "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), Hou played a key role in an elaborate scheme to funnel dozens of illegal contributions into the Campaign. As set forth above, Hou coordinated and concealed the use of straw donations to defraud the City of matching funds and thereby undermined the integrity of an election.  She abused her position of trust with the City as a campaign treasurer by submitting false filings in an effort to obtain matching funds, and she used her knowledge of CFB regulations and practices to coach Campaign staff and volunteers on creating a paper trail that would not alert regulators to the fraud.  On top of that, she lied to federal investigators and withheld documents from a grand jury in order to cover up this misconduct.  Hou's offense conduct undermined the City's campaign finance regime—the goal of which is to ensure fair, clean elections—and flouted a federal criminal investigation.  Such offenses strike at the core of our system of government.

The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct" also all weigh in favor of a Guidelines sentence.  18 U.S.C. § 3553(a)(2).  Contrary to Hou's sentencing arguments, this was far from a one-time lapse in judgment or the result of youthful inexperience.  At various critical points during the offense conduct, Hou made a choice to continue to offend.  She decided to coach Campaign staffers on how to forge CFB forms; she decided to withhold facts from the Campaign's attorney that would have forced her to disclose the deep-pocketed businessmen bankrolling the straw donors; she decided to solicit a straw donor, knowing that it was unlawful to do so; she decided to submit false matching-fund claims to the CFB; she decided to lie repeatedly to FBI agents; and she decided to withhold incriminating documents from the grand jury.  Perhaps one or two of these decisions might amount to a lapse in judgment.  Taken together, however, they constitute a pattern of intentional criminality, and they provide support for the public's increasing cynicism toward the electoral process and the candidates within it.

In light of this pattern, Hou gets it exactly backward when she argues that there is "no basis to imagine" that incarceration is necessary to promote respect for the law and general deterrence. (Hou Mem. 13). Contrary to that claim, Hou's attempts to deceive the CFB, the grand jury, and the FBI provide a robust basis to conclude that a Guidelines sentence is appropriate.[11]  Hou's repeated and deliberate use of deception, combined with her participation in the straw donor scheme, and her abuse of her position as a campaign treasurer, demonstrate that a Guidelines sentence is appropriate to promote respect for the law and provide adequate deterrence.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to a sentence within the Guidelines range of 24 to 30 months' imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
BRIAN A. JACOBS / JUSTIN ANDERSON
Assistant United States Attorneys
(212) 637-2512 / -1035

cc:    Gerald Lefcourt, Esq., Sheryl Reich, Esq., and Renato Stabile, Esq. (by ECF and email)
       U.S. Probation Officer Emily Frankelis (by email)

---

[11] Hou's sentencing letter itself suggests yet another way Hou was deceptive in connection with the offense. In her submission, Hou quotes Martin Connor's observation that "[t]here were many occasions where [Hou] called me about contributions being delivered that she thought were not as they appeared. I confirmed her instincts and she rejected those donations. . . . [N]o one ever heard about her diligence in trying to avoid unlawful contributions." (Hou Mem. 19). Certainly the FBI agents investigating this matter never heard about Hou's rejection of unlawful contributions. That is because she told them, during her first interview, that since she had been treasurer, there had not been any contribution or contributor that made her feel uncomfortable or raised any suspicions. (PSR ¶ 63). Hou's efforts to mislead the agents on this matter are of a piece with the rest of her offense conduct.